

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

UNITED STATES OF AMERICA          )
                                  )          Criminal Action
VS.                               )          No:  15-0240
                                  )
MICHAEL A. LORD (01)              )
RANDALL B. LORD (02)              )
_____

SENTENCING VOLUME I
OFFICIAL TRANSCRIPT OF PROCEEDINGS
ON MAY 23, 2017, AT 2:00 P.M.
BEFORE THE HONORABLE S. MAURICE HICKS, JR.,
UNITED STATES DISTRICT JUDGE,
IN SHREVEPORT, LOUISIANA

**FOR THE GOVERNMENT:**
      AUSA Cytheria Jernigan
      U.S. Attorney's Office
      300 Fannin Street, Suite 3201
      Shreveport, Louisiana  71101-3068

**FOR THE DEFENDANTS:**
      Mr. Paul J. Carmouche
      Barham Warner Stroud Carmouche, L.L.C.
      920 Pierremont Road, Suite 412
      Shreveport, Louisiana  71106

Produced by mechanical stenography, transcript produced by computer.

**MARIE M. RUNYON, RMR, CRR**
FEDERAL OFFICIAL COURT REPORTER
300 FANNIN STREET, ROOM 4212
SHREVEPORT, LOUISIANA  71101
(318) 934-4756

1     (Court called to order with the defendants

2     present at 2:08 p.m.)

3          THE COURT:  Thank you.  Court will come to order.

4  Please be seated.

5     All right.  This afternoon's docket consists of a

6  combined sentencing hearing in the matter of United States of

7  America vs. Michael A. Lord and United States of America

8  vs. Randall Lord.

9     We start in this -- Ms. Jernigan, you are counsel for the

10  Government; am I correct?

11          MS. JERNIGAN:  Yes, Your Honor.

12          THE COURT:  And, Mr. Carmouche, you are retained

13  counsel for both defendants?

14          MR. CARMOUCHE:  Both defendants, Your Honor, that's

15  correct.

16          THE COURT:  All right.  We have a set of objections

17  that we will deal with in due course.

18     The Court states that the matter involving Defendant

19  Randall B. Lord is -- well, we're here because of the entry of

20  a guilty plea to Count 1, conspiracy to operate an unlicensed

21  money servicing business.  And in that particular instance, we

22  have a calculated offense level of 21, a criminal history

23  category of Roman numeral I.

24     Would you agree that that is our starting point here,

25  Mr. Carmouche?

1              MR. CARMOUCHE:  That's correct, Your Honor.

2              THE COURT:  And with respect to Mr. Michael A. Lord,

3    we have a presentence report filed in that matter as well.

4    We're here in Michael Lord's case as a result of the entry of a

5    guilty plea to Count 1, conspiracy to operate an unlicensed

6    money servicing business; and Count 15, drug conspiracy.  His

7    calculated offense level is 25, with a criminal history

8    category of I as well.

9         The Court notes that under Michael Lord's statutory

10   scheme, as to Count 1, there is a not-more-than-5-years; and as

11   to Count 15, there is a not-more-than-5-years.  We have a

12   guideline range suggested on Michael Lord of 57 to 71 months.

13   And the issue of whether that's concurrent or consecutive will

14   be discussed, since it's not more than 5 years per count.

15        As to Mr. Randall Lord, the recommended guideline range

16   is 37 to 46 months, with a statutory maximum of 5 years on that

17   as well.

18        Let's see.  Let's get to a notation on the record that

19   the Court has previously considered motions to withdraw guilty

20   pleas on behalf of both defendants, which were denied, and

21   forming part of the objections to be considered today are -- or

22   kind of coordinated with -- portions of the respective motions

23   to withdraw guilty pleas, that basically having to do with the

24   absence of a licensing organization or structure within the

25   state of Louisiana for a money servicing business.

1    As I understand it, with one exception, the objections

2  for both defendants on the conspiracy to operate an unlicensed

3  money servicing business are the same for both defendants, but

4  only with that one exception, I believe.  Am I correct on that?

5  They largely track one another except in one instance; am I

6  correct?

7            MR. CARMOUCHE:  That's correct, Your Honor.

8            THE COURT:  All right.  And the Court, at the outset,

9  notes that the Government now concedes that the State of

10  Louisiana does not require a license to operate a bitcoin

11  exchange business, but that the federal government does and has

12  and did at the time of the indictment and at the time of the

13  entry of the guilty pleas.

14    To the extent that the objection pertains to the state

15  licensure requirement under Section 1(A) of the statute, those

16  objections appear to be moot given the Government's concession.

17  Would you agree with that, Mr. Carmouche?

18            MR. CARMOUCHE:  Yes, we agree.  But did I understand

19  Your Honor just to say that the Government, federal government,

20  has a licensing (inaudible)?

21        (Court Reporter asks for a repeat.)

22            MR. CARMOUCHE:  A licensing -- I started to say --

23            THE COURT:  Well, the registration requirement with

24  FinCEN, which probably we will hear evidence on about the

25  timing and circumstances of registration by the defendants at a

1    point after they were indicted.  Am I correct on that,
2    Ms. Jernigan?
3                MS. JERNIGAN:  Yes, sir.
4                THE COURT:  Isn't that correct?  Are we going to hear
5    evidence on that?
6                MS. JERNIGAN:  Yes, we're prepared to present
7    evidence on that.
8                THE COURT:  I kind of expected that, because the
9    dates and times appear to be -- it goes to the "knowingly"
10   aspect of things, and it also goes to the fact of the
11   regulations in 2013 that were put into effect that affect the
12   time period of the operation of either an MSB, money servicing
13   business, or a money transmitter or money transmitting
14   business, if you will.  So we'll -- I think we'll have to
15   probably hear evidence on those points during the course of
16   this.
17          But I wanted to make sure that because the Government
18   concedes that the State of Louisiana does not require a license
19   to operate a bitcoin exchange business, those objections are
20   moot.  And the second part is that whether or not the State of
21   Louisiana having or not having a licensing requirement and
22   licensing group for bitcoin exchange business operations does
23   not add to or detract from calculation of the sentencing
24   guideline ranges.
25          Boy, that's a mouthful to say, but basically that's how I

1    looked at this and understand it.  Would you concur with that,

2    Mr. Carmouche?  I'll ask you first.

3              MR. CARMOUCHE:  Somewhat.  The defendants were

4    accused and indicted for failure to -- or to act as a money

5    transmitter, money service business, without a license from the

6    State of Louisiana; so we think that the fact that the state of

7    Louisiana has no license and you couldn't get one if you wanted

8    to, then I think our objection should be not moot, but should

9    be sustained, and that the charge perhaps even shouldn't be

10   allowed to go forward.

11             THE COURT:  Ms. Jernigan?

12             MS. JERNIGAN:  Your Honor, the conspiracy count

13   against the two defendants contained in Count 1 of the

14   indictment alleged multiple ways in which they violated the

15   requirements to be registered and licensed.  One was to be

16   licensed by the State of Louisiana, but the first was that they

17   be registered with FinCEN.

18        There are specific allegations in the indictment that

19   indicated that money service businesses that dealt in virtual

20   currency such as bitcoin, which is what these defendants dealt

21   in, were covered by the FinCEN registration requirements as of

22   2013.  And so there were two ways in which the defendants could

23   be held criminally responsible for violating a conspiracy to

24   operate an unlicensed MSB.

25        And "unlicensed" is just a term of art referencing both

1    the state licensing requirement or a registration requirement

2    federally.

3          And so, as you indicated, we did concede based on the new

4    information provided by Counsel regarding the state licensing

5    requirement that would no longer be a viable option to

6    prosecute were this case to proceed to trial, but the evidence

7    would still support a violation for these same charges given

8    that they were not in fact registered with FinCEN for a

9    significant portion of the time the businesses operated.

10          THE COURT:  And I guess that's the distinction

11   between the objections being moot versus being sustained given

12   the Government's concession based on the new information that

13   the State of Louisiana had no licensing mechanism available for

14   the defendants to register their bitcoin exchange business

15   with.

16          I'm reminded:  Don't ever end a sentence with a

17   preposition.  Nonetheless, I'm also reminded of Churchill's

18   reply to that:  That is the kind of nonsense up with which I

19   will not put.

20          So the impossibility of what I'll call the "1-A

21   methodology of violating the statute," that is, registering

22   with the State of Louisiana as a money servicing business

23   involving bitcoin exchange as a business, renders it impossible

24   to use that method of violating in assessing any penalty.

25          Is that a fair statement, Ms. Jernigan?

1    MS. JERNIGAN:  Yes, Your Honor.

2    THE COURT:  And I don't see anywhere that there is a

3    difference in the calculation of the guideline ranges with

4    respect to how many different ways you could have violated the

5    registration requirements.  If Louisiana had a registration

6    system and they failed to register, it wouldn't change the

7    guidelines on this.

8    MS. JERNIGAN:  With -- well, what I would say to

9    that, Your Honor, is:  Based on the new -- let me back up.

10    The initial total amount of funds involved in the

11    unlicensed MSB included all of the monetary transactions that

12    went into and out of the various bank accounts that the

13    defendants' businesses had:  Pelican Mining, Crypto Currency

14    [sic], Data Secure [sic], and the others.

15    In light of the fact that the State of Louisiana has

16    decided not to regulate this particular type of MSB, we then

17    refined our analysis to focus on just the period when they were

18    no longer operating outside of FinCEN's registration

19    requirement.  And so the result of that was instead of being

20    over $3.5 million, it was $2.6 million.  So it brought it down

21    two levels --

22    THE COURT:  And that's that two-level --

23    MS. JERNIGAN:  Two levels.

24    THE COURT:  -- deal that we'll talk about at the

25    appropriate time.

1    In that particular instance, we still have the interval

2  of time between conducting operations without being registered

3  with FinCEN and the period of time upon registration with

4  FinCEN; and, as I understand it, a potential statement that may

5  have been materially false to someone who was a broker of

6  bitcoin saying, "Yes, we are registered, we have the

7  paperwork," when in fact they did not and it took two full

8  months or so afterwards to register with FinCEN.

9    MS. JERNIGAN:  That's correct, Your Honor.

10    THE COURT:  And that certainly goes to the

11  "knowingly" element involved in this thing as well from what I

12  can see trying to put this complex series of transactions and

13  the relative violations in perspective.

14    MS. JERNIGAN:  Yes, Your Honor.

15    THE COURT:  And in connection with that, then, with

16  the additional concession, if you will, dropping the

17  $3.5 million figure to a $2.6 million figure, there is a minus

18  2 in the calculation that is conceded by the Government; am I

19  correct?

20    MS. JERNIGAN:  Yes, Your Honor.

21    THE COURT:  All right.  Mr. Carmouche, do you concur

22  in that?

23    MR. CARMOUCHE:  It's pretty complicated, Your Honor.

24  Just one more correction.  There are some emails that were

25  attached by the Government that came from my client -- my

1    clients -- where they were emailing one another back and forth

2    about registering with FinCEN, and there was a statement made

3    by Randall Lord to Michael by email where he said, "I thought I

4    had registered."  He apparently forgot to press "submit."  Then

5    he found out later that he didn't do that.  He then went back

6    through the process and registered.

7          So, you know, whether that's evidence or not, but we just

8    wanted that out and that -- because the defendants don't feel

9    like they knowingly gave a falsehood to the FinCEN people.

10               THE COURT:  And that may get to a credibility call --

11               MR. CARMOUCHE:  Yes, sir.

12               THE COURT:  -- on that, and it's a preponderance of

13   the evidence issue in this particular matter.

14         The Court's already ruled that the withdrawal of the

15   guilty pleas is not going to take place; so I don't want to

16   hear any more evidence or argument on that point.  I've already

17   ruled on that, so we'll go forward from there.

18         But, A, there is no state licensing requirement.  That's

19   established.  Number 2, with the Government's concession on the

20   reduction of the $3.5 million figure to the roughly

21   $2.6 million figure, there is a minus 2.

22         We will address in due course issues concerning the

23   acceptance of responsibility calculations and whether the

24   minus 3 is appropriate under one or both or either of the

25   defendants, and we'll get to that as we proceed through it.

1    I'm going to withhold issues and objections pertaining to

2  Michael Lord's objections insofar as the drug conspiracy issue

3  is concerned until after we have disposed of the functionally

4  twin objections of the defendants on the money servicing

5  business issue that we need to take up first.  Okay?

6    All right.  Having used that as a starting point -- and

7  I'll state for the record, since there is no violation of state

8  law or federal law for failing to register with the State,

9  since the state in which they lived did not provide

10 registration requirements, the Court notes that the other LLCs

11 and so forth and other businesses were formed in other

12 states -- like Nevada, like Texas -- and we really don't

13 address operations with respect to those LLCs in those states

14 and the licensing requirements that may or may not exist.

15    Is that accurate, Ms. Jernigan?

16    MS. JERNIGAN:  That's accurate, Your Honor.

17    THE COURT:  All right.  I just want to make sure our

18 playing fields are on the same fields, literally within the

19 same ballpark on that.

20    In this instance, the first objection to be addressed is

21 on Michael Lord paragraph 3 and as to Randall Lord paragraph 2,

22 which are essentially the same objection, that is, that Michael

23 Lord and Randall Lord contend that each of them did not, quote,

24 "unlawfully, willfully, and knowingly combine, conspire,

25 confederate, and agree with his co-defendant to commit an

1    offense against the U.S. to conduct, control, manage,

2    supervise, direct, and own all or part of an unlicensed money

3    transmitting business."

4        Both maintain that they were unaware that the State of

5    Louisiana required a license for the bitcoin business.  It's

6    obvious from the entry of the guilty plea that no such inquiry

7    was ever made before commencement of the bitcoin business,

8    since if the inquiry had been made, they would have found that

9    there was no registration or licensing system operated by the

10   State of Louisiana.

11       Therefore, this Court finds that the objection should be

12   mooted, since even though a guilty plea was entered with those

13   methodologies -- one being the state licensing, the other being

14   the federal licensing requirement -- that the calculations

15   under the guidelines does not hinge, except with respect to the

16   money handled, on whether there was state registration, federal

17   regulation, either/or, or both.

18       To the extent that the defendant requests that the charge

19   cannot proceed, the Court simply notes that the methodology of

20   violation, based on the Government's concession, was not used

21   in assessing either criminal history or calculation points,

22   with the exception of $3.5 million reduced to the $2.6 million.

23       To the extent that the objection requires this Court, if

24   under further review, to overrule those objections, those

25   objections are hereby overruled.  No changes to the presentence

 1 | report are warranted.

 2 | The only remaining aspect of that goes to the "knowingly"

 3 | issue, Ms. Jernigan.  Do you wish to -- since that coordinates

 4 | with other objections, do you want to address the "knowingly"

 5 | issue at this point?  Or do you want to wait till we're further

 6 | down --

 7 | MS. JERNIGAN:  I think it might be --

 8 | THE COURT:  -- into the other objections?

 9 | MS. JERNIGAN:  Yes, Your Honor, the latter option.

10 | THE COURT:  All right.

11 | The Court also notes that under U.S. Sentencing

12 | Guidelines Section 3E1.1, under Commentary, Application

13 | Note 1 -- and this applies with respect to both objections and

14 | both defendants -- it is stated that the defendant -- a

15 | defendant should not falsely deny any additional relevant

16 | conduct.  A defendant may remain silent, but should not falsely

17 | deny or frivolously contest relevant conduct.

18 | That's simply as a foreshadowing for what we're going to

19 | get into, I think, with other objections.

20 | The next objection that is filed happens to be to

21 | paragraph 4 of both Randall Lord and Michael Lord's objection.

22 | Fairly stated, both defendants contend that they had no way of

23 | knowing whether the reported bitcoin transactions in the amount

24 | of $14,000 and $19,000 originated from the sale of legal or

25 | illegal steroids, a controlled substance.

1          The Court notes that this objection also relates not only

2     to paragraph 4, but also to paragraph 42 -- which is the same

3     number, I think, in both PSRs -- which contains a two-point

4     increase for the specific offense characteristic if the offense

5     involved funds that were represented as being proceeds from the

6     distribution of controlled substances.

7          The objection could possibly impact the guideline

8     calculation and does require a ruling by the Court.

9          The presentence report indicates that, as reported by the

10    case agents, on or about February 4, 2015, and February 24,

11    2015, Michael Lord knowingly conducted exchanges of $14,000 and

12    $19,000 in U.S. currency for bitcoins.  During the

13    transactions, the undercover agent represented that the funds

14    used in each exchange were proceeds from the sale of illegal

15    steroids.

16         Thus, the PSR appears to be properly completed on that

17    basis, with the resulting guideline range being correct based

18    on the evidence.

19         In this instance, I'm not sure, Mr. Carmouche -- and I

20    want to hear your reply to this -- that under U.S. Sentencing

21    Guidelines Section 2S1.3(b)(1), and I'll quote subparagraph 1,

22    "If, A, the defendant knew or believed that the proceeds" --

23    "that the funds were proceeds of unlawful activity or were

24    intended to promote unlawful activity; or, B, the offense

25    involved bulk cash smuggling, increase by two levels."  That's

1    really what we're talking about here.

2         Did I summarize that correctly from the Government's

3    viewpoint as to where the defendants and the Government stand

4    on that?

5              MS. JERNIGAN:  I believe so, Your Honor.

6              THE COURT:  Mr. Carmouche, is that a fair summary of

7    where we start before I hear from the lawyers individually?

8              MR. CARMOUCHE:  Yes, Your Honor.

9              THE COURT:  Okay.  Mr. Carmouche, you want to address

10   that further, since it's your objection?

11             MR. CARMOUCHE:  Your Honor, we did put that in.  My

12   clients and I discussed this when we drew up our objections to

13   the presentence report and went back over and read the

14   transcript of that transaction, and there was a point in the

15   transaction where the undercover agent mentioned illegal

16   steroids.  We thought that was not in there.  My clients said

17   they were busy doing other things while that was going on.

18   They never remembered him saying that.  But, in any event, it

19   is in the transcript, so we're --

20             THE COURT:  You want to withdraw that objection?

21             MR. CARMOUCHE:  We withdraw that objection.

22             THE COURT:  All right.  That objection is withdrawn.

23        And, Mr. Michael Lord, do you concur with that?

24             DEFENDANT MICHAEL LORD:  To withdraw?

25             THE COURT:  To withdrawing that objection.

1    DEFENDANT MICHAEL LORD:  Yeah.

2    THE COURT:  And, Mr. Randall Lord, likewise?

3    DEFENDANT RANDALL LORD:  Yes, sir.

4    THE COURT:  Very well.

5        The next objection really has to do with paragraph 5 of

6    the presentence report of Michael Lord, and that is the

7    statement in the objection that -- or the argument is that

8    Michael Lord argues that he and not his father, Randall Lord,

9    failed to file a currency transaction report for the $14,000

10   and $19,000 transactions that are referenced in paragraph 4.

11       In this particular instance, the Court notes that this

12   objection does not impact the sentencing guidelines.

13       The presentence report appears to the Court to be

14   properly completed and correctly cites the indictment, but I

15   don't know where else we go from here on that point.

16   Mr. Carmouche, can you help me out on that?

17          MR. CARMOUCHE:  I'm not sure I followed that

18   completely, Your Honor.  In our objections, the defense

19   objections, No. 5?

20          THE COURT:  To paragraph 5 in Michael Lord's PSR, not

21   in Randall's.

22          MS. JERNIGAN:  Page 3.  He's on the third objection

23   on page 3.

24       (Off-the-record discussion between counsel.)

25          THE COURT:  And this is one of the differences,

 1    really, between the two reports and objections filed to the

 2    report.

 3              MR. CARMOUCHE:  I must have a different . . .

 4          It's Objection No. 5, or is it --

 5              THE COURT:  No.  It's to paragraph 5.  I'm sorry.  I

 6    have them identified by paragraph numbers as opposed to

 7    objection number.

 8              MS. JERNIGAN:  No. 3.

 9              THE COURT:  It's Objection No. 3, but it pertains to

10    paragraph 5.  Did I state that correctly?  I hope I did.

11              MS. JERNIGAN:  Yes, Your Honor.

12              THE COURT:  Thank you.

13          And that's why I refer to it by paragraphs in the PSR.

14    That's the only way I could try to keep them separate.

15              MR. CARMOUCHE:  I've got Objection No. 3, but

16    paragraph 11.  I'm not sure . . .

17              THE COURT:  Would you get together with Ms. Jernigan

18    real quick and see if we're dealing with the same document.

19          (Off-the-record discussion between counsel.)

20              THE COURT:  The way it's listed in the objection,

21    it's listed as an "Objection/Clarification:."  There's an

22    introductory paragraph, then there's "3.  Page 4, paragraph 5."

23              MS. JERNIGAN:  Your Honor, I think we understand.

24    Mr. Carmouche, I believe, is looking off of Mr. Lord Sr.'s set

25    of objections, and the third one references paragraph 11.  And

1   I believe Your Honor is working from Michael Lord's objections

2   from Mr. Carmouche.

3           THE COURT:  Yep.  We're going to have a quick copy

4   made so we're literally on the same page, Mr. Carmouche.

5       (Clerk exits courtroom.)

6           MR. CARMOUCHE:  Thank you, Your Honor.

7        I have it now.

8           THE COURT:  We'll wait till Denise makes a copy and

9   comes back.  And we may place it in the record with a red

10  circle around it to be sure that we're literally on the same

11  page.

12      (Clerk returns to courtroom and hands document

13      to Defense Counsel.)

14          THE COURT:  All right.  Mr. Carmouche, you have it

15  there?  We're ready to proceed?

16          MR. CARMOUCHE:  Yes, Your Honor.

17          THE COURT:  No need for me to re-summarize this, but

18  tell me what else needs to be included on that.  I don't see

19  that that's a major problem, but it does appear to the Court

20  that the PSR was properly completed and dovetails with the

21  indictment to which these defendants pled guilty.

22          Now, tell me where we go from here on that objection.  Is

23  there anything further that I need to know?  Or any further

24  argument to be made, I guess is what I'm asking.

25          MR. CARMOUCHE:  No, Your Honor.  I'm sure I listed --

1   I did list the arguments that we wanted to make.

2          THE COURT:  All right.  Ms. Jernigan, do you have

3   anything further to add on this particular point?

4          MS. JERNIGAN:  Your Honor, to the extent that there

5   are a series of objections that endeavor to separate out

6   Randall Lord from Michael Lord, we think that those are not

7   properly founded objections.

8          These defendants both participated actively in the

9   unlicensed MSB -- to varying degrees, but, certainly, I don't

10   think it can be disputed that Randall Lord actively

11   participated in that based on the documents, based on his

12   presence in each of the undercover face-to-face meetings where

13   cash greater than $10,000 was provided.  They each served a

14   role:  the opening of business accounts, bank accounts.

15          So there's more than a factual basis to support the

16   assertion in the PSI that Randall Lord did knowingly and

17   willfully fail to file CTRs required in transactions over

18   $10,000.

19          THE COURT:  It does appear to the Court that because

20   both pled guilty to Count 1, conspiracy to operate an

21   unlicensed money servicing business -- with "conspiracy" being

22   a sort of partnership in crime where every person involved in

23   the conspiracy, not necessarily knowing what the other person's

24   doing, becomes the agent of every other member so that any act

25   taken by or undertaken by one member of the conspiracy is

1    fairly attributable to other members of the conspiracy.

2          Have I stated that correctly under the law in paraphrase

3    form, Ms. Jernigan?

4                MS. JERNIGAN:  Yes, Your Honor.

5                THE COURT:  Mr. Carmouche?

6                MR. CARMOUCHE:  You did, Your Honor.

7                THE COURT:  That's the problem.

8          To the extent that this Court notes that the guilty plea

9    was entered to conspiracy to operate an unlicensed money

10   servicing business, in this instance, Michael Lord's objection

11   to paragraph 5 of the presentence report is hereby overruled.

12         The Court notes that there is no change warranted to the

13   PSR under this ruling, and we will proceed to the next

14   objection.

15         In terms -- and I'm trying to do this numerically by

16   presentence report, Mr. Carmouche.  With respect to Randall

17   Lord -- if you would pull that set of objections out.

18         The next one I have is to paragraph 11 of the presentence

19   report of Randall Lord, and the argument there is that Randall

20   Lord did not exercise any control, whether directly or

21   indirectly, of the business of buying or selling bitcoins, nor

22   is there any property owned by him which was derived from the

23   bitcoin business.

24         That, I think, probably goes to the same problem that we

25   just covered with respect to the two defendants pleading guilty

1    to a conspiracy to operate an unlicensed money service

2    business.

3         And I -- Ms. Jernigan, do you concur with that analysis?

4    Again, whatever one person does as part of the conspiracy is

5    fairly attributable to the other as kind of a partnership in

6    crime where each member of the conspiracy becomes the agent of

7    every other member of the conspiracy?

8         MS. JERNIGAN:  I do, Your Honor.  And, in addition,

9    the forfeiture notice that's contained in the indictment to

10   which the defendants agreed as a part of their plea agreement

11   is not based on the funds generated from the bitcoin business

12   being used to purchase property, it's "involved in" as the

13   mechanism for forfeiture.

14        THE COURT:  It's intrinsic to the crime?

15        MS. JERNIGAN:  Yes, Your Honor.

16        THE COURT:  As opposed to extrinsically purchased

17   property as a result of ill-gotten gains?

18        MS. JERNIGAN:  Yes, Your Honor.

19        THE COURT:  Okay.  I'm trying to put it in words I

20   think I understand as best I can.

21        Mr. Carmouche, let me hear from you, sir.

22        MR. CARMOUCHE:  Our argument, I guess, is that all of

23   the property owned by Mr. Lord had been purchased long before

24   any of this bitcoin business started, had no connection to

25   money that was derived from bitcoin sales; and that just based

1   on that, it wasn't anything that he got from bitcoin sales.

2          THE COURT:  In this particular instance, the

3   objection to paragraph 11 of Randall Lord's presentence report

4   does not impact the calculation of the sentencing guidelines.

5          The Court has researched the matter and finds that the

6   presentence report was properly completed and correctly cites

7   Section E of the signed Plea Agreement which was filed into the

8   record of these proceedings at the time of the entry of the

9   guilty plea.  No changes to the PSR are warranted.

10          In this particular instance, to the extent that a ruling

11   is necessary, the objection is hereby overruled.

12          Again, proceeding in numeric order, the next objection

13   that I have is paragraph 15 as to Randall Lord's set of

14   objections.  Basically, in summary, Randall Lord contends that

15   while he assisted his son in setting up the bitcoin business,

16   he never actually operated the exchange business, nor did he

17   profit from it.

18          It's possible that this objection could impact the

19   sentencing guidelines, and the issue becomes the source of the

20   information in the presentence report.  Mr. Carmouche, you want

21   to address that in a little bit greater detail?

22          Because we have the signed Plea Agreement that's in the

23   record as part of the plea hearing in this matter, and as I

24   reviewed this, it appears that Mr. Lord's contentions with

25   respect to paragraph 15 appear to contradict his obligations

1  outlined in the signed Plea Agreement.  And if they do, then we

2  for the first time raise the issue about acceptance of

3  responsibility if there is a true contradiction there.

4         So I'm -- that's kind of where I am right now.  Do you

5  want a moment to discuss that with your client?

6         And it may actually be easier at this point,

7  Ms. Jernigan, if I let you make statements that then

8  Mr. Carmouche could address.  Since I have, I think, correctly

9  summarized where we are, I probably need to hear from the

10  Government on this point.

11         And I guess what I'm really asking is whether now that

12  the objection has been raised and summarized, does the

13  Government wish to offer any testimony, or is it simply a

14  matter of reference in the record for a legal conclusion and

15  factual conclusion to be made by the Court under the Plea

16  Agreement versus the objection?

17         MS. JERNIGAN:  Your Honor, we have testimony and

18  exhibits that we're prepared to provide in support of the

19  factual findings in the PSI report.

20         THE COURT:  Why don't we do that, then?  And,

21  Mr. Carmouche, you can cross-examine the witness on that and

22  then make closing statements at the end of the presentation by

23  the Government.

24         You may call your witness.

25         MS. JERNIGAN:  The Government calls Agent Heusel.

1       (Witness sworn.)

2           THE COURT:  And I wasn't trying to cut you off,

3    Mr. Carmouche.  I'm just trying to figure out the best way of

4    approaching this, and I think this may cure the process and

5    protect the procedure.

6       Go ahead.

7           MS. JERNIGAN:  Thank you, Your Honor.

8                        DIRECT EXAMINATION

9    BY MS. JERNIGAN:

10   Q.   Would you please state your name for the record and spell

11   your last name.

12   A.   Darrin Heusel, H-e-u-s-e-l.

13   Q.   What do you do for a living?

14   A.   I'm a special agent with IRS Criminal Investigations

15   Division.

16   Q.   Agent Heusel, were you involved in the investigation

17   involving the defendants appearing before the Court this

18   afternoon, Randall Lord and Michael Lord?

19   A.   Yes, I was.

20   Q.   And did the investigation related to their money

21   transmission activities involve the use of undercover and

22   surveillance techniques?

23   A.   Yes, it did.

24   Q.   And could you explain to the Court the time frame

25   associated with the use of an undercover agent.

1    A.    Well, we had -- we had several meetings.  The first

2    meeting was in, I believe, November of 2013.  And then we had a

3    series of other recorded and monitored meetings between an

4    undercover agent and Mr. Lord.

5    Q.    And how many total interactions were involved with the

6    Lords and the undercover?

7    A.    I believe four total interactions.

8    Q.    Okay.  One in November of 2015?

9    A.    Yes.

10    Q.    One in December of 2015?

11    A.    (No response.)

12    Q.    Is that correct?

13    A.    '15, yes.

14    Q.    I'm sorry.  '14.

15    A.    It's '14.

16    Q.    And then two in February of 2015?

17    A.    Correct.

18    Q.    And were some of those communications and at least one

19    transaction conducted just via text message and phone between

20    the undercover and one or both of the Lords?

21    A.    That's correct.

22    Q.    Ultimately, I want to direct your attention to the

23    transactions that occurred in February of 2015 involving the

24    undercover.  Do you recall that period?

25    A.    Yes, I do.

1    Q.    What, generally, did the undercover relate to the Lords

2    about what he did and why he was doing bitcoin business with

3    them?

4    A.    Generally, he relayed to them that he owned and operated

5    a gym and sold illegal steroids and other narcotics out the

6    back door.

7    Q.    Including human growth hormone?

8    A.    That's correct.

9    Q.    Did he indicate where the purported drugs came from?

10   A.    He bought them offline.  Or -- that's where he purchased

11   the drugs?

12   Q.    Yes.

13   A.    China.

14   Q.    So the undercover told the Lords that he was buying

15   illegal steroids and human growth hormone from China?

16   A.    Right.

17   Q.    For use in connection with a gym?

18   A.    Correct.

19   Q.    A fitness gym that he had?

20   A.    Correct.

21   Q.    Were the face-to-face meetings audio- and/or

22   video-recorded?

23   A.    Yes, they were.

24         MS. JERNIGAN:  And, Your Honor, I have for the Court

25   a copy of the exhibits that we'll be using this afternoon.

1          THE COURT:  All right.

2          MS. JERNIGAN:  May I approach the witness?

3          THE COURT:  You may.

4          MS. JERNIGAN:  And, Your Honor, for the record,

5    Mr. Carmouche was previously provided a copy of the exhibits

6    in toto back in, I believe, September, which was our prior

7    sentencing hearing date, and these are the same set of exhibits

8    provided to him at that time.

9    BY MS. JERNIGAN:

10   Q.    Agent Heusel, did one of the face-to-face meetings

11   involving the undercover and the Lords take place on or about

12   February 24 of 2015?

13   A.    Yes, it did.

14   Q.    Where?

15   A.    At McDonald's on East Bert Kouns in Shreveport.

16   Q.    And the recording of that interaction, is that contained

17   on what's been marked for identification as Government

18   Exhibit I?

19   A.    Yes, it is.

20   Q.    And that is an audio recording of the undercover meeting

21   in this case?

22   A.    That's correct.

23   Q.    And has that communication between the Lords and the

24   undercover agent been transcribed?

25   A.    Yes, it was.

1   Q.   And that's also contained in the exhibit labeled

2   Government Exhibit I, pages GOV-001 through 017?

3   A.   That's correct.

4        THE COURT:  Mr. Carmouche, you have seen these

5   proposed exhibits already?

6        MR. CARMOUCHE:  Yes, Your Honor.

7        THE COURT:  All right.  Thank you.

8        MS. JERNIGAN:  At this time, Your Honor, we'll play

9   that.

10       THE COURT:  All right.

11      (Audio played.)

12       MS. JERNIGAN:  I apologize, Your Honor.  I didn't

13   have the right media.

14      Your Honor, to speed this along, I'll just refer to the

15   transcript.

16      If there's no objection from Counsel?

17       MR. CARMOUCHE:  Yeah, no objection.

18       THE COURT:  Mr. Carmouche might be as

19   technology-challenged as I am.  I prefer the transcript

20   frankly, because I can read it and I don't have to rely on my

21   hearing up here on the bench.

22       MR. CARMOUCHE:  I agree, Your Honor.

23       THE COURT:  All right.  Thank you.  Proceed.

24       MS. JERNIGAN:  Thank you, Your Honor.

25   BY MS. JERNIGAN:

1    Q.    Agent Heusel, with reference to the transcript contained

2    in Government Exhibit I, who all attended the face-to-face

3    meeting with the undercover?

4    A.    The undercover agent, Randall Lord, and Michael Lord.

5    Q.    And where were the defendants advertising their bitcoin

6    exchange business?

7    A.    Localbitcoins.com.

8    Q.    And the only phone number associated with that

9    advertisement was whose phone number?

10   A.    Michael's.

11   Q.    And the undercover communicated only with that number?

12   A.    That's correct.

13   Q.    But both defendants showed up for the face-to-face?

14   A.    That's correct.

15   Q.    Both at this time in February and in the prior occasions

16   involving the undercover?

17   A.    That's correct.

18   Q.    Okay.  Agent Heusel, if you would direct your attention

19   to page 4 of Government Exhibit I, and let me know when you're

20   there.

21   A.    I'm there.

22   Q.    Okay.  Beginning at the top, when the undercover stated,

23   "25.1, 4.20 [sic] isn't.  I mean, I -- I had another good week

24   again last week with the -- selling the steroids, you know, the

25   human growth hormone.  And I'm just kind of thinking.  I know

1    you guys are saying that it's not as profitable for you to

2    really mine coins any more, right," what response did Michael

3    Lord give?

4    A.    "Yes.  It's not nearly -- yes.  It's getting bad."

5    Q.    The UC went on to say, "I mean, I'm trying to think up

6    ahead.  Me running the gym, I make some money.  But the real

7    bulk of the money is selling the illegal drugs out the back."

8          And what response was given at that point?

9    A.    Michael Lord said, "I understand."

10   Q.    And what response did Randall Lord give?

11   A.    Randall Lord indicated to -- or he said, "So the gym is

12   just the front."

13   Q.    The UC went on to state, "Yeah.  I mean, I can't -- I

14   can't have my accountant knowing about this at all."

15         And what response did Michael Lord give?

16   A.    Michael Lord said, "I know."

17   Q.    And what response did Randall Lord give?  On the top of

18   page 5.

19   A.    Randall Lord said, "I understand."

20   Q.    During the course of your investigation, did you obtain

21   bank records related to the defendant's money service business?

22   A.    I did.

23   Q.    From what banks?

24   A.    Several banks:  Chase, BB&T, Regions, Citizens Bank &

25   Trust in Texas.

1   Q.    Was Citizens National Bank out of Texas one of the places

2   where the defendants banked?

3   A.    Yes.

4   Q.    And when I say "the defendants," what accounts were

5   housed at Citizens National Bank in Texas?

6   A.    They had several businesses that opened accounts for them

7   either as Quantum Health, Pelican Mining, and they had Jewella

8   Chiropractic accounts opened in -- they had accounts opened in

9   the name of Jewella Chiropractic Clinic, Data Security.  And I

10  can't recall the other one.

11  Q.    Could you turn to what's been marked as Government

12  Exhibit L, Bates stamp CNB2-001 through 045.

13  A.    Okay.

14  Q.    Do you recognize what's contained in that Government

15  exhibit?

16  A.    Yes.  Those are bank records that we subpoenaed from

17  Citizens National Bank.

18        MS. JERNIGAN:  Your Honor, the Government would move

19  to admit Exhibits I and L in evidence.

20        THE COURT:  Any objection?

21        MR. CARMOUCHE:  Which exhibits?

22        MS. JERNIGAN:  L.  It's the CNB.

23        THE COURT:  Government Exhibit L is the Certification

24  of Response to Subpoena by Citizens National Bank and the

25  attachments to that, Ms. Jernigan?  Or are you just doing part

1    of that exhibit?

2              MS. JERNIGAN:  The entire exhibit.

3              THE COURT:  So that ends on page?

4              MS. JERNIGAN:  45.

5              THE COURT:  45.  All right.  Thank you.

6         And Exhibit I as well?

7              MS. JERNIGAN:  Yes, Your Honor.  Which is the

8    transcript, 17 pages in length, from the February 24, 2015,

9    face-to-face meeting.

10             THE COURT:  And in your exhibit book, that's shown as

11   "Face-to-Face Meeting 1:46 p.m. Session 3," Government

12   Exhibit I through and including Government -- through the

13   17-page exhibit, plus the CD that's with it?

14             MS. JERNIGAN:  Yes, Your Honor.

15             THE COURT:  All right.  Thank you.

16             MS. JERNIGAN:  Thank you.

17   BY MS. JERNIGAN:

18   Q.    Agent Heusel, if you could direct your attention to

19   page 2 of Government Exhibit L.

20   A.    Yes.

21   Q.    This is the account opening document for the Quantum

22   Health bank account with Citizens National Bank?

23   A.    That's correct.

24   Q.    What signatures appear on this account opening document?

25   A.    Randall Lord and Michael Lord.

1  Q.    And if you could direct your attention to page 6 of that

2  exhibit, and let me know when you're there.

3  A.    Okay.

4  Q.    What's shown on this page of the exhibit in the bank

5  statement?

6  A.    There are checks transferring or what appears to be

7  transferring money out of the account.

8  Q.    From what account to what account?  To whom is the check

9  made payable?

10  A.    The check's made payable to Pelican Mining from Quantum

11  Health.

12  Q.    And the first check in the upper portion of the page is

13  dated October 28 of 2015, in the amount of $61,183.34?

14  A.    That's correct.

15  Q.    And it appears to be signed by whom?

16  A.    Randall Lord.

17  Q.    And the second check on the lower half of that document,

18  dated October 26 of 2015, in the amount of $84,845 even, who

19  appears to have signed or issued that check?

20  A.    Randall Lord.

21  Q.    If you could turn to the next page, CNB2-007 through 008.

22  A.    Uh-huh.

23  Q.    Does that pattern continue where there are checks issued

24  to Pelican Mining signed by Randall Lord?

25  A.    Yes.  There are two checks issued from Quantum Health to

1    Pelican Mining signed by Randall Lord.

2    Q.    Okay.  Two or three?

3    A.    The one at the bottom is signed by Michael Lord.

4    Q.    Okay.  And if you could go to page CNB2-010, the check on

5    the bottom right-hand portion of the page appears to be signed

6    by whom?

7    A.    Randall Lord.

8    Q.    And that's another check following the same pattern that

9    we've been discussing?

10   A.    That's correct.

11   Q.    In relation to the investigation, had the investigation

12   become overt at the point that these checks and the activity

13   that we see reflected in Exhibit L -- let me start again.

14         Could you explain to the Court where the nature of the

15   investigation was at this period.

16   A.    At this period, we had made -- already made contact with

17   Michael and Randall Lord, and we interviewed Michael Lord by

18   that point.  We had also issued subpoenas to those companies.

19   Q.    To their various business entities?

20   A.    That's correct.

21   Q.    So the investigation was known?

22   A.    Yes.

23   Q.    Agent Heusel, if you could turn to page 017 in that

24   exhibit, and let me know when you're there.

25   A.    Okay, I'm there.

1  Q.    Is this one of the bank statements associated with the

2  Quantum Health bank account at Citizens National Bank?

3  A.    That's correct.

4  Q.    To what address was the bank account associated with?

5  A.    10022 Winding Ridge Drive, Shreveport, Louisiana.  And

6  that is the residence of Randall Lord.

7  Q.    And, again, if you could turn to page 019 in that

8  exhibit, and tell the Court whose signature appears on the

9  majority of the checks that are on that page.

10  A.    It appears that there was three from Michael Lord and

11  seven from Randall Lord.

12  Q.    Now, you've looked at numerous bank accounts associated

13  with each of the businesses involved in the bitcoin exchange

14  for the defendants; correct?

15  A.    That's correct.

16  Q.    And in addition to Quantum Health, there was Data

17  Security?

18  A.    That's correct.

19  Q.    Pelican Mining?

20  A.    Yes.

21  Q.    Crypto Currency?

22  A.    Yes.

23  Q.    And -- I'm sorry.  Crypto Processing Solutions.  I

24  misspoke.  Was that one associated with --

25  A.    That's correct.

```
 1   Q.     -- Michael Lord?
 2          And Jewella Chiropractic Clinic was a name associated
 3   with respect to various bank accounts involved in the bitcoin
 4   exchange business?
 5   A.     That's correct.
 6   Q.     Under whose -- under which defendant's name?
 7   A.     Randall Lord.
 8   Q.     Did you also review records in connection with their
 9   acceptance of credit cards in exchange for bitcoin?
10   A.     Yes.
11   Q.     And describe for the Court what the documents reflected
12   regarding Randall Lord's involvement in the operation of the
13   business.
14   A.     It appears that Randall Lord was the one that set up all
15   the credit card processors, and he was the one that was having
16   direct communications with all the credit card processing
17   companies.
18   Q.     And when you say "having direct communications," can you
19   give the Court an example of what your investigation revealed
20   in that respect.
21   A.     At one point, I believe it was CD -- it was one of the
22   credit card processors had emailed wanting supporting documents
23   for a certain transaction, and they emailed and spoke with
24   Randall Lord.  And they had correspondence back and forth about
25   a certain transaction.
```

1    MS. JERNIGAN:  I tender the witness, Your Honor.

2    THE COURT:  Mr. Carmouche, did you respond to my

3  request?  Did you have an objection to Exhibit I and Exhibit L?

4  If so, I didn't hear it.

5    MR. CARMOUCHE:  No objection.

6    THE COURT:  All right.  They're in evidence then.

7  You may proceed with your cross.

8                          CROSS-EXAMINATION

9  BY MR. CARMOUCHE:

10 Q.    Agent Heusel, the -- is it in the transcript of the

11 undercover agent that he bought the steroids or HGN from China?

12 A.    I -- it should be in -- maybe not that meeting, but maybe

13 in another meeting.

14 Q.    So that would -- the meeting you were testifying to is

15 the McDonald's meeting?

16 A.    All the meetings were at McDonald's.

17 Q.    And at that meeting that you were just testifying to, was

18 there a large amount of cash transferred from the undercover to

19 the Lords?

20 A.    Yes.

21 Q.    And I believe there was some conversation even about the

22 fact that they had -- whether they wanted to count it, count

23 the money in the restaurant or go somewhere else?

24 A.    Correct.

25 Q.    And they apparently counted it there?

1    A.    Yes.

2    Q.    So does the transcript indicate who was doing what?  Was

3    Randall Lord counting the money, Michael Lord doing something

4    else?

5    A.    I don't know if the transcript says who was counting the

6    money, but according to the video, Randall Lord was counting

7    the money.

8    Q.    So then while he's counting up either $1,900 or $1,400

9    and also talking about steroids or those kinds of things, do

10   you see where he could be distracted, maybe just answering

11   questions and still trying to count at the same time?

12   A.    He didn't indicate that he was distracted.

13   Q.    Was there a point in the transcript where Randall Lord

14   had to start over counting the money because he --

15   A.    I don't recall.  That may have happened.

16   Q.    Now, all of the checks and the objects in there, those

17   were bank deposits in a bank in Texas; right?

18   A.    Those checks that we just referred to at Citizens?

19   Q.    Right.

20   A.    Those were checks transferring money from one account to

21   another.

22   Q.    Okay.  From one of the Lords' accounts that they --

23   A.    One was from -- it was transferring money from Quantum

24   Health to Pelican Mining.

25   Q.    And did you ever discover what those transfers came from?

1   What were they for?

2   A.    They were transfers from one business to another.

3   Q.    And there's nothing illegal about that sort of thing?

4   A.    No.  There's nothing illegal about transferring the

5   money, no.

6   Q.    So then the amounts of money, is that something that the

7   banks report to FinCEN or some federal agencies?

8   A.    No, not transfers.  Not checks transferred.

9   Q.    So in your investigation of this -- because you -- you

10  mentioned that Mr. Randall Lord had set up credit card accounts

11  with credit card processors?

12  A.    Yes.

13  Q.    And did -- was there -- did the credit card companies

14  lose any money during this time in dealing with the Lords?

15  A.    I don't recall.  There may have been some small losses.

16  Q.    During the -- while you were looking at this and

17  investigating this, did it appear that if there was a fraud

18  committed against the credit card company, that there would be

19  charge-backs and those charge-backs would go against the Lords?

20  A.    Yes, that could happen.

21  Q.    Did you actually see it happen and --

22  A.    Yes, I saw some charge-backs to their accounts.

23  Q.    You don't know whether there would have been -- every

24  time there was a fraud reported, that it would be charged back

25  to the Lords?

1  A.    Yeah.  Any -- I mean, the fraud could have happened

2  either way, either the credit card company loses money or they

3  charge back the merchant.

4           MR. CARMOUCHE:  I don't have any further questions,

5  Your Honor.

6           THE COURT:  Any redirect?

7           MS. JERNIGAN:  Yes, Your Honor.

8                      REDIRECT EXAMINATION

9  BY MS. JERNIGAN:

10 Q.    Agent Heusel, you were asked some questions about the

11 credit card companies and the charge-back process involving the

12 defendants; do you recall that?

13 A.    That's correct.

14 Q.    What is MPC?

15 A.    It is a credit card processing company.

16 Q.    And how, if you can explain to the Court, are they

17 related to PaySimple?

18 A.    They -- related to Pay -- I think they're a parent

19 company or a risk management-type company for PaySimple.

20 Q.    Was that one of the credit card processors that the

21 defendants used?

22 A.    Yes.

23 Q.    Did they accurately disclose to the credit card processor

24 that they were exchanging bitcoin?

25 A.    No, they did not.

1  Q.    And were there communications between both of the

2  defendants about the questions raised by that credit card

3  processor?

4  A.    I believe, from what I recall, without looking at the

5  actual documents, that the credit card company would actually

6  converse with Randall by either phone or email and then Randall

7  would talk to Michael.

8  Q.    Agent Heusel, would you turn to Government Exhibit K in

9  the binder before you.

10 A.    Okay.

11 Q.    You recognize what's contained in that 5-page exhibit?

12 A.    Yes.  It's an email from Randall -- or email chain from

13 Randall to Michael Lord.

14 Q.    And what's the time frame of that email string?

15 A.    January 2015.

16 Q.    Dating back through and including December 24 of 2014?

17 A.    That is correct.

18 Q.    What starts the communication between the credit card

19 processor and the defendant?

20 A.    It was started by Justin Smith, who works at MPC, sending

21 an email to Randall Lord notifying that their client,

22 PaySimple, had -- that MPC was conducting a review over a

23 certain transaction.

24 Q.    Okay.  And they emailed what email account according to

25 this document?  If you go back to page 004 of that exhibit.

1    A.    RandallLord@gmail.com.

2    Q.    Okay.  And was there a response that was given to

3    PaySimple in reply to their inquiry about the credit cards?

4    A.    Yes.  There was a response from RandallLord@gmail.com

5    that talks about, "I'm taking new cards --" or taking cards for

6    health care services and basically that he's telling them that

7    he can't share a whole lot of information based upon HIPAA

8    laws.

9    Q.    There's a specific reference to not wanting to violate

10   HIPAA laws in this email response to the credit card processor?

11   A.    Correct.

12   Q.    Now, at some point after the inquiries raised by the

13   credit card processor are there emails between the Randall Lord

14   Gmail account and Internet151?

15   A.    That's correct.

16   Q.    And with whom is Internet151@gmail associated with?

17   A.    Michael Lord.

18   Q.    And in summary fashion, what discussion unfolds between

19   these two as relates to dealing with the third-party processor

20   questioning their credit card transactions for their credit

21   card processing ability?

22   A.    Basically, in summary, Randall and Michael are talking

23   about the credit card processor is kind of wanting identifying

24   information to go along with the transactions, and he's

25   telling -- Michael is telling Randall that he doesn't have any

1    names associated with these numbers of the cards that he's
2    processing, they're prepaid debit cards and they don't have
3    names, and along those lines.
4    Q.    And at one point does Randall Lord offer to provide a
5    cell phone number and a fake name as a way to thwart the credit
6    card efforts to figure out what was going on?
7    A.    Yes.  He says at one point, "I can give them your cell
8    phone number with a fake name," referring to Michael, "or
9    Brian's cell with a fake name.  Or how many do you want -- do I
10   have to give them?"
11           MS. JERNIGAN:  Your Honor, the Government would move
12   to admit Exhibit K in evidence.
13           THE COURT:  Any objection?
14           MR. CARMOUCHE:  No objection, Your Honor.
15           THE COURT:  Admitted.
16           MS. JERNIGAN:  Thank you, Your Honor.
17   BY MS. JERNIGAN:
18   Q.    And then going back to the face-to-face transactions, you
19   described Randall Lord's role as counting the cash during the
20   course of the cash being provided in exchange for bitcoin?
21   A.    That's correct.
22   Q.    What was Michael Lord doing while Randall Lord was
23   counting the cash?
24   A.    Michael was in charge of the actual exchange of the
25   bitcoins from their prospective bitcoin wallets through the

1    scanning of the phones.

2    Q.    So he used his --

3    A.    He used his cell phone and then he would process the

4    transactions for the undercover agent through his cell phone.

5    Q.    Okay.

6          MS. JERNIGAN:  That's all I have, Your Honor.

7          THE COURT:  All right.  You may step down.

8          Oh.  Do you have a follow-up?

9          MR. CARMOUCHE:  I'm sorry.  Just a --

10         THE COURT:  I'll allow it.

11                    RECROSS-EXAMINATION

12   BY MR. CARMOUCHE:

13   Q.    Michael, you said, was conducting the transaction on his

14   cell phone while Randall Lord was counting cash?

15   A.    That's correct.

16   Q.    Did it appear that the transaction on the cell phone was

17   more than just a text, it was sort of a complicated thing that

18   would require Michael Lord's attention, total attention, while

19   that's going on?

20   A.    Michael's attention that he wasn't even having

21   conversations with the undercover agent?

22   Q.    Yes.  Yes.

23   A.    They were talking the whole time while he was counting

24   the cash.

25   Q.    He was, but Michael was doing the transaction on the cell

1   phone?

2   A.    Well, the actual transaction only takes a couple of

3   seconds once they just scan.

4   Q.    So there's no complication whatsoever doing that on a

5   phone?

6   A.    I guess it determines your level of experience whether

7   it's complicated or not.

8   Q.    The discussion between Michael and Randall about using

9   phony names or whatever on the credit cards or the credit card

10  purchases or whatever they were doing there, still was there no

11  money lost by the credit card companies during these

12  transactions?

13  A.    I don't know about that particular transaction, because

14  I'm not sure which one they were trying to verify.

15  Q.    Or any of them?

16  A.    Was there any loss on any of the credit card

17  transactions?

18  Q.    Yes.

19  A.    Yes, there was loss in some of the credit card

20  transactions.

21  Q.    Through the processors and the credit cards?

22  A.    Now, with the processor, I'm not sure whether it was the

23  processor or the bank that lost the money.

24  Q.    So if there were charge-backs, wouldn't that have been

25  made on any loss that -- from the Lords?

1 | A.   Yes.  That's the first attempt they do to recoup the
2 | money, is charge back the merchant.
3 | Q.   So -- and you're saying there were some charge-backs that
4 | they never got back?
5 | A.   That who?
6 | Q.   The credit card companies or the credit card processing
7 | company.
8 | A.   Yes, there was a few that the bank lost out on some
9 | transactions.
10 | Q.   And it's -- so they -- the Lords, didn't they cover all
11 | the transactions where there might have been a loss?
12 | A.   I can't say whether they covered all of them or not.
13 |         MR. CARMOUCHE:  All right.  Thank you.
14 |         THE COURT:  All right.  You may step down.  Thank
15 | you.
16 |     Do you have any other evidence to present on this point?
17 |         MS. JERNIGAN:  On this point, no, Your Honor.
18 |         THE COURT:  Mr. Carmouche, do you have any further
19 | argument on your objection in light of the evidence
20 | presentation?
21 |         MR. CARMOUCHE:  No other argument, Your Honor.
22 |         THE COURT:  Take a moment just to review with your
23 | clients, if you would.
24 |         MR. CARMOUCHE:  Nothing further, Your Honor.
25 |         THE COURT:  All right.  Ms. Jernigan, any concluding

1    remarks on this point?

2              MS. JERNIGAN:  No, Your Honor.

3              THE COURT:  In this particular instance, with respect

4    to evaluating the objection filed by Randall Lord to

5    paragraph 11 of his PSR, and paragraph 15, while the objection

6    could impact the sentencing guidelines, the Court, having heard

7    argument following evidence on this and taking into account the

8    written objections, the Court finds that there are no changes

9    to the presentence report warranted; that the testimony and

10   exhibits are in accordance with the signed Plea Agreement; and

11   the contention by Mr. Lord that he never actually operated the

12   exchange business nor did he profit from it is in contradiction

13   to the evidence that was just offered by the Government.

14             Accordingly, the Court notes, again, that the acceptance

15   of responsibility issue is still present, and the Court will

16   take this into consideration as an additional factor in whether

17   to allow that in the guideline calculation.

18             Once again, the Court draws attention to U.S. Sentencing

19   Guideline Section 3E1.1 and the commentary in Application

20   Note 1 that a defendant should not falsely deny any additional

21   relevant conduct; that certainly a defendant may remain silent,

22   but should not falsely deny or frivolously contest relevant

23   conduct.

24             In this instance, the Court finds by a preponderance of

25   the evidence that Randall Lord actually assisted in operating

1   the business in moving money between the various businesses

2   where money was derived from the bitcoin exchange business and,

3   to the extent that can be derived from the evidence presented

4   so far, appears to have profited from that business.

5   Accordingly, the objection is overruled.

6         Next I have, again in chronological order and sequence,

7   paragraph 22 in Randall Lord's presentence report wherein he

8   contends that he registered with FinCEN -- and for the record,

9   that's capital F-, i-n-, capital C, capital E, capital N --

10  after being made aware that it's required.

11        It appears to the Court that he further argues that the

12  state licensing rules did not appear to cover the buying and

13  selling of bitcoins, so forth and so on.  The Court has already

14  ruled on the state registration aspect of that.

15        The Court notes that to the extent that the objection

16  addresses Louisiana state license requirements on a

17  bitcoin-related business, the Court has already declared it

18  moot based on the concession of the Government that there was

19  no registration procedure or organization for licensing set up.

20        In this particular instance, the fact that both or either

21  of the defendants registered with FinCEN after, quote,

22  "discovering that registration was required," end quote, does

23  not affect the Guidelines calculation.

24        In this particular instance, the presentence report

25  appears to correctly incorporate information contained in the

1   indictment and Plea Agreement, and appears to the Court to have

2   been properly completed.  It is the Court's ruling that no

3   changes to the PSR are warranted under this set of

4   circumstances.  But I'll make that a preliminary ruling.

5        Do you wish to present any evidence on this particular

6   point in light of the Government -- or the Court's summary of

7   what appears in the record in opposition to the objection

8   raised by Randall Lord to paragraph 22?

9             MR. CARMOUCHE:  (No response.)

10            THE COURT:  Mr. Carmouche, you want to present any

11  evidence on that point, or any further argument?

12            MR. CARMOUCHE:  Not on that point, Your Honor.

13            THE COURT:  All right.  Anything further on this

14  particular point?

15            MR. CARMOUCHE:  Not on this particular point.

16            THE COURT:  All right.  Thank you.

17       Ms. Jernigan, how about you?

18            MS. JERNIGAN:  No, Your Honor.

19            THE COURT:  All right, then.  The Court's preliminary

20  ruling becomes its actual ruling on this.  The Court rules that

21  no changes to the presentence report are warranted.

22       With respect to the registration issue with FinCEN, the

23  failure to timely register with FinCEN is the underlying

24  offense conduct to which Michael Lord and Randall Lord pled

25  guilty.  To the extent that a ruling is necessary, the

1    objection should be overruled.

2         Let me get a point of clarification here.  Ms. Jernigan,

3    was it Michael Lord, only, that pled guilty to the failure to

4    register?  Or was it Randall Lord that likewise pled guilty to

5    registered at FinCEN?

6              MS. JERNIGAN:  Randall Lord pled guilty to that as

7    well.

8              THE COURT:  I wanted to be sure my notes were correct

9    on that.  I had it as both, but I wanted to be absolutely sure.

10        And is the registration done by individuals or through

11   one or more of the various companies that they used?

12             MS. JERNIGAN:  It's company-specific rather than

13   person-specific.

14             THE COURT:  All right.  Thank you.  And I wanted to

15   make that clarification as well.  And I'll change the ruling,

16   too, with respect to both entered guilty pleas, but the

17   registrations themselves involved the various companies that

18   have been previously identified operated by the defendants.

19        All right.  The next paragraph that I have in number

20   order is paragraph 23 in Michael Lord's presentence report,

21   which is, I think, the same basic objection that I just dealt

22   with in Randall Lord's presentence report under paragraph 22.

23        And for the Court of Appeal, I know this is confusing,

24   but this is the best way I know how to approach this under the

25   circumstances.

1     Basically, in paragraph 23 of Michael Lord's report, he
2  contends he did not believe he needed a license and Louisiana
3  may not have had the license requirement for his business.  The
4  contention is made that with respect to registration with
5  FinCEN, he did register once he found out he needed to
6  register.
7     Again, same ruling I will put into place.  To the extent
8  the objection addresses state license requirements, it has been
9  mooted.  To the extent further ruling is necessary, it is
10  overruled on the state licensure requirement.
11     The Court notes the fact that the defendants registered
12  with FinCEN after discovering registration was required does
13  not affect the guideline calculation.
14     The Court has previously ruled in Randall Lord's similar
15  objection that the presentence report was properly completed
16  and correctly cites the information contained in the
17  indictment.  No changes to the PSR are warranted.  Therefore,
18  to the extent that a ruling is necessary, the objection is
19  overruled.
20     And at this point, Mr. Carmouche, at the end of all of
21  these objections, you can note your objection to any of the
22  Court's rulings.
23     Ms. Jernigan, that applies for you as well.
24     We're just trying to take these up in sequence to try to
25  move this forward in due course.

1      MR. CARMOUCHE:  Thank you, Your Honor.

2      THE COURT:  Now, there is a paragraph 30 in Michael

3  Lord's report arguing that he, and not Randall Lord, failed to

4  file the currency transaction report as stated in the

5  indictment.  He further maintains that he had no way of knowing

6  whether the reported bitcoin transactions in the amounts of

7  $14,000 and $19,000, respectively, originated from the sale of

8  legal or illegal steroids, a controlled substance.

9      The objection was previously addressed in the probation

10  officer's response relating to paragraphs 4 and 5.  Is there --

11  I've already heard argument and so forth on this.  Is there

12  anything else to be provided?  Again, this is the other side of

13  the coin on an objection that's been previously ruled on by the

14  Court.

15      MS. JERNIGAN:  Nothing further from the Government,

16  Your Honor.

17      THE COURT:  Anything, Mr. Carmouche?

18      MR. CARMOUCHE:  Nothing from us, Your Honor.

19      THE COURT:  The PSR -- or, excuse me, the presentence

20  report is correctly worded and no change is warranted.

21      With respect to the previous objections reiterated to

22  paragraphs 4 and 5, those rulings are reiterated.  To the

23  extent that a specific ruling on this objection is deemed

24  necessary, the objection is hereby overruled.

25      We now proceed to the issue of the monetary matter in

1  paragraphs 25 to 27 of Randall Lord's set of objections where

2  Randall Lord objected to the original amount of $3.5 million in

3  so-called documented deposits.  The contention is made that

4  some of the deposits included in the offense conduct were

5  deposits of currency and had nothing to do with the sale of

6  bitcoins.

7       The Court notes that in performing the calculations in

8  paragraph 41, Probation applied Sentencing Guidelines

9  Section 2S1.3(a)(2), which starts with a base level of 6 plus

10  the number of offense levels from the table in Section 2B1.1.

11       Originally, the offense level was 6 plus an additional 18

12  because the Government contended the total value of the funds

13  exceeded $3.5 million.  The Government now concedes that the

14  total value of the funds was about $2.6 million because the

15  funds exchanged for bitcoins after the defendants registered

16  with FinCEN in November of 2014 have been removed from the

17  calculations.

18       Am I correct on that, Ms. Jernigan?

19            MS. JERNIGAN:  Yes, Your Honor.

20            THE COURT:  So far, so good, Mr. Carmouche?

21            MR. CARMOUCHE:  Yes, Your Honor.

22            THE COURT:  The offense level is now 6 plus 16, as

23  opposed to 18, under Section 2B1.1(b)(1).  And I think it's

24  either "1" or "l."  I'm not sure.  The probation office refers

25  to U.S. vs. Abdi, 342 F.3d 313, Fourth Circuit case 2003, for

 1   the principle that the district court should look to the total

 2   value of the funds.

 3        Probation also cites to *United States vs. Beras,* 183 F.3d

 4   22, a First Circuit case 1999, which rejected the defendant's

 5   argument that the enhancement under the fraud table only

 6   applied if there was a so-called loss in the crime.

 7        In this particular instance, given the evidence on the

 8   banking that was introduced and the prior rulings by the Court,

 9   there are no further changes to the presentence report that I

10   can see are warranted under the circumstances.

11        Is there any need for additional testimony on this point,

12   Ms. Jernigan?

13             MS. JERNIGAN:  Your Honor, we can.  We have a summary

14   chart that mirrors what's contained in the PSI report.

15   Agent Heusel can explain how he arrived at the figures

16   contained in that.  But if the Court's prepared to rule on the

17   facts adduced at this point, we can proceed in that manner.

18             THE COURT:  And as long as the Government ends up

19   with the $2.6 million number and Mr. Carmouche is comfortable

20   with that, with the summary chart involved, I'm fine with that.

21        Mr. Carmouche?

22             MR. CARMOUCHE:  We aren't particularly happy with

23   that, Your Honor.

24             THE COURT:  I understand.

25             MR. CARMOUCHE:  We feel like if you're going to -- if

 1   that many points get added to the base level, that there needs

 2   to be more proof than just "these bank accounts were here, so

 3   that money is obviously money from bitcoin sales."

 4          THE COURT:  With that notation made, call your

 5   witness.

 6          MS. JERNIGAN:  Government calls Agent Heusel -- or

 7   recalls Agent Heusel.

 8          THE COURT:  You're still under oath, sir.

 9          THE WITNESS:  Thank you.

10          THE COURT:  By the way, the Court has to depart at

11   5:00 to get to a dinner outside of Ruston tonight by 6:00.

12          MS. JERNIGAN:  Oh, wow.  You have to be in Ruston?

13          THE COURT:  By 6:00, not by 5:00; otherwise, we'd be

14   closing up shop momentarily.

15          MS. JERNIGAN:  Yes, Your Honor.

16          THE COURT:  And if this spills over, we'll reconvene

17   tomorrow morning or at another time convenient to counsel

18   without turning the rest of the world upside down.

19          MS. JERNIGAN:  Yes, Your Honor.  We'll move as

20   expeditiously as we can.

21          THE COURT:  Oh, I like the word "expeditiously," but

22   we need to be thorough, because these are important objections

23   that have been raised.

24          MS. JERNIGAN:  Yes, Your Honor.

25                    DIRECT EXAMINATION

1   BY MS. JERNIGAN:

2   Q.    Agent Heusel, I want to discuss the financial analysis

3   that you did in connection with your investigation in this

4   case.  Can you turn to what's been marked for identification as

5   Government Exhibit H in the binder in front of you.

6   A.    Yes.

7          MS. JERNIGAN:  And I believe the Court has a copy of

8   that as well?

9          Yes.  Okay.

10  BY MS. JERNIGAN:

11  Q.    Can you explain to the Court your analysis as it relates

12  to the total deposit figure of $2.6 million contained in

13  Government Exhibit H.

14  A.    The way I came up with this, the 2.6 figure, is I took

15  the bank accounts that the majority of the transactions were --

16  you could actually match up the cash deposits and then a direct

17  transfer out to Coinbase, which is the purchase of bitcoins.

18  Q.    Are there other bank accounts that had at least some

19  activity involving Coinbase, the vendor or the exchanger that

20  the defendants used, not contained in this exhibit?

21  A.    You mean like a majority or contained any or --

22  Q.    Contained any.

23  A.    Yeah.  I took out some that had, you know, what appeared

24  to be other transactions that may have been related to

25  Randall's rental properties or, you know, that had other

1    deposits in them that didn't match up with the transferred
2    purchase of bitcoins.
3    Q.    Well, let's talk a little bit about the defendant's
4    source of income, starting with Michael Lord.  Based on the
5    bank records and other financial information to which you had
6    access, what sources of income did Michael Lord have?
7    A.    During the investigation, I never came across any other
8    type of source of income for Michael Lord.
9    Q.    Other than what?
10   A.    Other than his bitcoin exchanging.
11   Q.    With respect to Randall Lord, what sources of income did
12   he have?
13   A.    Randall had a rental property or lease property that he
14   was -- well, he owned a building, and there was several tenants
15   that paid him rent.
16   Q.    Is that located on Jewella Avenue in Shreveport,
17   Louisiana?
18   A.    Yes.
19   Q.    And some of the tenants include a church, I believe?
20   A.    Yeah.  There was a church and a chiropractic clinic.
21   Q.    Was there also a salon, I think, in that --
22   A.    At one time there was.  I'm not sure what the time frame
23   was.
24   Q.    Was there also a bagpiping business?
25   A.    Yes.  Randall did have a business where he was paid for

1  bagpipe playing or however you determine what to call it.

2  Q.    Okay.  Now, let's start at the beginning.  Or let me

3  point out the bank accounts that are in the name, for example,

4  of Michael Lord.  That's in his name individually as opposed to

5  one of the business entities referenced in the indictment?

6  A.    That's correct.

7  Q.    So why was that account with, for example, Wells Fargo

8  ending in 3621, included in this calculation?

9  A.    Because you could see direct transfers from currency

10  deposits where the amounts matched up in the cash deposited and

11  followed shortly by a transfer ACH withdrawal to Coinbase.

12  Q.    Is that also the case with respect to the Bank of

13  Internet account bearing Michael Lord's name?

14  A.    That is correct.

15  Q.    And what else?

16  A.    Each account that was included was the majority of -- the

17  majority of the transactions were the deposits followed by an

18  ACH withdrawal transfer to Coinbase to purchase bitcoins.

19  Q.    Okay.  Agent Heusel, if you would turn to Government

20  Exhibit L, which has previously been admitted, and direct your

21  attention to page 037.  And let me know when you're there

22  within that exhibit.

23  A.    Okay.  I'm there.

24  Q.    This is a bank statement for the Citizens National Bank

25  account for Randall Lord d/b/a Quantum Health; correct?

1    A.    That's correct.

2    Q.    For July of 2015?

3    A.    Correct.

4    Q.    And was this included in the calculations contained in

5    Exhibit H?

6    A.    I do not believe this bank account was included.

7    Q.    And that's because it was outside the time frame --

8    A.    It was outside the --

9    Q.    -- after they became --

10   A.    Yes.  It was past the registration.

11   Q.    Okay.  But as relates to showing the activity within the

12   account being solely or predominantly Coinbase-related, can you

13   summarize what's contained in the miscellaneous debits and

14   credits section of this account statement.

15   A.    Okay.  If you look at, like, particular transactions on,

16   you know, 6/11, you have a deposit of $1,853 and one penny, and

17   then you'll see a direct withdrawal on the next date of 6/12 to

18   Coinbase.com for the exact same amount.  The next transaction

19   is the same way:  You have 6/17, deposit, and then you go to

20   the next date and there is an ACH withdrawal to Coinbase for

21   the exact same amount.

22   Q.    Let's talk about the Jewella Chiropractic Clinic entries

23   on your summary chart in Government Exhibit H.

24         Now, the defendant Randall Lord is a chiropractor by

25   education and professional training?

1  A.    Yes.

2  Q.    And at one point he worked as a chiropractor within the

3  Jewella clinic?

4  A.    Yes.

5  Q.    So as it relates to the Jewella Chiropractic Clinic bank

6  accounts, why are they included within this summary chart?

7  A.    They are included because that was the account that was

8  used for a lot of the credit card processing for -- because at

9  that time Randall was not operating Jewella Chiropractic.

10  Jewella Chiropractic Clinic, the store front, was actually

11  being operated and run by another chiropractor.

12  Q.    There's a chiropractor in the clinic other than Mr. Lord?

13  A.    Correct.

14  Q.    But the bank account that bore this name was related to

15  Coinbase activity?

16  A.    Yes.

17  Q.    Dating back as far as when?

18  A.    October 2013.

19  Q.    And that's, for example, with the Chase bank account?

20  A.    That's correct.

21  Q.    Agent Heusel, I'm showing you what's been marked as

22  Government Exhibit N, which is Bates-stamped BBT2-001 through

23  086.  Do you recognize what's contained in that exhibit?

24  A.    Yes.  These are bank records that we subpoenaed of

25  Quantum Health at BB&T Bank.

1   Q.    And this is one of the bank accounts not included in the

2   $2.6 million figure in terms of Coinbase-related money

3   transmission transactions?

4   A.    That's correct.

5         MS. JERNIGAN:  Your Honor, the Government would move

6   to admit Exhibit N in evidence.

7         THE COURT:  I am looking at my exhibit book, and I've

8   got a blank behind Exhibit N, as in "Nancy."

9         MS. JERNIGAN:  Yes, Your Honor.  I wasn't sure that I

10  was going to use it.  But I have just a few copies.  I was

11  going to show it on the ELMO, and then I will have one admitted

12  into evidence.  But this one, I'll need to use the ELMO.

13        THE COURT:  Let me take a look at it before you admit

14  it, if I might.

15      Mr. Carmouche, you have a copy?

16        MR. CARMOUCHE:  She just handed me one, Your Honor.

17        THE COURT:  All right.  Ms. Jernigan, let me ask you

18  this question:  In Exhibit N that you're referring to, which is

19  prefaced with the affidavit of Branch Banking & Trust Company

20  under the certifying officer's last name of Cober, does that

21  include information on accounts in all of the various

22  businesses that we have been talking about today, whether it's

23  Crypto Processing Solutions, which is a d/b/a of Michael Lord,

24  as well as other business entities as well operated, like Data

25  Security, LLC at Winding Ridge, also with Pelican Mining, LLC

1    at the same address on Winding Ridge, and Randall Lord d/b/a

2    Quantum Health?  Does that include the range of various

3    businesses and entities that we have identified during the

4    course of this hearing and connected to the indictment?

5            MS. JERNIGAN:  With the exception of Jewella

6    Chiropractic Clinic.  They did not have a Jewella Chiropractic

7    Clinic account at this bank.  But all of the other business

8    entities had bank accounts titled in their name, yes, Your

9    Honor.

10           THE COURT:  Thank you.

11       Mr. Carmouche, do you have any objection to the

12   introduction of that exhibit?

13           MR. CARMOUCHE:  No objections, Your Honor.

14           THE COURT:  It's admitted.  You may continue.

15           MS. JERNIGAN:  Thank you, Your Honor.

16   BY MS. JERNIGAN:

17   Q.    Agent Heusel, I'm going to direct your attention to the

18   page Bates-stamped BBT2-074, which is an October 2015 account

19   statement for Michael Lord doing business as Crypto Processing

20   Solutions.  Do you see that?

21   A.    Yes.

22   Q.    And the account activity as summarized towards the bottom

23   portion shows about $1600 worth of deposits or transactions

24   into the account; correct?

25   A.    Yes.  That was the beginning balance and ending balance

1    for that statement.

2    Q.    And there was no other activity reflected within that

3    month; correct?

4    A.    That's correct.

5    Q.    Going to page 076 within that same exhibit, what's shown

6    there, Agent Heusel?

7    A.    That is a deposit slip of -- and I believe there was

8    $2,500 in currency deposit on that date to Crypto Processing

9    Solutions.

10   Q.    Okay.  And totalling $2,500?

11   A.    Correct.

12   Q.    And let's walk through the supporting deposits.  On

13   page 077, do you see that?

14   A.    Yes.

15   Q.    What's contained in that bank statement following the

16   deposit slip?

17   A.    That is a Western Union money order that was purchased at

18   Publix and -- for $500, made out to Crypto Processing

19   Solutions.

20   Q.    On or about June 12 of 2015?

21   A.    That's correct.

22   Q.    With the last three serial numbers of 903?

23   A.    Correct.

24         THE COURT:  And Publix is a grocery chain?

25         THE WITNESS:  Publix is a grocery chain mainly in

1   Florida.
2          THE COURT:   Thank you.
3   BY MS. JERNIGAN:
4   Q.    Are there any Publix in Louisiana?
5   A.    I believe there's some down south, but I -- no, not
6   positive.
7   Q.    Going to page 078 of that same exhibit, Agent Heusel, is
8   this another money order from Western Union?
9   A.    Yes.   It's another money order from Western Union in the
10  amount of $500 on the date of June 12, 2015, made payable to
11  Crypto Processing Solutions.
12  Q.    And the last three digits of the serial number for that
13  money order?
14  A.    904.
15  Q.    Going on to page 079, is that another Western Union money
16  order from Publix?
17  A.    That's correct.   In the amount of $500, serial number
18  last three digits of 905, date of Jan -- June 12, 2015, made
19  out to Crypto Processing Solutions.
20  Q.    Page 080 is another Western Union money order?
21  A.    Yes.   Purchased from Publix, last three digits of the
22  serial number are 906, in the amount of $500, purchase date of
23  June 12, 2015, made payable to Crypto Processing Solutions.
24  Q.    And page 81 in that exhibit is another money order;
25  correct?

1  A.    Correct.  Serial number last three digits are 907,
2  purchased on June 12, 2015, in the amount of $500, made payable
3  to Crypto Processing Solutions.
4  Q.    The pattern that we saw of sequentially numbered money
5  orders all obtained on the same date in support of one deposit,
6  did you see that -- how frequently would you see that in the
7  bank records?
8  A.    That was very common.
9  Q.    I'm going to direct your attention to page 14 within the
10 BB&T bank records for Quantum Health in October of 2015.  Do
11 you see that, Agent Heusel?
12 A.    Yes, I do.
13 Q.    Can you summarize the level of activity in the account at
14 that point.
15 A.    The beginning balance was $9.02, with a single service
16 charge of $10, resulting in an ending balance of negative 98
17 cents.
18 Q.    Directing your attention to page BBT2-016.  I think
19 that's in focus now.  What do we see in this portion of the
20 exhibit, Agent Heusel?
21 A.    That is a deposit slip for a deposit to Quantum Health on
22 May 30, 2015, in the amount of $2,999.
23 Q.    And going to the support for that deposit, again on
24 page 017 within the same exhibit, can you see that okay?
25 A.    Yes.

1    Q.    And is this a personal money order in the amount of $999?

2    A.    Yes.  That is a personal money order for $999 purchased

3    on May 29, 2015, made payable to Quantum Health.

4          THE COURT:  Is there a remitter block or the name of

5    the person obtaining the money order?

6          THE WITNESS:  It's not always -- like you can see

7    down here at the bottom there will be a signature of a

8    purchaser where you're supposed to write the name of the

9    purchaser.  They don't -- lots of times don't do that.

10         THE COURT:  That's blank, and that's a routine that

11   you found repeatedly through these personal money orders?

12         THE WITNESS:  It's common practice when you keep it

13   under $1,000 that they don't require identification when

14   purchasing that thing.  That's why you see a lot of them

15   purchased under that amount.

16         THE COURT:  All right.

17   BY MS. JERNIGAN:

18   Q.    And then going to page BBT-018, is that another money

19   order from Bank of America?

20   A.    Yes.  Purchased on May 29, 2015, in the amount of $1,000,

21   made payable to Quantum Health.

22   Q.    Page 19 within that same exhibit is a third money order

23   in the amount of $1,000 payable to Quantum Health issued by

24   Bank of America?

25   A.    That's correct.

1   Q.    And they all contain this same --

2   A.    Appears to be the same signature, yes.

3   Q.    Okay.  And if we go to the next month's statement within

4   that BB&T set of records, it generally shows about $25 worth of

5   funds in the account at that point?

6   A.    That's correct.

7   Q.    And how quickly would funds, once deposited, be

8   transferred out to Coinbase?

9   A.    Within a day or two.

10  Q.    And you saw that across all of the accounts contained in

11  Government Exhibit H?

12  A.    Yes.  I strictly focused my analysis for the summary

13  sheet to reflect that type of activity.

14  Q.    Now, we walked through an example regarding BB&T and

15  Citizens National Bank in Texas.  And just to reiterate, these

16  two banks and the deposit activity and transfer out are not

17  included in your financial calculations?

18  A.    That's correct.

19  Q.    But the pattern as relates to funds coming in, in

20  whatever form, be it credit cards, money orders, cash, followed

21  soon thereafter by Coinbase transactions, you saw that in the

22  bank accounts that are contained in this exhibit?

23  A.    Yes.  Those two bank accounts that we just looked at were

24  similar to the transactional pattern that we saw throughout the

25  whole entire investigation.

1          MS. JERNIGAN:  I tender the witness, Your Honor.

2          THE COURT:  All right.  It's 4:00.  Given the fact

3     that we've been going a full two hours, let's take about a

4     ten-minute break before we resume to allow everybody to

5     stretch.

6          Mr. Carmouche, you'll be ready with your

7     cross-examination at that time?

8          MR. CARMOUCHE:  Thank you, Your Honor.  I will.

9          THE COURT:  Court is in recess.

10        (Recess had 4:03 - 4:14 p.m.)

11         THE COURT:  Thank you.  Court will come to order.

12    Please be seated.

13         Two housekeeping matters before Mr. Carmouche can get up

14    and do his cross-examination.

15         Number one, first, Ms. Jernigan, you referred to an

16    Exhibit H that has not made it into evidence or may be part of

17    the PSR for something, and I wanted to kind of clear that up.

18    It's not technically offered in evidence.  There's an Exhibit H

19    that the Court has referred to and looked at in connection with

20    the agent's testimony, and I want to be sure that we know what

21    we're talking about.

22         MS. JERNIGAN:  Yes, Your Honor.  At this time the

23    Government would move Exhibit H in evidence, one document

24    titled "Bank Deposit Summary Sheets."

25         THE COURT:  All right.  And that's -- you've covered

1   that during your direct examination of the witness?

2                MS. JERNIGAN:  Yes, Your Honor.

3                THE COURT:  All right.  And that contains the summary

4   sheet showing a $2,656,491.40 total deposit amount?

5                MS. JERNIGAN:  Yes, Your Honor.

6                THE COURT:  All right.  And that is the substitution

7   for the $3.5 million amount that was discussed earlier?

8                MS. JERNIGAN:  That's correct.

9                THE COURT:  All right.  Second, Ms. Jernigan -- sorry

10  I made you sit down.  I wasn't quick enough on the draw there.

11  Do you want to submit these exhibits in electronic form to the

12  clerk after the hearing is over?

13               MS. JERNIGAN:  Yes, Your Honor.  I will do that.

14               THE COURT:  All right.  That's probably the best way

15  to do it in order to have everything together as quickly as

16  possible.

17          Denise, any other items that need to be addressed at this

18  point?

19               THE CLERK:  That's it.  Thank you.

20               THE COURT:  All right.  Thank you.

21          All right.  Mr. Carmouche, your cross-examination, sir.

22                           CROSS-EXAMINATION

23  BY MR. CARMOUCHE:

24  Q.   Agent Heusel, I have a copy of the document that is

25  identified as Government Exhibit N that was -- that's what you

1   were just testifying to.

2   A.    The BB&T records?

3   Q.    I'm sorry?

4   A.    The BB&T bank records?

5   Q.    Yes.  Yes.

6         Now, these documents appear to show a lot of deposits

7   going into those different accounts at BB&T; is that correct?

8   A.    Yes, they show deposits.

9   Q.    And is there any evidence of where -- after the money was

10  deposited, what happened to it?

11  A.    Yes.  It was transferred to Coinbase.

12  Q.    Okay.  But it doesn't show that in here, does it?

13  A.    I don't have a copy of it, but I --

14        MR. CARMOUCHE:  If I can approach the witness, Your

15  Honor?

16        THE COURT:  You may.

17  BY MR. CARMOUCHE:

18  Q.    Look through there and see if there's money -- you see

19  money in, but I don't see money going out.

20  A.    Trying to find an example for you.

21        All right.  For example, in BB&T2, page 44, you'll see a

22  counter deposit and then you'll see in a transfer out right

23  above it, it says ACH Corp. debit to Coinbase.com.

24  Q.    And that was for $2,570?

25  A.    Well, the deposit was $2,570, and the amount out was

1    1640.  And most likely what happened was, it was transferred

2    the following month.  Or, actually, one of the -- the reason

3    why it's off is because one of the deposits was actually a

4    reversal from Coinbase for $930.  So that's why the out and the

5    in don't match.

6    Q.    Is that the only place in that document shows some funds

7    going out?

8    A.    On page 24 you have a counter deposit of $2,999 followed

9    by a transfer to Coinbase.com for $2,998.

10   Q.    So suffice it to say there are a few places where there

11   was some money going out, but the large majority of those

12   documents only show money coming in?

13   A.    Well, the one transaction we talked about before was a

14   $2,999 deposit, and then there was a $2,998 transfer out to

15   Coinbase.

16           THE COURT:  And Coinbase is the link on?

17           THE WITNESS:  Coinbase --

18           THE COURT:  It proves the -- what?

19           THE WITNESS:  Coinbase is a bitcoin exchange -- a

20   middleman kind of thing where they sell bitcoins.  They sell

21   and convert bitcoins.  They are a processor.  You can buy

22   bitcoins from them or you can exchange bitcoins for currency.

23           THE COURT:  To in-and-out --

24           THE WITNESS:  Yes.

25           THE COURT:  -- from American currency to bitcoin,

1   from bitcoin to American or any other currency --

2          THE WITNESS:  Correct.

3          THE COURT:  -- that they trade in?

4          THE WITNESS:  That's correct.

5          THE COURT:  All right.  And is it routine or typical,

6   based on your analysis, that Coinbase was the proverbial

7   middleman for substantially all of the transactions that we're

8   talking about here?

9          THE WITNESS:  I would say for about more -- more than

10  50 percent of their transactions were through Coinbase.

11  Towards the end, people stopped using Coinbase because of

12  certain reasons, but -- he quit using Coinbase and went into

13  another bitcoin exchanger later on in it.  But a majority of

14  the investigation was purchased from Coinbase.

15         THE COURT:  All right.  Thank you.

16  BY MR. CARMOUCHE:

17  Q.    Agent, in your investigation of bitcoin and bitcoin

18  transactions, can you explain how a person like Michael Lord

19  could make money exchanging, buying or selling bitcoins?

20  A.    They generally charge a percentage.

21  Q.    So if you have a $2,000 deposit and a $2,000 going-out

22  payment to, say, Coinbase, how much of that would be profit?

23  A.    For that particular transaction, I'm not sure.  You'd

24  have to look.  You'd have to look at other records, not just

25  straight bank transactions, to determine the profit.

1    Q.    So did your investigation show during all this time

2    that -- what those profits might be?  You got records from

3    Bitcoin to show what they would sell to a purchaser?

4    A.    You mean records from Coinbase --

5    Q.    Yeah.

6    A.    -- or bitcoin?

7    Q.    Either one.  I mean, could you -- if the bitcoin cost

8    $2,000 and Coinbase charged $2,001, would that be the exchange

9    rate, the profit?

10   A.    Not necessarily.  It depends on how much -- for example,

11   during the undercover's transactions, he has an app on his

12   phone that determines his percentage that he gets on each

13   exchange, and that's how his percentage is determined.

14         So he will actually transfer from another wallet to one

15   of his other wallets and do the transaction, and then turn

16   around and replenish his wallet.  So he'll actually have more

17   money, because he gets more money than he actually -- say he

18   takes in $3,000.  He'll actually only sell them $2,800 worth of

19   bitcoins.

20   Q.    I see.  So if relevant conduct in a case like this is

21   $2,500,000, would it be safe to say that only a small

22   percentage of the $2,500,000 would be money made by people

23   exchanging --

24   A.    Oh, yes.  I'm not saying that he made $2.6 million.

25   That's not what I'm saying.

1      You could come out a ballpark of maybe his profit.  If

2  he's charging a 10 percent or a 12 percent markup, then you can

3  multiply that by the $2.6 million.  That's the amount of money

4  involved in the transactions.

5  Q.    So buying and selling bitcoins, if you're following the

6  regulations, FinCEN regulations and whatever licensing

7  requirements, then it's completely legal, right, in this

8  country?

9  A.    To be a bitcoin business?

10  Q.    Yeah.

11  A.    Yes.  As long as you register and follow the rules, yes,

12  it is legal.

13  Q.    Now, when you were looking at the bank accounts -- and

14  that was just one of the bank accounts you looked at -- did you

15  detect any or did you suspect any or have any concern that the

16  defendants were attempting to hide their bitcoin processes?

17      I mean, they -- this was in the bank; right?  In a bank

18  that you could get the records to?  Or anybody could,

19  basically, any law enforcement agent could.

20  A.    Yes.  But when they opened the bank accounts, they didn't

21  represent that they were a bitcoin exchange business.  And when

22  they opened with the credit card processors, they did not

23  disclose the fact that they were a bitcoin exchange business.

24  Because, in fact, when the credit card processors find out,

25  they actually terminated them.

1    Q.    They shut them down.

2          So it could be that if there was any effort not to be

3    completely truthful with the credit card processor, that was an

4    effort, possibly, to stay in business; right?

5    A.    Yes.  They were probably trying to stay in business,

6    yeah.

7    Q.    And in your looking at all of these exchanges, did you

8    see where any of the credit card companies -- I think I asked

9    that before -- lost money based on the defendants' dealings

10   with them?

11   A.    There were some occasions, some records that we obtained

12   from Capital One, where Capital One lost money.  Now, able to

13   determine which transactions they lost money on, we're not

14   sure; so we're not positive that they lost money in that

15   particular transaction with them.

16   Q.    So can you show us any direct loss to any of those

17   agencies -- the credit card processors, credit card companies,

18   or the banks -- that lost money by the defendants' dealings?

19          MS. JERNIGAN:  Objection.  Loss is not relevant to

20   the offenses in this matter, it's the value of the funds

21   involved in the unlicensed MSB.

22          THE COURT:  And "value of funds," by that, you mean

23   each transaction as shown on Exhibit H being used as the

24   guideline amount for calculation purposes?

25          MS. JERNIGAN:  Yes, Your Honor.

1    THE COURT:  And not each transaction or deposit or

2 exchange showing a profit or a loss or a net zero --

3    MS. JERNIGAN:  That's correct.

4    THE COURT:  -- to the exchangers?

5    MS. JERNIGAN:  Yes, Your Honor.

6    THE COURT:  Okay.  Sustained.

7 BY MR. CARMOUCHE:

8 Q.   Just one last question.  You may have already answered

9 it.  The money that was coming in, did it all go to Coinbase or

10 some bitcoin agency?

11 A.   You mean every dollar amount that they --

12 Q.   Yes, sir.

13 A.   -- deposited in all their accounts?  No, not -- there --

14 that's why some of the bank accounts were taken out of the

15 summary chart.

16 Q.   And is there some document you have that would show us

17 how much money went from the defendants' accounts to Coinbase

18 or some other bitcoin transaction or company --

19 A.   Yes.  There are records that show exactly the money

20 transfers.

21 Q.   Okay.  So we -- but we haven't seen those yet, I don't

22 guess?

23 A.   Today?

24 Q.   Yeah.

25 A.   Of all the transactions?

1    Q.    Yeah.

2    A.    No, we have not shown that today.

3          MR. CARMOUCHE:  Thank you, Your Honor.  That's all I

4    have.

5          THE COURT:  Any redirect on this point?

6          MS. JERNIGAN:  Yes, Your Honor.

7                    REDIRECT EXAMINATION

8    BY MS. JERNIGAN:

9    Q.    Agent Heusel, you were asked questions about efforts to

10   hide their bitcoin business on cross-examination.  Do you

11   recall that?

12   A.    Yes.

13   Q.    The bank accounts listed in Government Exhibit H cover

14   what time period?

15   A.    They cover October 2013 to October 2014.

16   Q.    And what's the first account listed on Government

17   Exhibit H?

18   A.    The first account listed?

19   Q.    Yes.

20   A.    Is Quantum Health at Bank of America.

21   Q.    And during what period is the total deposit reflected?

22   A.    May 1, 2014, to June 30, 2014.

23   Q.    And what happened after June 30, 2014, for that bank

24   account?

25   A.    They were closed down by Bank of America.

1    Q.    And what happened to the next bank account listed on
2    Government Exhibit H?
3    A.    That was Quantum Health at Wells Fargo from March 1,
4    2014, to April 30, 2014, and that account was also -- was
5    closed by Wells Fargo.
6    Q.    And that's the case for all of these accounts?
7    Eventually, they were closed down by the bank once they
8    realized what the defendants were actually using the accounts
9    for; correct?
10   A.    That's correct.  That's why you see the openings right
11   after the closings of that -- at certain banks.
12   Q.    And that's why there's so many accounts?
13   A.    That's why there's so many accounts, yes.
14   Q.    And there were documents that the defendants filled out
15   regarding what the accounts would be used for, for these
16   various banks?
17   A.    Yes.
18   Q.    And what did they say the intended expected business
19   activity would be?
20   A.    Well, for example, Quantum Health represented as a
21   medical service company.  And then, for example, Data Security
22   talked about just being a computer consultant.
23   Q.    And there were also misrepresentations when they applied
24   to process credit cards; correct?
25   A.    Yes.

Q.    And why was it important to the banks and the credit card

processors to know what actually the defendants were going to

be using these accounts for?

A.    Well, in one particular situation, we asked the credit

card processing company what bearing it had, and they said

they -- their underwriters had labeled bitcoin exchange

business as high risk and they were actually operating at a

medium risk because -- so they're saying that if they found out

they're a bitcoin exchange, they'd be elevated to high risk,

and certain processors aren't able to process for high risk

companies.

                MS. JERNIGAN:  That's all I have, Your Honor.

                THE COURT:  All right.  You may step down.  Thank

you.

        Mr. Carmouche, the objections to paragraphs 25 to 27 in

Randall Lord's PSR, following the evidence, do you have any

additional follow-up to make in the way of argument or the

presentation of any countervailing evidence?

                MR. CARMOUCHE:  That was -- in the chronological

order that we're going, Your Honor, that was --

                THE COURT:  That's correct.  It has to do with

Exhibit H, primarily, and the $2.6 million-plus summary sheet

reduced from the $3.5 million that was originally part of the

PSR.

        And the objection was, on behalf of Randall Lord, that

1    some of the deposits were simply currency deposits.  And from

2    what I heard, based on Exhibit H, those are currency deposits,

3    but they are Coinbase/bitcoin exchange-related.  And that's the

4    issue that I would like for you to address, if you can.

5              MR. CARMOUCHE:  I don't think we have anything else

6    to offer on that particular objection, Your Honor.

7              THE COURT:  All right.  Thank you.

8         Ms. Jernigan, do you have any concluding remarks on what

9    the evidence showed or anything of that sort with respect to

10   this objection?

11             MS. JERNIGAN:  No, Your Honor.

12             THE COURT:  The Court finds by a preponderance of the

13   evidence that the summary sheet marked as Exhibit H indicating

14   the $2.6 million-plus summary sheet, on a preponderance of the

15   evidence basis, are sufficiently related to show sale and/or

16   exchange of bitcoins, whether it's to or from the so-called

17   bitcoin or internet wallets, and the handling of the total

18   amount of money shown on Exhibit H is properly used in the

19   calculation in changing it from a plus 18 steps to a plus 16,

20   thereby resulting in a two-point reduction in calculations that

21   inures to the benefit of both defendants in this particular

22   matter.

23        The Court has previously cited the *U.S. vs. Abdi* and

24   *U.S. vs. Beras* cases in connection with this.

25        The Court again reiterates its concern that the

1   objections by Michael Lord and Randall Lord on this point cast

2   further doubt on points being awarded for acceptance of

3   responsibility.

4       The Court overrules the objection.  No further changes to

5   the PSR are warranted.

6       Next is the same ruling with respect to paragraphs 37 to

7   41 and paragraph 45 for Michael Lord.  However, the Court notes

8   that the objection there, while to the same values that are

9   shown in Exhibit H, that Michael Lord argues that the base

10   offense level and the total offense level calculations in the

11   presentence report are a result of piling on and offend his due

12   process.

13       The argument is, and as I heard in cross-examination of

14   the witness, that bitcoins are legal currency and that he pled

15   guilty to not having a state license or registering with FinCEN

16   in a timely manner.

17       In this particular instance, the Guidelines call for and

18   require calculations to be made on the basis of the amount of

19   the transactions involved in connection with the bitcoin

20   business, which was actually a composite transaction business

21   run through a number of different LLC's and d/b/a's of Randall

22   Lord and/or Michael Lord as part of the conspiracy.

23       He maintains that the imprisonment range that nets out

24   under the Guidelines is disproportionate with his crime, and

25   also argues that there was no loss to anyone.  Accordingly, he

 1    contends it is a victimless crime.

 2         The Court notes that it is not necessary under the

 3    Guidelines for a specific person or juridical person to -- or

 4    business entity to lose money for the calculation to apply.  In

 5    this particular instance, the process itself and the failure to

 6    register properly are so-called societal-type crimes with harm

 7    resulting from transactions which are not adequately tracked

 8    and registered in accordance with law as a money servicing

 9    business or as a money transmitter or money transmitting

10    business.

11         In this particular instance, it appears to the Court that

12    these objections raised individually by Michael Lord offend the

13    notion of acceptance of responsibility and constitute a claim

14    that he does not believe that his actions are the result of

15    criminal activity, which flies in the face of the sworn plea

16    hearing and his admission of guilt in fact under oath in this

17    open court.  Accordingly, the Court rules that acceptance of

18    responsibility with respect to this individual, Mr. Michael

19    Lord, is hereby removed.

20         With respect to Mr. Randall Lord, taken as a whole the

21    objections and taken into account also with Michael Lord in the

22    attempt to withdraw the guilty plea under the circumstances

23    also leads the Court to the same conclusion that acceptance of

24    responsibility is now improperly included within the PSR.

25         Thus, the Court will sustain the use of the plus 16, as

1   opposed to the plus 18, to the base offense level of 6, but

2   will recalculate the guidelines with a minus 3 as those

3   acceptance of responsibility points have now been removed with

4   respect to both individuals.

5          In this particular instance, the Court having found the

6   acceptance of responsibility is no longer warranted, the Court

7   notes a couple of different things.

8          First of all, they were originally awarded a three-point

9   reduction for acceptance of responsibility under

10  Section 3E1.1(a) and (b).

11         Second, Application Note 3 to this section of the

12  Guidelines which has been repeatedly cited by this Court during

13  today's hearing, that merely entering a guilty plea does not

14  entitle a defendant to an adjustment under this section as a

15  matter of right.

16         The guilty plea, combined with truthfully admitting the

17  conduct comprising the offense of conviction, and either

18  truthfully admitting or at least not falsely denying any

19  additional relevant conduct serves as significant evidence of

20  acceptance of responsibility.  However, this Court notes that

21  such evidence may be outweighed by conduct of the defendant

22  that is inconsistent with such acceptance of responsibility.

23         This Court finds that, No. 1, defendants', plural,

24  objection that there was no loss to anyone or victim of this

25  crime and, 2, the attempt to withdraw the guilty plea as

1    indicated in the motions themselves constitute conduct that is

2    inconsistent with the finding of acceptance of responsibility.

3           The Court notes that the portion dealing with the absence

4    of state registration capability in Louisiana simply moots an

5    area of fact finding and simply removes a mode of committing

6    the underlying crime of conspiracy to operate a money servicing

7    business under the circumstances.

8           The Court previously noted that the failure to register

9    with the state being a legal impossibility under the

10   circumstances does not change or alter any of the calculations;

11   that the mode of violation in this particular case has to do

12   with federal regulations.

13          And the Court finds, under a preponderance of the

14   evidence standard and under a credibility standard, that the

15   defendants knew and, with reasonable inquiry, should have known

16   of the registration requirements with the federal government's

17   FinCEN and obtaining after filing of the paperwork the proper

18   registration.

19          Accordingly, the Court hereby orders that the presentence

20   report be amended to reflect this change, and the calculations,

21   after the objections and removal of the acceptance of

22   responsibility pursuant to this Court's order with respect to

23   Randall Lord, is now calculated at a Level 28, with a guideline

24   range of 78 to 97 months.

25          And with respect to Michael Lord -- and we haven't gotten

1  to the drug issues yet with respect to Michael Lord.  It's a --

2  I'm sorry.  We've got an error here in my notes.

3      With respect to Michael Lord on this point, before we get

4  to the drug objections, it would be an amendment on this

5  portion of it to a net offense level of 28, with a guideline

6  range of 78 to 97 months; and as to Randall Lord, a net offense

7  level of 24, Category I, which translates into a 51-to-63-month

8  range.

9      Now, we are at a quarter of 5:00 in the afternoon and we

10 still have the drug-related charges to go over on the various

11 objections by the defendant, and I don't know that we can do

12 that in 15 minutes, Mr. Carmouche.

13     Ms. Jernigan, you're entitled to speak to this as well.

14         MS. JERNIGAN:  May we have a sidebar, Your Honor?

15         THE COURT:  One sidebar coming up.  You want it on

16 the record or off the record?

17         MS. JERNIGAN:  Off the record.

18         THE COURT:  All right.  Come on up.

19     (Bench conference had off the record.)

20         THE COURT:  All right.  The Court is mindful of the

21 late hour and the amount of work that still is left to be done

22 on the sentencing hearing involving Michael Lord and the

23 objections raised to the drug-related count to which Michael

24 Lord pled guilty.

25     At this particular point, I am going to conclude the

1   Court's rulings on the objections with respect to Mr. Randall
2   Lord.
3           Mr. Carmouche, would you like to note your objection to
4   the Court's rulings at this time, for the record?
5               MR. CARMOUCHE:  Yes, Your Honor, I do.  And to all of
6   those rulings, we object.
7               THE COURT:  Noted.
8           And with respect to tomorrow, I would like to reconvene
9   at 9:30 in the morning, at which time we will begin with the
10  objections involving the drug component of Michael Lord's
11  guilty plea and the objections to the PSR on that topic, and
12  then proceed to ruling on those objections, then proceed to
13  allocution by Randall Lord, allocution by Michael Lord, and
14  concluding remarks by the Government and Mr. Carmouche
15  following any decision to allocute by the defendants.
16          I do not wish to constrain the allocution in any manner,
17  which is why I think it's more appropriate that we reconvene
18  tomorrow morning in order that we can also have an opportunity
19  to decide what further motions may be necessary on behalf of
20  the Government and to prepare adequately for the remaining
21  portion tomorrow.
22          That will give you time to consult with your clients,
23  too, regarding allocution, if you would, Mr. Carmouche.
24              MR. CARMOUCHE:  Right.
25              THE COURT:  Anything further this afternoon that we

1    need to review, Ms. Jernigan?

2            MS. JERNIGAN:  Nothing further from the Government,

3    Your Honor.

4            MR. CARMOUCHE:  Nothing from us.

5            THE COURT:  All right.  The evidence has been offered

6    and received and admitted at this particular point.

7            With nothing further, we are adjourned for the day, to

8    reconvene tomorrow morning at 9:30.

9            (Proceedings adjourned at 4:52 p.m.)

I N D E X

PROCEEDINGS                                              Page

        Witnesses Called by the Government:

                Agent Darrin Heusel:
                        Direct Examination...................24
                        Cross-Examination....................37
                        Redirect Examination.................40
                        Recross-Examination..................44
                Agent Darrin Heusel (Recalled):
                        Direct Examination...................55
                        Cross-Examination....................69
                        Redirect Examination.................77


EXHIBITS                          *Identified*    *Admitted*

        Government Exhibit No. H...............    56          68
        Government Exhibit No. I...............    27          37
        Government Exhibit No. K...............    41          43
        Government Exhibit No. L...............    31          37
        Government Exhibit No. N...............    60          62




                        Certificate

I hereby certify this 20th day of September, 2017, that the
foregoing is, to the best of my ability and understanding, a
true and correct transcript from the record of proceedings in
the above-entitled matter.


                        /s/ Marie M. Runyon
                        Official Court Reporter