

1          UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF LOUISIANA

3             SHREVEPORT DIVISION

4

UNITED STATES OF AMERICA        )
5                                )     Criminal Action
VS.                             )     No:  15-0240
6                                )
MICHAEL A. LORD (01)            )
7  RANDALL B. LORD (02)         )
   _____

8

9             SENTENCING VOLUME II
         OFFICIAL TRANSCRIPT OF PROCEEDINGS
10        ON MAY 24, 2017, AT 9:30 A.M.
      BEFORE THE HONORABLE S. MAURICE HICKS, JR.,
11           UNITED STATES DISTRICT JUDGE,
             IN SHREVEPORT, LOUISIANA

12

13  FOR THE GOVERNMENT:
         AUSA Cytheria Jernigan
14       U.S. Attorney's Office
         300 Fannin Street, Suite 3201
15       Shreveport, Louisiana  71101-3068

16  FOR THE DEFENDANTS:
         Mr. Paul J. Carmouche
17       Barham Warner Stroud Carmouche, L.L.C.
         920 Pierremont Road, Suite 412
18       Shreveport, Louisiana  71106

19

20

21

   Produced by mechanical stenography, transcript produced by
22  computer.

23  _____
          MARIE M. RUNYON, RMR, CRR
24       FEDERAL OFFICIAL COURT REPORTER
         300 FANNIN STREET, ROOM 4212
25       SHREVEPORT, LOUISIANA  71101
             (318) 934-4756

1 (Court called to order with the defendants

2 present at 9:39 a.m.)

3  THE COURT:  Good morning.  Court will come to order.

4  All right.  We are here for Day Two of a sentencing

5 hearing in the matter of United States vs. Michael Lord and

6 United States vs. Randall Lord.  We came to a halt yesterday

7 with rulings on objections that had been filed by the defendant

8 on behalf of Randall Lord and Michael Lord involving the money

9 servicing or money transmitting business involving bitcoins.

10  To the extent -- I believe the Court has ruled on all the

11 objections.  Mr. Carmouche, did I catch all the objections that

12 you raised, or did I miss any?

13  MR. CARMOUCHE:  I believe you caught them all, Your

14 Honor.

15  THE COURT:  I thought we had.  Just to be sure, to

16 the extent that I have not ruled on any objections, I will note

17 that the Court -- in accordance with and for oral reasons

18 provided in yesterday's portion of the hearing, those are

19 hereby overruled.

20  That gets us to the point of moving to objections on the

21 drug side of things for Michael Lord.  Ms. Jernigan, do you

22 concur with that?

23  MS. JERNIGAN:  I believe that's correct, Your Honor.

24  MR. CARMOUCHE:  That's correct.

25  THE COURT:  You, likewise, Mr. Carmouche?

1          MR. CARMOUCHE:  Yes, sir.

2          THE COURT:  All right.  Please be seated.

3      Ms. Jernigan, what did you decide to do about the

4  objections that the Government has raised to the presentence

5  report on the drug component?

6          MS. JERNIGAN:  Your Honor, we will proceed with

7  presenting evidence in support of the objections that we

8  submitted.

9      The Government submitted four objections regarding

10  Count 15 of the indictment.  I believe two of those four have

11  already been addressed, and the presentence report provides

12  accordingly regarding the synthetic cannabinoid, both the

13  initial inclusion of it and then the actual conversion ratio of

14  it.

15      The other two that then remaining outstanding relate to

16  other offense characteristics of the drug conspiracy regarding

17  mass marketing through a computing service and then use of a

18  special skill, I believe were the last two outstanding

19  objections for that count of the defendant's convictions.

20          THE COURT:  So let me be sure.  Let me summarize the

21  first objection that we're going to be dealing with, and that

22  is that the Government argues that the 0.014 kilograms of the

23  drug known as 5F-AB-PINACA shipped from China to Michael Lord's

24  acquaintance, Al Hasnat Laghari, should be included in the

25  guideline calculations at a rate of 167 grams of marijuana

1    equivalent per gram of synthetic marijuana, for a total of

2    169.338 kilograms of marijuana equivalent.

3           The Government also references a second package that

4    Michael Lord ordered from China containing a white powder which

5    was intercepted by Customs and Border Protection.

6           The current status of the presentence report is that it

7    has been amended to reflect the new calculation with the

8    PINACA, also known as "synthetic marijuana," converted to the

9    marijuana equivalent at the rate of 1:167 ratio.  This resulted

10   in a base level of 24 for the drug charge.

11          As to the second package from China, the Government's

12   response to the defendant's sentencing memorandum, that package

13   contained a drug abbreviated as "TFMPP" which has a chemical

14   name of "3-Trifluoromethylphenylpiperazine," spelled

15   p-i-p-e-r-a-z-i-n-e -- that's as close I can get on that

16   chemical name -- which is commonly used with other substances

17   as an alternative to MDMA.  The drug at issue is referred to as

18   legal "Molly" or "Ecstasy" because it has been removed from the

19   list of Schedule I substances.  As such, the second package is

20   not included in the guideline calculations regarding drug

21   quantities.

22               MS. JERNIGAN:  That's correct, Your Honor.

23               THE COURT:  So does that fairly summarize this?

24               MS. JERNIGAN:  Yes, Your Honor.

25               THE COURT:  And we did not have, at the time that

1    this was first scheduled for sentencing, a chemical report at

2    all on the second bag; so we didn't really know what it was.

3              MS. JERNIGAN:  That's correct, Your Honor.

4              THE COURT:  And now that report has been received and

5    details the findings that I just placed in the record.

6         At this particular point, Mr. Carmouche, you rise?

7              MR. CARMOUCHE:  Yes, Your Honor.  There was the

8    indication that Michael Lord ordered those drugs that you were

9    just discussing.  We don't believe there's evidence to show

10   that Michael Lord ordered them.  The undercover or snitch is

11   the person who was ordering those drugs, not Michael Lord; so

12   we would object to that being included in the conversation.

13             THE COURT:  All right.  Ms. Jernigan, any evidence as

14   to that, or should the PSR be amended to reflect that?  Or did

15   I correctly state it?

16             MS. JERNIGAN:  Your Honor, we do not have direct

17   evidence of which party ordered the drugs from China.

18             THE COURT:  All right.

19             MS. JERNIGAN:  Just that it was involved during the

20   existence of the conspiracy.  Again, the weight has not been

21   included, so it doesn't impact the calculations of the

22   guidelines for Michael Lord.

23             THE COURT:  And I don't consider it as behavior,

24   quote-unquote, regardless of who placed the order,

25   Mr. Carmouche, that enters the Court's calculus in -- with

1    respect to that, because the second bag is legal.  So I'll be
2    glad to correct that to say that the evidence does not reflect
3    who specifically ordered it, but that it was ordered as part of
4    the conspiracy on the drug component of Mr. Lord -- Mr. Michael
5    Lord's guilty plea.
6              MR. CARMOUCHE:  Thank you, Your Honor.  And I'm sure
7    there will be some testimony on those issues this morning.
8              THE COURT:  Like I said, that behavior doesn't enter
9    into the Court's consideration at all in this matter.
10         All right.  Ms. Jernigan, call your witness.
11             MS. JERNIGAN:  The Government calls Mr. Laghari.
12        (Witness sworn.)
13             THE COURT:  And you may begin when you're ready.
14             MS. JERNIGAN:  Thank you, Your Honor.
15                        DIRECT EXAMINATION
16   BY MS. JERNIGAN:
17   Q.    Good morning.  Would you please state your first and last
18   name for the record and spell both.
19   A.    Al Hasnat Laghari, A-l H-a-s-n-a-t L-a-g-h-a-r-i.
20   Q.    Mr. Laghari, I'm going to ask you to sit forward a little
21   bit in your chair, make sure you speak into that bar that's in
22   front of you -- that's the microphone -- so that everyone can
23   hear you clearly.
24         Mr. Laghari, how old are you?
25   A.    23.

1  Q.    Do you currently reside in the state of Washington?

2  A.    Yes, ma'am.

3  Q.    And prior to that, where did you live?

4  A.    Springhill, Louisiana.

5  Q.    What do you do for a living?

6  A.    I own a restaurant and a catering business.

7  Q.    And that's in Washington?

8  A.    Yes, ma'am.

9  Q.    Do you know the defendant, Michael Lord?

10 A.    Yes, ma'am.

11 Q.    How did you meet him?

12 A.    We met on the internet buying bitcoins.

13 Q.    How did you know him as?

14 A.    I knew him as "Internet151."

15 Q.    Internet151?

16 A.    Yes, ma'am.

17 Q.    What was that?

18 A.    That was a pseudo name he used on the internet.

19 Q.    Do you see Michael Lord in court today?

20 A.    Yes, ma'am.

21 Q.    Can you identify where he's seated and an article of

22 clothing he's wearing?

23 A.    In the center of that table, in a black suit.

24 Q.    Okay.

25        MS. JERNIGAN:  Your Honor, may the record reflect the

1    witness has identified Michael Lord?
2              THE COURT:  So noted.
3    BY MS. JERNIGAN:
4    Q.    Mr. Laghari, you've previously been convicted of a
5    felony; correct?
6    A.    Yes, ma'am.
7    Q.    On more than one occasion?
8    A.    Yes, ma'am.
9    Q.    And were you convicted of a felony out of south
10   Louisiana?
11   A.    Yes, ma'am.
12   Q.    Related to what?
13   A.    Possession of drugs.
14   Q.    And were you convicted in Webster Parish for drug
15   activity that's the subject of this case?
16   A.    Yes, ma'am.
17   Q.    Going back to your interactions with the defendant
18   Michael Lord, you said you met him as a result of purchasing
19   bitcoin?
20   A.    Yes, ma'am.
21   Q.    Why were you purchasing bitcoin?
22   A.    I was using bitcoins to order drugs off the internet.
23   Q.    And how did you happen to find a bitcoin dealer that was
24   in this area as opposed to California or New York?
25   A.    I used a website called "localbitcoins" that you enter

1    your ZIP Code and it finds bitcoin dealers in your area.

2    Q.    Why use bitcoin rather than pay for your drugs with cash

3    or anything else?

4    A.    Because bitcoins are fully anonymous and allow you to

5    order drugs without leaving a paper trail per se.

6    Q.    How did you first learn about bitcoin?

7    A.    Just reading on the internet, I came across an article

8    and became interested.

9    Q.    Can you explain to the Court how bitcoin works when you

10   use them.

11   A.    I guess bitcoin is an anonymous cryptocurrency that isn't

12   regulated by any government or state; so nobody can really tell

13   who's using it or who's doing what, to an extent.

14   Q.    And when you say "encrypted," encrypted involving every

15   party that's a party to a transaction involving bitcoin?

16   A.    I believe so.

17   Q.    Okay.  So going back to your introduction to Michael Lord

18   over the internet, you said you wanted to buy bitcoin for the

19   purpose of buying drugs?

20   A.    Correct.

21   Q.    How did you -- after you contacted him via Internet151,

22   what happened from there?

23   A.    Placed a request to purchase an amount of bitcoins.  He

24   accepted the request and messaged me shortly later, and we set

25   up a meeting.

1    Q.    Where did that meeting take place?

2    A.    At McDonald's on Bert Kouns.

3    Q.    In Shreveport, Louisiana?

4    A.    Yes, ma'am.

5    Q.    Okay.  And what happened when you met at McDonald's?

6    A.    I arrived and texted him, said I was there.  He said he

7    was inside.  I walked in, sat down at the table, handed him

8    maybe $500, give or take, counted the money, sat my phone on

9    the table, he transferred the coins, and I left.

10   Q.    Is the transfer of currency or the conversion of currency

11   into bitcoin done using your cellular devices?

12   A.    It can be done on a computer, cell phone, iPad.  But at

13   the time, he was using his phone.

14   Q.    On how many occasions -- let me back up.

15         Approximately when did that initial meeting with Michael

16   Lord take place?

17   A.    This is maybe two and a half, three years ago.

18   Q.    And on how many occasions did you meet with him

19   face-to-face for the purposes of purchasing bitcoin?

20   A.    At least 15, if not more.

21   Q.    For each of your purchases of bitcoin, was it related to

22   or in order to facilitate your drug trafficking?

23   A.    Yes, ma'am.

24   Q.    On any of the occasions where you met Michael Lord to buy

25   bitcoins, was anyone else present?

1  A.    I believe on one occasion, maybe two, his father was with

2  him, but we didn't have any interaction.

3  Q.    Okay.  And, again, were all these meetings at McDonald's

4  or other places in the Shreveport area?

5  A.    Correct.  I believe once or twice, maybe, he got inside

6  my vehicle, we didn't go inside McDonald's, because there was a

7  larger sum of money.  I didn't feel comfortable handing that

8  much money in a public setting.  But always at McDonald's.

9  Q.    Always at McDonald's.  Okay.

10            MS. JERNIGAN:  Permission to approach the witness,

11  Your Honor?

12            THE COURT:  You may.

13  BY MS. JERNIGAN:

14  Q.    Now, you were living in Springhill prior to relocating to

15  the state of Washington?

16  A.    Yes, ma'am.

17  Q.    Were you also at least partially living in the Baton

18  Rouge area at this time frame?

19  A.    Yes, ma'am.

20  Q.    And so on those occasions where you were in the Baton

21  Rouge area, would you travel back up to Shreveport to meet with

22  Michael Lord?

23  A.    Yes, ma'am.

24  Q.    Mr. Laghari, I want to direct your attention to May of

25  2015.  Did law enforcement show up at your family's home in

1  Springhill, Louisiana?

2  A.    Yes, ma'am.

3  Q.    Was that in connection with the delivery of a package?

4  A.    Yes, ma'am.

5  Q.    How did you first get word that law enforcement was at

6  your parents' house?

7  A.    I believe I got a phone call from my brother telling me

8  that something was wrong.

9  Q.    And were you at the house when law enforcement first

10  arrived?

11  A.    No, ma'am, I was not.

12  Q.    But did you ultimately travel back to your house?

13  A.    Yes, ma'am.

14  Q.    What did you do en route going back to the house?

15  A.    I mean, I tried to destroy my cell phone.  I threw my

16  wallet out the window.  I panicked.  I made some phone calls.

17  Q.    Did you meet with the defendant prior to returning to the

18  house?

19  A.    Yes, ma'am.

20  Q.    And by "the defendant," I'm referring to Michael Lord.

21  A.    Yes, ma'am.

22  Q.    What did you do when you saw the defendant?

23  A.    I told him something was gravely wrong, that I was in

24  trouble, and I handed him a large amount of drugs and told him

25  to find some money to help me.

1    Q.    What kind of drugs?

2    A.    Xanax.

3    Q.    Where had the Xanax come from?

4    A.    I had manufactured it.

5    Q.    If you would turn in the binder in front of you to the

6    Tab A and let me know when you're there.

7    A.    Yes, ma'am.

8    Q.    Do you recognize what's contained in Government

9    Exhibit A?

10   A.    Yes, ma'am.

11   Q.    What's in that exhibit?

12   A.    This is a TDP 5 pill press, a VH5 mixer, and a large bag

13   of binder.

14   Q.    Do you recognize the area where those two items are

15   located?

16   A.    Yes, ma'am.

17   Q.    How are you able to recognize that area?

18   A.    This is a building my father owned in Arkansas.

19          MS. JERNIGAN:  Your Honor, the Government would move

20   to admit Exhibit A in evidence.

21          THE COURT:  Any objection?

22          MR. CARMOUCHE:  No objection, Your Honor.

23          THE COURT:  Admitted.

24          MS. JERNIGAN:  Madam Clerk, may I have the ELMO?

25          THE CLERK:  Yes.

BY MS. JERNIGAN:

Q.    Okay.  Mr. Laghari, if you could point out the pill press in this photograph.

A.    It's going to be the large silver machine to the top left with the round wheel.

Q.    And the item to the left that's white and has a wheel to it, what is that?

A.    That's the press, ma'am.  That's what I was referring to first.

Q.    Can you turn to Government Exhibits B and C.  Do you recognize what's contained in both of those exhibits?

A.    Exhibit B is the pill press.  Exhibit C is a mixer.

Q.    Okay.

         MS. JERNIGAN:  Your Honor, the Government would move to admit Exhibits B and C in evidence.

         THE COURT:  Any objection?

         MR. CARMOUCHE:  No objection, Your Honor.

         THE COURT:  Admitted.

BY MS. JERNIGAN:

Q.    Mr. Laghari, this is a close-up shot of the press?

A.    Yes, ma'am.

Q.    What's the white powdery substance seen on the machine and in the clear Tupperware containers there on the table?

A.    The white powdery substance is binder, pill binder.

Q.    And how did that relate to the pill press?

1    A.    It's the ingredient that's used to hold the pills
2    together.
3    Q.    Directing your attention to Government Exhibit C, this is
4    a close-up photograph of the mixer?
5    A.    Yes, ma'am.
6    Q.    And there is a clear plastic bag on the top of that
7    device; correct?
8    A.    Yes, ma'am.
9    Q.    Do you know what's in that bag?
10   A.    I can't say with certainty.  It could be active
11   ingredient or it could be binder.
12   Q.    When you say active ingredient, what are you referring
13   to?
14   A.    Alprazolam.
15   Q.    Going back to Government Exhibit A, there is a bag in the
16   foreground here on the -- what appears to be the floor of that
17   room.
18   A.    Yes, ma'am.
19   Q.    Do you see that?
20   A.    Yes, ma'am.
21   Q.    Approximately how big is that bag?
22   A.    20 kilograms.
23   Q.    Of what?
24   A.    Microcrystalline cellulose, pharmaceutical grade binder.
25   Q.    Can you explain to the Court why the pill press, the

1    mixer, the binder, and all these items we've just talked about
2    were located in your father's business in Arkansas and how that
3    came about.
4              MS. JERNIGAN:  Madam Clerk, can we have the lights,
5    please.
6              THE CLERK:  Sure.
7              THE WITNESS:  Could you ask the question one more
8    time?
9    BY MS. JERNIGAN:
10   Q.    Why were the pill press, the mixer, and the product
11   located in your father's business in Arkansas?  How did this
12   all come about?
13   A.    Because myself and Michael needed a location to set up
14   our operation, and at the time this seemed like a reasonable
15   idea.
16   Q.    And what was the operation that you and Michael Lord were
17   going to have?
18   A.    To manufacture hundreds and thousands of pills of Xanax
19   and sell them on the internet.
20   Q.    How did you go from being a bitcoin customer to entering
21   into a drug conspiracy with Michael Lord?
22   A.    Maybe just opportunity.
23   Q.    You indicated that you met with him approximately 15
24   times?
25   A.    Correct.

1  Q.    For the purpose of purchasing bitcoin?

2  A.    Correct.

3  Q.    Who first brought up, if you recall, the idea of doing

4  drug manufacturing?

5  A.    I can't say who brought it up, but I believe after some

6  time we became more comfortable with each other and started

7  talking about what my business was, what his business was, what

8  we do, what he does.  And I believe we spoke about the drug

9  market on the internet and how there was a hole in the Xanax

10  game, there was a demand; and through my research and his

11  research, we realized that it was possible that we could fill

12  that hole.

13  Q.    Why was there a hole, in your view?

14  A.    There was a previous vendor who was arrested prior to

15  this who was one of the biggest Xanax suppliers on the

16  internet.

17  Q.    And when you say "vendor," what are you referring to?

18  A.    He was a -- he had an online marketplace.

19  Q.    Who was that vendor?

20  A.    His name was "Xanax King."

21  Q.    So Xanax King was an online vendor.  Online where?

22  A.    He was on a multitude of online platforms:  the Silk

23  Road, Agora, different websites where drugs are sold.

24  Q.    Is that sometimes referred to as the "darknet"?

25  A.    Correct.

1  Q.    And you were aware that that particular individual had

2  been arrested?

3  A.    Correct.

4  Q.    And so was, therefore, no longer able to distribute

5  Xanax?

6  A.    Correct.

7  Q.    How did you get the pill press and the mixer?

8  A.    Myself and Michael did a lot of research online over

9  previous months to this:  reading Xanax King's police reports,

10  what kind of pill presses he had; Googling how to acquire these

11  things; looking on eBay, Alibaba, different Chinese websites.

12  I believe we were both in communication back and forth with

13  suppliers negotiating prices, shipping, things like that.

14  Q.    And so what was the goal?  What was the plan for how this

15  would work, how much you would charge?  You obviously ordered

16  the equipment.  What did you discuss with Michael Lord in that

17  respect?

18  A.    The goal was to build a stockpile of pills, set up an

19  online shop, sell them as fast as possible, build up a

20  stockpile of bitcoins, cash them out in U.S. dollars and split

21  the profits.

22  Q.    Now, going back to May of 2015, when law enforcement

23  showed up, you said you handed off pills or product?

24  A.    Correct.

25  Q.    And that was product that you had made using that

1  equipment that we saw in Exhibits A through C?

2  A.    Correct.

3  Q.    And you handed it off to Michael Lord?

4  A.    Correct.

5  Q.    With what instructions or request?

6  A.    To get rid of it, to come up with some money, and to help

7  my parents.

8  Q.    After you met with Michael, did you ultimately arrive

9  back at your parents' residence in Springhill, Louisiana?

10 A.    Yes, ma'am.

11 Q.    And did you begin to cooperate with law enforcement's

12 investigation?

13 A.    Yes, ma'am.

14 Q.    What were some of the things you did in connection with

15 cooperating with law enforcement?

16 A.    I mean, I turned over all the evidence, gave them my

17 phone.  I -- I don't know.  What else?

18 Q.    Did you communicate with the defendant after you began

19 cooperating with law enforcement?

20 A.    Afterwards, I did.

21 Q.    And were those communications recorded?

22 A.    Yes, ma'am.

23 Q.    How did you communicate with him?

24 A.    Through cell phone, through my laptop, through encrypted

25 chats, and one time face-to-face.

1   Q.    When you say "encrypted chats," can you explain what

2   particular platforms you used and why you used that method.

3   A.    We both had platforms on our laptop referred to as a

4   "Jabber chat" or an "Adium" where it's end-to-end encryption,

5   nobody else can read it, and we were just instant-chatting back

6   and forth.

7           THE COURT:  Is the encryption done by the website

8   itself?

9           THE WITNESS:  I believe it's -- yes, sir.  It's not

10  really a website.  It's more of like a software.  And I believe

11  it's done by the software.

12          THE COURT:   Thank you.

13  BY MS. JERNIGAN:

14  Q.    Now, you met with Agent Upchurch and Agent Heusel and

15  myself prior to coming to court today; correct?

16  A.    Yes, ma'am.

17  Q.    And were you shown CDs containing recordings of your

18  encrypted communications with Michael Lord?

19  A.    Yes, ma'am.

20          MS. JERNIGAN:  Permission to approach the witness,

21  Your Honor?

22          THE COURT:  You may.

23  BY MS. JERNIGAN:

24  Q.    Mr. Laghari, I've shown you two CDs marked for

25  identification as Government Exhibit M.  One is dated May 21 of

1    2015; is that correct?

2    A.    Yes, ma'am.

3    Q.    And the second one has a series of dates on it?

4    A.    Yes, ma'am.

5    Q.    What are those dates?

6    A.    21st, 22nd, 24th, and 28th.

7    Q.    And did you have an opportunity to review the contents of

8    those CDs?

9    A.    Yes, ma'am.

10   Q.    And were screenshots made of the recordings that are

11   contained in the additional exhibits we're going to talk

12   through in the binder?

13   A.    Yes, ma'am.

14   Q.    Did you initial the CDs?

15   A.    Yes, ma'am.

16   Q.    Those are your initials?

17   A.    Yes, ma'am.

18         MS. JERNIGAN:  Your Honor, the Government would move

19   to admit Exhibit M in evidence.

20         THE COURT:  Any objection?

21         MR. CARMOUCHE:  No objection, Your Honor.

22         THE COURT:  They're admitted.

23   BY MS. JERNIGAN:

24   Q.    Mr. Laghari, if you would turn to Exhibit D in your tab,

25   in your binder, and let me know when you're there.

 1  A.    Ready.
 2        MS. JERNIGAN:  Madam Clerk, can we have the
 3  projection to the computer, please.
 4        Your Honor, for the record, we're going to go play the
 5  recording.  There are screen grabs printed out in the binder
 6  just for record purposes, but the recording has the entirety of
 7  the communication.
 8        THE COURT:  All right.  Noted.
 9        MS. JERNIGAN:  Thank you.
10      (Audio playing.)
11  BY MS. JERNIGAN:
12  Q.    Mr. Laghari, who is "LouisXV@SwissJabber"?
13  A.    Myself.
14  Q.    And "Internet151"?
15  A.    Michael.
16  Q.    And what do we see being played on Government Exhibit M?
17  A.    This is a recording of my laptop screen where I'm in a
18  chat with Michael.
19  Q.    The very first . . .
20      (Audio played.)
21  BY MS. JERNIGAN:
22  Q.    Whose voice is that we hear?
23  A.    Myself.
24  Q.    So the recording recorded both the typing that you were
25  doing on the computer as well as what you were actually saying

1    in the room?

2    A.    I think so.  I was in the room with some agents at the

3    time.

4    Q.    Okay.  So "Internet151@SwissJabber" is the username

5    associated with Michael Lord?

6    A.    Yes, ma'am.

7    Q.    Had you communicated with him using that specific handle

8    prior to law enforcement cooperation?

9    A.    Yes, ma'am.

10   Q.    And you are the "LouisXV" that we see there at

11   SwissJabber?

12   A.    Yes, ma'am.

13   Q.    And this is an encrypted communication?

14   A.    Correct.

15   Q.    What sort of trail is left when you use this particular

16   method of communicating?

17   A.    None.  Once you close the program and close this window,

18   it's gone.

19   Q.    So if someone were to come and -- if law enforcement were

20   to come and seize your computer and do a forensic image of it

21   to see what documents, emails, anything like that, would this

22   be on there?

23   A.    If I would leave it open and they walked in while the

24   laptop was open, they could see it.  But if I were to close it

25   and close out the program, it'd be gone.

1  Q.    The beginning of the message says, "I was expecting to

2  hear from you last night.  Got kind of worried when you didn't

3  show up and didn't respond to me."

4        Do you see that on the screen there?

5  A.    Yes, ma'am.

6  Q.    Okay.  And that's from Mr. Lord to you?

7  A.    Yes, ma'am.

8  Q.    You indicated that you were exhausted.  What were you

9  doing?  Were you accurately telling him what was going on with

10 you at this point?

11 A.    Not necessarily.

12 Q.    Did he know that law enforcement had shown up at your

13 house?

14 A.    Yes, ma'am.

15 Q.    And what did you tell him after you began cooperating

16 with law enforcement?

17 A.    I told him I had made some kind of probation violation,

18 that I still was unsure what the exact law enforcement

19 situation was, and I was waiting to see how it was going to

20 play out.

21 Q.    The next response or entry from Internet151 says,

22 "Anyway, I have a plan regarding the press."

23        What press is he referring to?

24 A.    Referring to the pill press.

25        (Audio playing.)

1    BY MS. JERNIGAN:

2    Q.    Who is the "he" you're referring to?

3    A.    Michael.

4          (Audio playing.)

5              MS. JERNIGAN:  Your Honor, we're going to try to move

6    it along a little bit.  There's a five-minute gap between one

7    response and the next.  So . . .

8          (Audio played.)

9    BY MS. JERNIGAN:

10   Q.    Okay.  Mr. Laghari, can you read the response typed at

11   2:11 that we see on the screen there.

12   A.    Okay.  It says, "Okay.  Basically, I'm going to have you

13   rent space --"

14   Q.    I'm going to ask you to slow down so our court reporter

15   can keep up with what you're saying.

16             THE COURT:  She has a timer on words per minute.

17   You're not up to 295, which is the current record, but you're

18   getting close.

19             THE WITNESS:  Okay.

20   A.    It says, "Okay.  Basically, I'm going to have you rent

21   space in my dad's office building.  The space you'll be renting

22   is already converted into an apartment-style area, and it's

23   vacant right now.  You won't ever tell him anything about our

24   plans.  Just pose as one of my friends looking for apartment

25   space, and he'll show you around.  You'll tell him it's fine

1   and you'll take it.  He'll accept cash and won't make you sign

2   anything.  It includes all utilities and everything for only

3   $500.  Plus the building is empty at night; so you won't

4   disturb anyone with the press/mixer."

5   BY MS. JERNIGAN:

6   Q.    Okay.  So do you know where -- did you know at that time

7   what particular office building he was referring to?

8   A.    I can't remember if he sent me the address prior to this

9   message or afterwards, but I know 24 hours around this time

10  this message was sent we discussed something about his dad's

11  apartment.

12  Q.    In Shreveport, Louisiana?

13  A.    Correct.

14  Q.    And you were going to move the pill press and the mixer

15  from Arkansas, where it was, to Shreveport?

16  A.    Correct.

17  Q.    And why?  How would that -- why was that necessary for

18  the drug manufacturing operation?

19  A.    Because we were under the understanding that there was

20  some law enforcement heat coming down on me; and we didn't feel

21  comfortable at the current location it was at, and we needed to

22  move it.

23          MS. JERNIGAN:  Okay.  Let's go to the beginning of

24  the third one, please.

25  BY MS. JERNIGAN:

1    Q.    And the portion of the internet chat -- or, I'm sorry,

2    the instant message chat that we just read is contained to the

3    first page of Government Exhibit D?

4    A.    Correct.

5    Q.    Okay.  If you'd go to the second page of that exhibit,

6    please.

7              MS. JERNIGAN:  We have it?  Okay.  Let's let that

8    play.

9         (Audio played.)

10             MS. JERNIGAN: Let's pause it.

11   BY MS. JERNIGAN:

12   Q.    Mr. Laghari there's a reference by Internet151 at

13   approximately 2:24 to "8.33% uptime past hour, 53.39% 24

14   hours."  What is that a reference to?

15   A.    This is a reference to a darknet marketplace called

16   "Agora" and how much time it had been online in the last hour

17   and how much time it had been online in the last 24 hours.

18   Q.    And Agora was one of the places the two of you intended

19   to sell the Xanax on?

20   A.    Correct.

21   Q.    And then there's also a discussion that you ask him about

22   names for your venture with Michael Lord?

23   A.    Correct.

24   Q.    Why do you need a name?

25   A.    You have to have a name for your marketplace, like any

1   business.

2   Q.    Okay.

3         MS. JERNIGAN:  Let's let it play.

4      (Audio played.)

5         MS. JERNIGAN:  Pause it.

6   BY MS. JERNIGAN:

7   Q.    You threw out a series of names as possible names for

8   your business in terms of being a vendor; correct?

9   A.    Correct.

10  Q.    What was Michael Lord's response?

11  A.    "I like Bar Shop."

12        MS. JERNIGAN:  Your Honor, in the interest of time,

13  we'll at this point proceed with the screenshots contained in

14  Government Exhibit D rather than going with the recording,

15  which has already been admitted in evidence.

16        THE COURT:  All right.

17        MS. JERNIGAN:  If there's no objection.

18        MR. CARMOUCHE:  Well, I didn't say I didn't object.

19     I'd like to -- Your Honor, I would like to identify who

20  the people are in the background that are talking and laughing

21  as these screenshots were being done.  And if I could at least

22  have that explanation --

23        THE COURT:  That's an authentication issue.

24        MR. CARMOUCHE:  Yes, sir.

25        THE COURT:  Sustained.  Go ahead and identify those

1    people.

2    BY MS. JERNIGAN:

3    Q.    Mr. Laghari, the recording that we're playing in court,

4    where was that made?

5    A.    It was made at the Springhill police station.

6    Q.    After the law enforcement personnel showed up in May at

7    your parents' residence, were you arrested?

8    A.    Yes, ma'am.

9    Q.    Were you taken into custody?

10   A.    Yes, ma'am.

11   Q.    Did you remain in custody throughout that week?

12   A.    Yes, ma'am.

13   Q.    And so the recordings, the consensual recordings that you

14   made of your communications with Michael Lord, were all in the

15   presence of law enforcement?

16   A.    Correct.

17   Q.    And who were some of the members of law enforcement that

18   you recall being present?

19   A.    Mr. Upchurch was present, Police Chief --

20   Q.    Just for the record, you're pointing to Mr. Brian

21   Upchurch, who is seated at counsel table?

22   A.    Yes, ma'am.

23   Q.    Okay.

24   A.    I believe Police Chief Will Lynd was also present.

25   Q.    The Springhill Chief of Police, Will Lynd?

1    A.    Yes, ma'am.

2    Q.    Okay.

3    A.    Detective Bryan Montgomery.

4    Q.    He's also with the Springhill Police Department?

5    A.    Yes, ma'am.

6    Q.    Or was?

7    A.    And I believe Detective -- I can't remember his last

8    name -- from the IRS was present sometimes and sometimes was

9    not.

10   Q.    Agent Heusel, you're referring to, who is --

11   A.    Yes, ma'am.

12   Q.    -- the other agent sitting at the table?

13   A.    Yes, ma'am.

14   Q.    Okay.  Those are the ones you remember being in the room?

15   A.    Yes, ma'am.

16   Q.    And those are -- are those the voices we hear in addition

17   to yours on this recording?

18   A.    Yes, ma'am.

19   Q.    And the monitor in front of you has a date in the upper

20   left-hand corner.  Do you see that?

21   A.    My monitor doesn't have anything.

22         THE CLERK:  You need to turn it on.

23   BY MS. JERNIGAN:

24   Q.    Do you see the date in the upper left-hand corner?

25   A.    I just see a time.

1          Oh.  Upper left?  Yes, ma'am.

2    Q.    It says "Screen Capture Tool Pro"?

3    A.    Yes, ma'am, I see it.

4    Q.    And then what date appears after that?

5    A.    5/21.

6    Q.    Of 2015?

7    A.    Yes, ma'am.

8    Q.    Okay.  And is that consistent with when you were in

9    police custody in Springhill?

10   A.    Yes, ma'am.

11         MS. JERNIGAN:  Your Honor, I think at this point

12   we've established a sufficient foundational basis for the

13   parties involved in the recordings.

14         THE COURT:  Mr. Carmouche?

15         MR. CARMOUCHE:  I have no objection then, Your Honor.

16         THE COURT:  He cries uncle.

17         MS. JERNIGAN:  Thank you, Your Honor.

18         THE COURT:  Foundation established.  Authentication

19   done.  Proceed.

20         MS. JERNIGAN:  Thank you, Your Honor.

21         THE COURT:  It's admitted.

22         Oh.  Mr. Carmouche, with respect to the procedure that

23   Ms. Jernigan is intending to use, that is, the entire

24   recordings are in, but in order to save time, they're going to

25   use the extracts from the exhibit book, do you have an

1    objection to that proposed procedure?

2            MR. CARMOUCHE:  No objection to that, Your Honor.

3            THE COURT:  All right.  Thank you.  You may continue.

4    BY MS. JERNIGAN:

5    Q.    Mr. Laghari, if you would turn back to the binder that

6    you have there in front of you.

7    A.    Yes, ma'am.

8    Q.    And turn to page GOV-004 behind Tab D.

9    A.    Okay.

10   Q.    The top of that particular excerpt starts with you asking

11   "What's up?" at about 9:17 --

12   A.    Correct.

13   Q.    -- in terms of the time stamp.  Do you see that?

14   A.    Yes, ma'am.

15   Q.    And you received a response from Internet151, the

16   defendant, containing a link to reddit.com.  What is "reddit"?

17   A.    "Reddit" is an online message board, place to post news

18   articles, pictures, sometimes referred to as the "front page of

19   the internet."

20   Q.    Okay.  Does it have other uses?

21   A.    I don't understand the question.

22   Q.    Okay.  Let me move on.

23         Later on in the communication, there's a reference to an

24   app called "Wickr."  Do you see that down in the middle of the

25   page?

1    A.    Yes, ma'am.

2    Q.    And you write, "I had a buddy that told me to use some

3    app called 'Wickr.'  It had, like, self-destructing messages.

4    You set the time limit and they disappear."

5    A.    Yes, ma'am.

6    Q.    Why were you discussing Wickr with him?

7    A.    I believe we were always discussing operational security,

8    how we can communicate more safely, things of that nature.

9    Q.    Okay.  If you could go to the next page GOV-005.  Do you

10   see a portion of the communication beginning around 9:24?

11   A.    Yes, ma'am.

12   Q.    And Mr. Lord asks about whether or not Agora is up?

13   A.    Yes, ma'am.

14   Q.    And Agora, again, is what?

15   A.    A darknet marketplace.

16   Q.    And what about Black Bank, which is referenced by you

17   later on, around 9:25?

18   A.    This is another darknet marketplace.

19   Q.    At 9:24 -- I'm sorry -- 9:25, Internet151 sends you a

20   message that says, "I'm thinking we may need to set up on

21   Nucleus Market as well as Agora."

22        So were those three markets -- Agora, Nucleus and Black

23   Bank -- places that you were going to use to advertise your

24   services?

25   A.    Correct.

1    Q.    What is Nucleus?

2    A.    Nucleus is another marketplace.

3    Q.    What is the difference with these various marketplaces?

4    A.    They're just run by different groups in different parts

5    of the world.  I believe they're just different platforms,

6    different websites.

7    Q.    How do you gain access to them?

8    A.    Open an account, message the admins.  That's about it.

9    Usually pay a fee.

10   Q.    Is there any method used to verify that you are indeed a

11   seller of controlled substances, if that's what you're going to

12   be as a vendor?

13   A.    Not necessarily.  Sometimes people set up shops selling

14   fake wares and scam people.  There's no real verification.

15   Q.    Okay.  If you could go to page GOV-006.  Around 9:27, you

16   received a message from Internet151 regarding vendors and not

17   wanting to have too many accounts.  Do you see that?

18   A.    I see it.

19   Q.    And at 9:27, does he write, "So I'm thinking Agora plus

20   one really reliable site."

21   A.    Correct.

22   Q.    "And that right now looks to be Nucleus."  Is that right?

23   A.    Correct.

24   Q.    So in these series of communications, you're discussing,

25   I guess, the pros and cons of different darknet markets and

1   determining which are the ones would be the place where you

2   were going to advertise the Xanax that you were going to

3   manufacture?

4   A.    Right.

5   Q.    Had you had discussions about that prior to May 21 of

6   2015?

7   A.    Yes, ma'am.

8   Q.    Could you go to the ninth page of Government Exhibit D,

9   GOV-009.

10  A.    Okay.

11  Q.    There's a reference on this portion of the screenshot to

12  Reddit and The Barbarians?

13  A.    Correct.

14  Q.    Can you explain to -- and there's also a reference on

15  this page to Silk Road.  What was Silk Road, to your

16  understanding?

17  A.    Silk Road was the original darknet marketplace.  It was

18  the first online open drug trade website.

19  Q.    Okay.  And was there some interest between the two of you

20  with The Barbarians or using that as a resource to get educated

21  on this?

22  A.    Correct.  The Barbarians was a subreddit or subcommunity

23  on Reddit of Xanax users, buyers, and sellers.

24  Q.    All right.  If you could turn to Government Exhibit D --

25  I'm sorry -- E in your binder.

1      MS. JERNIGAN:  Madam Clerk, can I have the ELMO,

2    please.

3    BY MS. JERNIGAN:

4    Q.    Mr. Laghari, I'm showing you what's been marked GOV-001

5    from Government Exhibit E.  This is another screenshot from the

6    instant messages you had with the defendant back in May of

7    2015.  Do you see that date of May 22 in the upper left-hand

8    corner there (indicating)?

9    A.    Yes, ma'am.

10   Q.    What do we see on the left-hand portion of this document?

11   A.    The left-hand portion?

12   Q.    This portion of the screenshot (indicating).  I'm sorry.

13   Did you see that?

14   A.    The right-hand?  Oh.  Those are posts by users.  This is

15   the Agora subreddit.  This is on Reddit.  This is a community

16   within Reddit about Agora marketplace to draw posts by users.

17   Q.    And then directing your attention to the right-hand side?

18   A.    This is the sidebar.  This is just general information

19   about Agora, the official market link, the form link, different

20   communities relating to Agora.

21   Q.    And it's self-described as the "darknet market"?

22   A.    Correct.

23   Q.    Okay.  The area that I've asterisked regarding the

24   official link, what is that?

25   A.    That is the official URL to get to the marketplace from

```
 1   the Tor network.

 2   Q.    When you say "Tor," what are you referring to?

 3   A.    Tor is similar to -- it's a web browser similar to

 4   Internet Explorer, Mozilla Firefox, or Chrome, but Tor is used

 5   to access the deep Web.

 6   Q.    Does it come with a level of anonymity?

 7   A.    Correct.

 8   Q.    Is that the benefit and the purpose of having --

 9   A.    Yes, ma'am.

10   Q.    -- the Tor?

11         So you couldn't just type in "Agora" and get to this?

12   A.    No, ma'am.

13   Q.    Going to page 2 of that exhibit.  Again, you're

14   continuing to chat with him, and we see those communications on

15   the right-hand portion of the document?

16   A.    Correct.

17   Q.    And over here, were you simultaneously accessing the

18   darknet?

19   A.    No, ma'am.  This is on a normal web browser.  This is

20   Google Chrome.  I'm just on a website looking to see what

21   markets are up and what markets are down.

22   Q.    Where are the -- are those the markets listed on the

23   left?

24   A.    Correct.

25   Q.    And we see a reference to "Black Bank"?
```

1    A.    Correct.

2    Q.    What does the red arrow down mean?

3    A.    Currently offline.

4    Q.    And there's also a red arrow down for Agora?

5    A.    Also offline.

6    Q.    What about Crypto Market?

7    A.    Crypto Market's online.

8    Q.    At the time that this was accessed?

9    A.    Yes, ma'am.

10   Q.    Continuing on with the excerpts contained in Government

11   Exhibit E, there's a reference to "running TAILS" on page 3 of

12   that exhibit.  Do you see that?

13   A.    Yes, ma'am.

14   Q.    Okay.  It's Government Exhibit E, page GOV-003.  And

15   around 2:55 in terms of the time stamp, Internet151 writes,

16   "We'll probably both want dedicated machines running TAILS for

17   running vending.  Just a cheap laptop should do.  I'm already

18   familiar with TAILS, so I can set that up."

19         Can you explain to the court what "TAILS" is and why that

20   was something you were discussing as a part of your --

21   A.    "TAILS" is an operating system similar to Mac or

22   Windows 7 or something along those lines, but TAILS is strictly

23   built on the idea of anonymity and being secure.  So if we were

24   to run an illegal online shop, we wanted as much security as

25   possible; so we were planning on getting laptops, each, using

1    TAILS strictly for this, not to check our emails, not to look

2    at YouTube or Facebook, strictly for this purpose.

3    Q.    But if you're already communicating with each other using

4    platforms like Signal and -- Adium, I think you said was the

5    other one?

6    A.    Yes, ma'am.

7    Q.    You're selling your wares on the darknet.  Why do you

8    need an extra layer of protection and anonymity?

9    A.    Because this is an additional layer of security.  I mean,

10   we wanted as much security as possible.

11   Q.    And what form of payment were you going to accept for the

12   Xanax that you were going to sell?

13   A.    Bitcoin.

14   Q.    Anything else?

15   A.    Online?

16   Q.    Yes.

17   A.    No.  Strictly bitcoin.

18   Q.    Just bitcoin?

19         Later on, there's a reference or an inquiry by Michael

20   Lord about the guy you were selling to in Baton Rouge.  Do you

21   see that?

22   A.    Yes, ma'am.

23   Q.    What is that a reference to?

24   A.    This is a reference to a client I had in Baton Rouge who

25   would purchase large sums of Xanax from me, prior to meeting

1   Michael, for cash.

2   Q.    So those are discussions that you had with Michael Lord

3   about your drug dealing activities?

4   A.    Correct.

5   Q.    Going to page 4 of that same exhibit, in talking about

6   the vendor names, did the defendant suggest "WorldofXanax" at

7   about 3:29 according to the time stamp?

8   A.    Yes, ma'am.

9   Q.    And going to the last page of that exhibit, page GOV-005,

10  what's the entry around 3:31?

11  A.    "I'll register the email to and make the PGP keys and

12  share that information all with you."

13  Q.    What does "PGP" refer to?

14  A.    I'm not sure exactly what the acronym stands for, but

15  it's a reference to a type of encryption where if you were to

16  send me something, only I would have the keys to unlock it and

17  only we could message back and forth.  You would have to have a

18  key to unlock the message.

19  Q.    The email that's referenced in that instant message was

20  the email account for your vendor registration?

21  A.    I believe so.

22  Q.    If you could turn to Government Exhibit F in your binder,

23  Mr. Laghari.  Page 1 of that exhibit contains additional

24  instant messages between you and Mr. Lord; correct?

25  A.    Correct.

1    Q.    And in this portion of the conversation, you guys begin

2    discussing pricing, how much you're going to sell each Xanax

3    pill or bar for?

4    A.    Correct.

5    Q.    And what were you envisioning charging for your pills?

6    Or what did you discuss at this time?

7    A.    I said that we should sell them for a dollar apiece.

8    Q.    The second page of that exhibit has additional

9    conversations between you and Mr. Lord.  Again, you continue to

10   talk about the pricing and what quantity level you were going

11   to sell the pills in as contained in these communications;

12   correct?

13   A.    Correct.

14   Q.    Towards the latter part of this, was there discussion of

15   accessing the darknet to figure out what the market price was

16   for Xanax?

17   A.    Correct.

18   Q.    By whom?

19   A.    Both of us.

20   Q.    Turn to the G exhibit in your binder.  That is a

21   three-page exhibit marked GOV-001 through 003.  I want to

22   direct your attention to the bottom communication on the first

23   page from Internet151.  Do you see that?

24   A.    Yes, ma'am.

25   Q.    It says, "I have WorldofXanax registered on Agora, Agora

1  forums, AlphaBay, AlphaBay forums, Lelanthos, Nucleus, Nucleus

2  forums, and Reddit.  Do you see that?

3  A.    I see it.

4  Q.    And so at that point WorldofXanax was registered on those

5  various darknet platforms --

6  A.    Correct.

7  Q.    -- according to what Michael was telling you?

8  A.    Yes, ma'am.

9  Q.    I want to go to the second page of that exhibit, and

10 there's a reference to a "25 digit generated unique password

11 for each account"?

12 A.    Correct.

13 Q.    And "each account" is referring to each of the vendor

14 accounts on those different platforms?

15 A.    Yes, ma'am.

16 Q.    And what response, at the bottom there, 12:01, did

17 Michael Lord write regarding security?

18 A.    "I know my security, smiley face."

19 Q.    And please continue reading the rest of the message.

20 A.    "All I got left to do is register on USPS's site, grab a

21 printer, and get the press moved and we're pretty much good to

22 go."

23 Q.    Why did you need to register with the Postal Service's

24 website?

25 A.    Because we planned on purchasing prepaid shipping labels

1   in bulk and mailing our drugs.

2   Q.    Mr. Laghari, if you would turn to the exhibit marked "J"

3   in your binder and let me know when you're there.

4   A.    I'm there.

5   Q.    Okay.  Is this a screenshot from the computer regarding

6   WorldofXanax registration?

7   A.    Yes.

8   Q.    Regarding the vendor account or Agora's platform?

9   A.    Correct.

10  Q.    Showing you what's been marked as Government Exhibit J,

11  GOV-001, single-page exhibit.

12        Okay.  So in the upper left-hand portion, we see

13  "WorldofXanax"?

14  A.    Correct.

15  Q.    And what is this address in the search bar there?

16  A.    That's the URL for Agora.

17  Q.    And we saw this on the previous exhibit on the Agora

18  screenshot?

19  A.    Yes.

20  Q.    I'm going to shift over to the right-hand portion of this

21  exhibit.  Do you see a reference to "bitcoin"?

22  A.    Yes, ma'am.

23  Q.    What does it say?

24  A.    It says that there's zero bitcoins in this account's

25  wallet, whoever is logged in, and the current market rate is

1    $226.40 U.S. dollars per bitcoin.

2    Q.    Does the exchange rate bitcoin for currency, U.S.

3    currency, fluctuate?  Does the exchange rate fluctuate?

4    A.    Yes, ma'am.

5    Q.    How frequently?

6    A.    Minute to minute.

7    Q.    And in going to the lower right-hand portion, this is

8    dated June 3 of 2015?

9    A.    Correct.

10   Q.    At that point, were you still in custody?

11   A.    Yes, ma'am.

12   Q.    So you didn't register this on the Agora website?

13   A.    No, ma'am.

14         MS. JERNIGAN:  Your Honor, the Government would move

15   to admit Exhibit J in evidence.

16         MR. CARMOUCHE:  No objection, Your Honor.

17         THE COURT:  All right.  It's admitted.

18   BY MS. JERNIGAN:

19   Q.    Did you order items in furtherance of this drug

20   conspiracy from places other than China?  You or Michael Lord?

21   A.    Yes, ma'am.

22   Q.    Where else?

23   A.    I ordered from vendors on Agora.  And when you order

24   drugs, you don't necessarily know where they're coming from,

25   you just know what country they're coming from.

1   Q.    I'm sorry.  What did you say?

2   A.    I mean, there was times when I ordered alprazolam from a

3   USA domestic seller; so I wasn't sure exactly what part of the

4   United States it was coming from, I just knew to expect to

5   receive a shipment.

6   Q.    So we saw talk of moving the pill press and the mixer out

7   of your father's business in Arkansas to Michael Lord's

8   father's business in Shreveport.  Did you ultimately have a

9   face-to-face meeting with Michael, again, while you were

10  cooperating with law enforcement in May of 2015?

11  A.    Yes, ma'am.

12  Q.    And was that meeting consensually recorded?

13  A.    Yes, ma'am.

14  Q.    I'm going to show you what's been marked as Government

15  Exhibit O.  Does that contain your initials, Mr. Laghari?

16  A.    Yes, ma'am.

17  Q.    And is it a recording of the face-to-face meeting?

18  A.    Yes, ma'am.

19  Q.    You need a break?

20  A.    I'm fine.

21        THE COURT:  Ms. Jernigan, while you're searching for

22  that, your Exhibits E, F, and G have not been offered in

23  evidence yet.

24        MS. JERNIGAN:  Your Honor, we would move to admit

25  those in evidence.

1          THE COURT:  All right.  Any objection to that?

2          MR. CARMOUCHE:  No objection, Your Honor.

3          THE COURT:  E, F, and G are admitted.

4          MS. JERNIGAN:  Madam Clerk, could we have the

5     projection again.

6          (Audio-video played.)

7     BY MS. JERNIGAN:

8     Q.    Mr. Laghari, where are you at this point on the video?

9     A.    In the parking garage at Willis-Knighton.

10    Q.    And whose partial body do we see there in the left-hand

11    portion?

12    A.    I believe that's Police Chief Will Lynd.

13    Q.    Okay.  And at this point, what were the events

14    immediately leading up to your being in the parking lot here in

15    Shreveport, in the hospital's garage?

16    A.    A couple of the federal agents and the Springhill Police

17    Chief put a wire on me and told me to go talk to Michael.

18    Q.    And had you been communicating with him as we'd seen,

19    either by phone or instant message?

20    A.    Yes, ma'am.

21         (Audio-video played.)

22    BY MS. JERNIGAN:

23    Q.    Who else was present and assisted in preparing you to be

24    recorded?

25    A.    I believe both agents sitting at the table over there,

1    Mr. Upchurch and -- I can't remember his name.  I'm sorry.

2    Q.    That's okay.

3    A.    And Police Chief Will Lynd, I believe Detective Bryan

4    Montgomery, myself, maybe one or two other federal agents.

5    Q.    Okay.  Where were you going to meet Michael Lord?

6    A.    McDonald's.

7    Q.    In Shreveport?

8    A.    Correct.

9          (Audio-video played.)

10          MS. JERNIGAN:  Your Honor, for time's sake, we'll

11   fast forward this recording to the point where the defendant is

12   actually -- I'm sorry -- the witness is actually at the

13   McDonald's restaurant meeting with the defendant.

14          (Audio-video played.)

15   BY MS. JERNIGAN:

16   Q.    Mr. Laghari, in that portion of the recording we just

17   listened to, you were asked whether or not anything was taken

18   by -- whether or not anything was taken; is that right?

19   A.    Correct.

20   Q.    Okay.  Where is the defendant vis-à-vis you in this

21   video?

22   A.    Sitting in the passenger seat of my truck.

23   Q.    So he's to your right?

24   A.    Correct.

25   Q.    And what, specifically, did he ask you as to whether or

```
 1   not anything had been taken?
 2   A.    He was asking me if the pill press and mixer had been
 3   taken, if we'd lost it.
 4   Q.    Anything else?
 5   A.    I don't think so.
 6   Q.    Did I hear reference to MDMA just then?
 7   A.    Oh.  He knew that I had a -- I had a lump sum of personal
 8   drugs that I had, and I was telling him that they had been
 9   confiscated from my house.
10   Q.    Okay.
11         (Audio-video played.)
12   BY MS. JERNIGAN:
13   Q.    You asked him about the outpowder in that portion we just
14   heard?
15   A.    Correct.
16   Q.    You're referring to what?
17   A.    Packages of alprazolam we were expecting.
18         (Audio-video played.)
19   BY MS. JERNIGAN:
20   Q.    At that portion of the recording we just heard,
21   Mr. Laghari, what are you being asked?
22   A.    "What happened with the cocaine?  It was supposed to
23   arrive Monday."
24   Q.    And what cocaine is he referring to?
25   A.    I asked Michael to get me some cocaine because I was
```

1  going to Florida with some friends to a music festival.  He

2  said sure, ordered it for me.  It was supposed to arrive

3  Monday.  I got arrested.

4  Q.    During the course of the rest of your meeting with --

5         MS. JERNIGAN:  Madam Clerk, can we have the lights.

6  BY MS. JERNIGAN:

7  Q.    -- with Michael Lord that day, did you have additional

8  discussions regarding moving the pill press and the mixer?

9  A.    Yes, ma'am.

10 Q.    And did you come to an agreement at that point, or no?

11 A.    On this day?

12 Q.    Uh-huh.

13 A.    I don't believe we did.

14 Q.    And at this point, he did not realize, obviously, that

15 you were cooperating with law enforcement?

16 A.    No, ma'am.

17        MS. JERNIGAN:  I tender the witness, Your Honor.

18        THE COURT:  All right.  We're going to take a short

19 break.  Court will reconvene at 11:00 by the clock on the back

20 wall.

21      All right.  We're in recess.

22      Mr. Carmouche, you can begin your cross-exam when we get

23 back.

24        MR. CARMOUCHE:  Thank you, Your Honor.

25      (Recess had 10:47 - 11:14 a.m.)

1         THE COURT:  Thank you.  Court will come to order.
2    Please be seated.
3         We'll get the witness back on the stand.
4         Mr. Carmouche, before you begin your cross-examination,
5    let me ask a couple of questions, and you can follow up from
6    that.
7         MR. CARMOUCHE:  All right.
8                  EXAMINATION BY THE COURT
9    Q.   In this instance, there is no question about the
10   establishment, Mr. Laghari, of all of the sites on the darknet,
11   and a reasonable conclusion would be, or could be, that
12   Mr. Lord is the one who registered on each one of those darknet
13   sites:  Tor to Agora, to all of the other stuff, through Reddit
14   or whatever.  That's one thing.
15        With the pill press in your father's place of business in
16   Arkansas, did you and/or Michael Lord actually manufacture
17   Xanax pills?
18   A.   Yes, sir.
19   Q.   The presentence report indicates a personal delivery of
20   Xanax pills to a girlfriend in Baton Rouge.
21   A.   Yes, sir.
22   Q.   You're familiar with that?
23   A.   Yes, sir.
24   Q.   Who made that delivery?
25   A.   Michael.

1   Q.    All right.  As a result of WorldofXanax registrations on

2   the darknet and its various sites that are component parts of

3   the so-called darknet, was there ever an advertisement run for

4   Xanax pills availability through the WorldofXanax?

5   A.    No, sir.  We never reached that point.

6   Q.    Was there ever a Xanax pill distributed as a result of

7   the registration of those sites?

8   A.    No, sir.

9   Q.    In terms of the Xanax pills that had been manufactured

10  either individually or together or by either of you using the

11  pill press, the alprazolam, and the binder that was in a

12  20-kilo bag on the floor, how many pills were manufactured?

13  A.    I would say give or take 10,000, but it's because that

14  same day I was incarcerated that I manufactured my first pills.

15  Q.    Okay.  Were you involved with Michael Lord in

16  manufacturing the other pills before the day that you found

17  yourself incarcerated?

18  A.    No, sir.  The day I was incarcerated was the first day

19  that I actually made active pills.  Before that, I had made --

20  you can call them "dummy pills," just playing with binder, just

21  working on the size and the shape and the hardness.  But the

22  first day I made actual pills with active ingredient was the

23  day I was incarcerated.

24  Q.    And you were able to make about 10,000 of those pills

25  that day?

1   A.    Yes, sir.  That morning.

2   Q.    Was Mr. Lord ever involved in the manufacture of the

3   pills?

4   A.    Yes, sir.

5   Q.    When?

6   A.    Prior to that day -- I believe the week before, maybe two

7   weeks before -- when we first acquired the press and the mixer,

8   we had gotten together for about a 10- to 12-hour period

9   working on calibrating the machine, putting it together,

10  figuring out how it works.

11  Q.    And was actual Xanax product manufactured?  Or were those

12  the so-called dummy pills?

13  A.    Those were just dummy pills.

14  Q.    And apart from the delivery of the Xanax and the cocaine

15  that was supposed to arrive in connection with going to

16  Florida -- which never occurred?

17  A.    Yes, sir.

18  Q.    Were there any other Xanax pills that came in from

19  suppliers that then were distributed by you and/or Michael

20  Lord?

21  A.    Prior to our operation?

22  Q.    Right.

23  A.    I had bought bitcoins from Michael to distribute my own

24  Xanax in Baton Rouge, not Michael's.

25  Q.    All right.  And in this instance, all of the registration

1    sites for, quote, "WorldofXanax," end quote, or other names

2    that may have been used, were those registrations completed by

3    both of you, or was that Michael Lord?

4    A.    No, sir, those were completed by Michael.

5    Q.    All right.  And you had mentioned training on the use of

6    the dark Web or training with respect to encryption on the

7    how-to, but I was confused because Michael already knew about

8    security.

9    A.    Michael was going to train me.

10   Q.    Okay.  So he had a skill set of doing the --

11   A.    Tech work.

12   Q.    -- either layers of security or encryption or messages

13   that were never kept on certain sites?

14   A.    Yes, sir.

15   Q.    You could communicate, but they would literally disappear

16   after the communication?

17   A.    Yes, sir.

18   Q.    Did he acquire that ability while you were together in

19   this conspiracy?

20   A.    No, sir.  I believe he was already knowledgeable in this

21   area.

22   Q.    That's your conclusion from your conversations with him

23   that we saw displayed on the screen --

24   A.    Yes, sir.  And prior to our meeting.  When I was buying

25   bitcoins from him, I knew that he was a very intelligent

1    computer skills set-type person.

2    Q.    All right.  Had you individually gotten onto the dark Web

3    or darknet, whichever the proper term is, on your own?

4    A.    Yes, sir.

5    Q.    Okay.  And did you have to learn how to do it?

6    A.    Yes, sir.

7    Q.    How did you learn?

8    A.    Google, YouTube, internet.  Just research.

9    Q.    Research.

10         Are there any training videos on YouTube or other sites

11   that explain this system and how to manipulate it?

12   A.    Yes, sir.  But being a customer and a seller is two

13   different skill sets.  So I knew how to be a customer, and I

14   knew how to purchase.

15         THE COURT:  And in this instance, let me ask this

16   question of you, Ms. Jernigan:  Has Mr. Laghari been granted

17   use immunity?

18         MS. JERNIGAN:  Yes, Your Honor.

19         THE COURT:  All right.  Thank you.

20   BY THE COURT:

21   Q.    In connection with the proposal, as this business got

22   formed between you and Michael Lord and the registrations put

23   in place and you had started manufacturing actual pills, you

24   would then be trained as a supplier on sites of the dark Web by

25   Michael Lord?  You were already customer-trained, so to speak,

1    self-trained, but you were to be trained by Michael Lord?

2    A.    To an extent.  I think we were both going to play

3    different roles.

4    Q.    Explain that to me.

5    A.    As in I was going to do more of the legwork, the manual

6    labor, the packaging, the manufacturing, and he was going to

7    run more of the tech side of it.

8    Q.    All right.  And also track and keep track of bitcoin

9    payments that would be used --

10   A.    Correct.

11   Q.    -- in order to acquire the drugs?

12   A.    Correct.

13   Q.    The U.S. Postal Service bulk mailing labels that were

14   talked about and the registration with the Postal Service, did

15   that ever occur?

16   A.    No, sir.

17            THE COURT:  All right.

18        Ms. Jernigan?

19            MS. JERNIGAN:  I want to clarify my prior response,

20   Your Honor.  Mr. Laghari was never charged in our case.  He was

21   always charged locally.  He's here pursuant to a subpoena that

22   we issued.  So there actually is no proffer or Kastigar letter,

23   and so there is no immunity in this case.  I misspoke.

24            THE COURT:  Ah.  Well, then I'll stop my questioning

25   on that point, because he potentially could face federal

 1   charges on this.  But he's already been prosecuted in Webster
 2   Parish for the same conduct --
 3              MS. JERNIGAN:  Yes.
 4              THE COURT:  -- arising out of the conspiracy that we
 5   are dealing with today?
 6              MS. JERNIGAN:  Yes, Your Honor.  He's already been
 7   prosecuted, pled guilty, and he's serving his sentence.
 8              THE COURT:  All right.  And I -- at this point, I
 9   would consider the questions that I've asked to be points of
10   clarification of prior testimony as opposed to exposing him to
11   any possible federal criminal prosecution.  And that's all I'll
12   say about that.
13   BY THE COURT:
14   Q.    Mr. Laghari, what happened to the 10,000 pills that you
15   had managed to actually press that contained alprazolam, also
16   known as "Xanax"?
17   A.    I have no idea.
18   Q.    Those were seized by law enforcement?
19   A.    No, sir.  I don't know what happened to them.
20   Q.    You don't know what happened to them.  All right.  Thank
21   you very much.
22              THE COURT:  Mr. Carmouche?
23                        CROSS-EXAMINATION
24   BY MR. CARMOUCHE:
25   Q.    Mr. Laghari, I'm going to have some questions about --

1    first, I'd like to know about your criminal background.  You

2    had two felony convictions, you said?

3    A.    Yes, sir.

4    Q.    And was the arrest on the pill press the third?  Or was

5    that the second?

6    A.    Second.

7    Q.    What was the first arrest/charge for?

8    A.    Possession of marijuana, in Point Coupee Parish.

9    Q.    And that was a misdemeanor?

10   A.    No, sir.  It was a felony.  It was possession with

11   intent.

12   Q.    Okay.  And you got sentenced to what?

13   A.    Probation.

14   Q.    Did you work with narcotics agents in that case?

15   A.    No, sir.

16   Q.    And the second one is this one in Springhill?

17   A.    Yes, sir.

18   Q.    Were you charged on the seizure of the items in Arkansas?

19   A.    I don't know.

20   Q.    Those pictures that you identified in Exhibits A -- I

21   think you might have a book up there -- A, B and C --

22   A.    Yes, sir.

23   Q.    -- where were those items?

24   A.    Those were in Arkansas.

25   Q.    Was it state agents or federal agents or both or --

1    A.    It was a mixture.

2    Q.    So were you charged with -- there were no charges in

3    Arkansas?

4    A.    No, sir.

5    Q.    So was part of the reason you were not charged in

6    Arkansas or with other federal offenses because you were

7    willing to work with the narcotics --

8    A.    Possibly, sir.  I was charged with a multitude of charges

9    in Louisiana.

10   Q.    So what was the ultimate deal?  What deal did you make?

11   A.    I got sentenced to 22 years, 5 years' probation, $17,000

12   in fines, 20 years suspended.

13   Q.    So if you didn't continue to work or cooperate, you could

14   do 20 years?

15   A.    Yes, sir.

16   Q.    Would you think that's some incentive to do whatever is

17   necessary to try to help to try to get Michael Lord convicted?

18   A.    It depends how you want to look at it.

19   Q.    When was the first conviction in Pointe Coupee?

20   A.    I was on probation when I got arrested for this charge;

21   so I was reconvicted while incarcerated on this charge.  My

22   probation was violated.

23   Q.    So if this was in 2014 and '15, then it would have been

24   prior to that?

25   A.    Yeah.

1   Q.     Sometime prior.  You don't remember the exact dates?

2   A.     I don't -- I don't understand the question.

3   Q.     I'm trying to figure out when the Pointe Coupee

4   conviction took place.  How long before this arrest did that

5   happen?

6   A.     Maybe six months.  But I was arrested in 2012.  It was an

7   ongoing process to be put on probation.

8   Q.     I see.  What was that process?

9   A.     Just dealing with lawyers and attorneys, going back to

10  court, push it back 90 days, going back to court.  This went on

11  for two and a half years.

12  Q.     Now, at -- did you graduate from LSU?

13  A.     No, sir.

14  Q.     There was some comment in what I read about finishing up

15  with graduation.

16  A.     Yes, sir.

17  Q.     Okay.  Did -- while you were at -- well, let's back up.

18         How long were you at LSU?

19  A.     About three and a half years.

20  Q.     While you were there, were you selling pills to students?

21  A.     At certain times, yes, sir.

22  Q.     And you first met Michael Lord because you were a

23  customer of his bitcoins?

24  A.     Correct.

25  Q.     Did you have any idea or any knowledge that he was

1   involved in drugs at the time you first met him?

2   A.    No, sir.

3   Q.    You said you met with him about 15 times.  Did -- so who

4   first brought up drug sales?

5   A.    I don't recall.  I believe we were just getting to know

6   each other and began to trust each other a little bit.

7   Q.    And you were using the bitcoins to buy drugs?

8   A.    Yes, sir.

9   Q.    And those drugs that you bought, did you sell them to --

10  A.    Yes, sir.

11  Q.    So you were committing more crimes buying drugs?

12  A.    Yes, sir.

13  Q.    Were you selling in Arkansas?  Baton Rouge?  Shreveport?

14  A.    Primarily Baton Rouge.

15  Q.    So were the people that you sold to -- were those college

16  students?

17  A.    Friends of mine.

18  Q.    Just friends?

19  A.    They may have been in college, may not.

20  Q.    Primarily, were they your age --

21  A.    Yes, sir.

22  Q.    -- your friends?

23        So when you first met Michael Lord, did you -- or during

24  the time you knew him, did you think, well, this guy knows

25  computers, he knows about bitcoins, he knows about these

1   things?  Did he impress you as a sophisticated, maybe, criminal
2   that would be good in the drug business?
3   A.    No.
4   Q.    I think there was -- and I'm not exactly sure . . .
5         (Off-the-record discussion between counsel.)
6   BY MR. CARMOUCHE:
7   Q.    If you look at Section D, and it's page 005.
8   A.    Okay.
9   Q.    At the very top of that page, is that you saying, "It
10  seems like our venture would be a thousand times more
11  profitable"?
12  A.    Yes, sir.
13  Q.    And what does Internet151 say in response?
14  A.    He says, "Oh, yeah, I know.  I told you that before when
15  you pitched the idea to me."
16  Q.    "Pitched the idea to me."  And the "idea" meaning pill
17  press, selling pills?
18  A.    Not necessarily.
19  Q.    What do you think it means?
20  A.    I think we had had a few conversations about putting our
21  minds together.  He knew that he was intelligent in bitcoins
22  and cryptocurrencies, and he knew I had a distribution little
23  bit of background.  He knew that I was very profitable with
24  what I was doing.  So I don't know what exactly this "pitched
25  idea" is referring to, but I know we brainstormed a few

1   different things.

2   Q.    So when you talk about, "Yeah, once we get the ball

3   rolling, hopefully orders will roll in as fast as we hope.  I

4   think it would help if I go ahead and make a vendor account."

5   A.    Except it says "I think it will help if you go ahead."

6   "You."  You said "I."

7   Q.    "If you go ahead and make a vendor account."  Okay.  But

8   is that in reference to pills, the Xanax, the Xanax pills from

9   the pill press?

10  A.    Right.

11  Q.    So perhaps "pitch the idea" had to do with that, then,

12  with the pill press?

13  A.    Perhaps.

14  Q.    Did you say on direct examination that you served -- I

15  mean, you were in jail for two weeks?

16  A.    A year.

17  Q.    A year.

18        And what period of time was that?

19  A.    From the time I was arrested till May 10.

20  Q.    Okay.  So when all of those videos were made that we saw

21  in the screenshots, you would get out of jail and go with

22  somebody in law enforcement and make --

23  A.    I was in custody the entire time.

24  Q.    And where were you in custody?

25  A.    For the first few weeks, Springhill police station.

1  Q.    And after that, where?

2  A.    Bayou Dorcheat Correctional Center.

3  Q.    Now, the pills that were manufactured -- I think they

4  said they were manufactured by you; right?

5  A.    Correct.

6  Q.    You got arrested before those could be distributed?

7  A.    Right.

8  Q.    And had you set up an operation before you got arrested

9  to distribute the pills?

10  A.    No, sir.

11  Q.    So where were you going to take the pills after you made

12  them?

13  A.    Nowhere.  We were going to set up a shop and try to sell

14  them.

15  Q.    So you were going to sell them on the internet?  You

16  were --

17  A.    Correct.

18  Q.    So what -- I think you had contacted Michael Lord about

19  getting the pills; right?  Or getting those pills and taking

20  them somewhere?

21  A.    Right.

22  Q.    Okay.  Where was that?

23  A.    To somebody in Baton Rouge that I knew who would

24  potentially want them.  I hadn't secured anything.

25  Q.    So Michael didn't know the person that he was going to

1    deliver to?

2    A.    No.

3    Q.    That was your connection; right?

4    A.    Correct.

5    Q.    You were brought in to testify in this hearing from

6    Washington, Washington state?

7    A.    Yes, sir.  Seattle.

8    Q.    You're not incarcerated up there?  Not in jail?

9    A.    I'm on parole.

10    Q.    So how did you get here?

11    A.    I was flown in by the wonderful people at the U.S.

12    Attorney's Office.

13    Q.    I don't know if we covered arrests for which you're on

14    probation or parole or whatever was -- was for what?  That you

15    got the 20 years suspended.

16    A.    Schedule I with intent, Schedule II with intent.

17    Q.    And that's a Webster Parish charge?

18    A.    State charge, yes, sir.

19    Q.    There's no federal charge?

20    A.    No, sir.

21    Q.    Were you ever threatened with a federal charge if you

22    didn't cooperate?

23    A.    No, sir.

24    Q.    Did anybody question you about the use of bitcoins for

25    drug purchases?  Were you ever brought in and interrogated

1   about the bitcoin purchases you --

2   A.    I don't recall.  I was interrogated a lot.

3   Q.    Did anybody suggest to you that using bitcoins to buy

4   illegal drugs, I guess, not regular drugs, but that that would

5   be, maybe, classic money laundering?

6   A.    I don't know.

7   Q.    Were your parents or your father -- were they arrested

8   over the federal agents or the narcotics agents finding all of

9   this illegal drugs and the pill press at their home?

10  A.    No, sir.  I took responsibility for my actions.

11  Q.    Did anybody say, "If you don't do what we want you to do,

12  that they're going to be charged too"?

13  A.    I don't think so.

14  Q.    Nobody said that?

15  A.    I don't think so.

16  Q.    Did anybody insinuate that?

17  A.    I don't think so.

18  Q.    Can you tell me why they weren't arrested?  I mean, they

19  had all the drugs --

20          MS. JERNIGAN:  Objection.  Calls for the witness to

21  speculate.

22          THE COURT:  Overruled.

23  BY MR. CARMOUCHE:

24  Q.    You can answer the question.  I was saying why --

25  A.    Because I came and turned myself in and said the stuff

1    belongs to me.  I came to law enforcement, and I turned myself
2    in.
3    Q.    Okay.  And was the agreement that if you turned yourself
4    in --
5    A.    There was no agreement.  I just came and turned myself
6    in.
7    Q.    Okay.  And did anybody ask you about the drugs and the
8    pill press and those things at your parents' --
9    A.    Obviously.
10   Q.    They did?
11   A.    Obviously.
12   Q.    And what did you say?
13   A.    I said they're mine.
14   Q.    And did anybody ask you, "Well, how would your parents
15   have not known that that was there if it was there?"
16   A.    They didn't know.
17   Q.    How did -- was it hidden?
18   A.    It was hidden.
19   Q.    So I think your testimony is that Michael Lord didn't do
20   the manufacturing.  You did that part; right?  He was the
21   computer guy setting up the website or whatever on --
22   A.    We only used the press twice:  one time he was with me,
23   one time I was by myself.
24   Q.    And the time he was with you was the dummy pills?
25   A.    Correct.

1    Q.    And when all of the Xanax bars or whatever was made, you

2    were there by yourself?

3    A.    Correct.

4    Q.    The pill press was ordered, I think, from China?

5    A.    Yes, sir.

6    Q.    And the ingredients?

7          Did you actually make the orders from China?

8    A.    You know, I don't recall a hundred percent, because there

9    was a lot of things being ordered in that time.  There was a

10   lot of drugs, different pieces coming together.  Some were done

11   by him, some were done by me.  Some were done with bitcoins,

12   some were done with Western Union.  I don't remember exactly

13   what was what.

14   Q.    Why were you using bitcoin to purchase the equipment?

15   A.    Because we wanted to remain anonymous.

16   Q.    And the -- do you recall using a fake ID to order goods

17   from China?

18   A.    I do.

19   Q.    And when was that?

20   A.    I don't recall the date.

21   Q.    Were you present when -- did Michael Lord use a fake ID

22   to order stuff?

23   A.    I believe he bought that fake ID from me.

24   Q.    So he bought it and then you -- but you used it.  It was

25   in what name?

1    A.      It was just a fake name with my picture on it.  I don't

2    even remember the name.

3    Q.      And you then made the orders.  I think -- let me back up.

4            There was a question that you answered on direct about

5    some cocaine that was supposed to arrive.

6    A.      Yes, sir.

7    Q.      When was that?

8    A.      This was, you know, a day or two before I was arrested.

9    Q.      And that was going to arrive at what location?

10   A.      This was going to arrive at my house.

11   Q.      And I think there's been no testimony that any of these

12   items arrived at Michael Lord's house?

13   A.      Right.  That was my cocaine, for me, for my personal use.

14   It was my cocaine.

15   Q.      It was yours?

16   A.      I was asking for it.  I asked Michael to get me an ounce

17   of cocaine.

18   Q.      And he got that from where?

19   A.      He ordered it online.

20   Q.      You asked him to get it for you?

21   A.      Right.  Because he had bitcoins.  I didn't have any

22   bitcoins at the time.

23   Q.      And was that in the items that were listed in that -- the

24   exhibit book at the sentencing hearing?

25   A.      I don't -- I don't know.

```
 1   Q.    So when was that?
 2   A.    I don't know.  Maybe a week prior to me getting arrested.
 3   Maybe a week and a half.  I told him I was going to Florida and
 4   I wanted an ounce of cocaine.
 5   Q.    And you -- did you know where you could purchase the
 6   cocaine?
 7   A.    Yes, sir.
 8   Q.    At that point, did Michael know where you could get it?
 9   A.    Yes, sir.
10   Q.    And where was that?
11   A.    On the deep Web.
12   Q.    So you asked Michael to do it, but it was yours?
13   A.    Right.
14   Q.    And then you -- because he had bitcoins?
15   A.    Correct.
16   Q.    And you had befriended him at that point?  Y'all were
17   working together?  You had made a lot of sales, a lot of
18   purchases of bitcoins?
19   A.    Right.
20         MR. CARMOUCHE:  One second, Your Honor.
21         THE COURT:  All right.
22   BY MR. CARMOUCHE:
23   Q.    I know that we had some discussion in -- prior, and I
24   believe you were asked about it, the AB-PINACA, whatever that
25   is.
```

1    A.    I don't know what that is.

2    Q.    You don't know what that is?

3    A.    No, sir.

4    Q.    And if -- do you know if Michael knew what that was?

5    A.    I have no idea.

6    Q.    You know what happened to that or whether that was

7    ordered?

8    A.    I have no idea.

9              MR. CARMOUCHE:  We'll tender, Your Honor.

10             THE COURT:  Redirect, Ms. Jernigan?

11             MS. JERNIGAN:  Just briefly, Your Honor.

12                      REDIRECT EXAMINATION

13   BY MS. JERNIGAN:

14   Q.    Mr. Laghari, you testified about the 10,000 pills with

15   the active ingredient that were manufactured using the pill

16   press and the mixer.  You recall that?

17   A.    Yes, ma'am.

18   Q.    And you said, I believe, on cross that you didn't know

19   what happened to them?

20   A.    I don't know where they ended up.

21   Q.    But you do know what happened to them once they left your

22   hands?

23   A.    Correct.

24   Q.    Where did they go?

25   A.    To Michael's hands.

1    Q.    Okay.  And did you ever get any indication that he took

2    any steps to do anything with those pills after you handed them

3    off to him?

4    A.    I had heard that he contacted my girlfriend at the time

5    in Baton Rouge and went and met up with her; but after that, I

6    don't know what happened to the pills.

7    Q.    When questioned about the package that brought law

8    enforcement to your parents' house in Springhill back in May of

9    2015, whose name did you mention?

10   A.    Michael's.

11   Q.    And you also testified on cross about, I believe, there

12   being a deal with the state and if you didn't cooperate, you'd

13   go and serve 20-something years.  I just want to clarify your

14   prior testimony.  You were charged in connection with your role

15   in this drug conspiracy that we've been talking about?

16   A.    Correct.

17   Q.    And that was in state court?

18   A.    Correct.

19   Q.    You've never been charged in federal court in --

20   A.    No, ma'am.

21   Q.    -- connection with this?

22         And you've signed no agreement with anyone on behalf of

23   our office, the U.S. Attorney's Office, have you?

24   A.    No, ma'am.

25         MS. JERNIGAN:  That's all I have, Your Honor.

1          THE COURT:  All right.  You may step down.  Thank

2    you.

3        Mr. Carmouche?

4          MR. CARMOUCHE:  Is it our time?

5          THE COURT:  Almost.

6        Ms. Jernigan, our records indicate that Government

7    Exhibit O has not yet been offered.

8          MS. JERNIGAN:  Your Honor, we move to admit O.

9          THE COURT:  I have that as a DVD or a CD.  I'm not

10   sure which.

11          MR. CARMOUCHE:  No objection.

12          THE COURT:  Was that the DVD at the Willis-Knighton

13   hospital parking lot --

14          MS. JERNIGAN:  Yes, Your Honor.

15          THE COURT:  -- that was displayed?

16          MS. JERNIGAN:  Yes, Your Honor.

17          THE COURT:  Thank you.  It's admitted.

18          MS. JERNIGAN:  Thank you.  Your Honor, that's all the

19   evidence we have at this time in support of the objections the

20   Government submitted vis-à-vis Count 15 in the indictment.

21          THE COURT:  In this particular instance, I want to be

22   sure that we define what those are.

23        The first objection has to do with the marijuana

24   equivalent per gram of the synthetic marijuana referred to as

25   "5F-AB-PINACA."  The Court notes that the PSR has been amended

1   to reflect that new calculation with the synthetic marijuana

2   converted to a marijuana equivalent at 1:167 as a ratio, and

3   resulting in a base offense level of 24 for the drug conspiracy

4   charge.

5         The second thing is that the second package of powder

6   which was referred to earlier by the Court as so-called "legal

7   Molly" or "legal Ecstasy" has been removed from the Schedule I

8   list of substances, and that objection is now -- that part of

9   the objection does not matter; am I correct?  It's moot?

10            MS. JERNIGAN:  Yes, Your Honor.

11            THE COURT:  All right.  And the second objection had

12   to do -- let me deal with the first one.

13         Mr. Carmouche, in that instance, do you have an objection

14   to the recalculation per the Guidelines of the synthetic

15   marijuana conversion ratio of 1:167?

16            MR. CARMOUCHE:  I don't have an objection to the

17   calculation, Your Honor, but I'm not sure that there was proof

18   that Mr. Lord was the one that had it ordered or that he had

19   brought it here.

20            THE COURT:  All right.  And we can address that

21   during your oral argument in conclusion with respect to the

22   Government's objections.

23         The second objection had to do with the contention that

24   Michael Lord distributed a controlled substance through mass

25   marketing by means of an interactive computer service.  The

1   Government contends that there should be a two-level increase

2   under guideline range -- or, excuse me, Guideline Section 2D1.1

3   (b)(7).

4        The third one has to do -- and that objection is still

5   pending.

6        The Government further maintains in another objection

7   that Michael Lord maintained the premise for the manufacture or

8   distribution of a controlled substance resulting in a -- or

9   should result in a two-level increase under Guideline

10  Section 2D1.1(b)(12).

11       In this particular instance, the Commentary Application

12  Note 17 to that section states that Subsection (B)(12) applies

13  to a building, room, or enclosure if used for the purpose of

14  manufacturing or distributing a controlled substance, including

15  storage of a controlled substance for the purpose of

16  distribution.

17       The PSR has already been amended to reflect that

18  two-level increase.  Am I correct on that, Ms. DeMoss?

19            THE PROBATION OFFICER:  Yes, sir.

20            THE COURT:  And, Ms. Jernigan, likewise, you concur?

21            MS. JERNIGAN:  Yes, sir, Your Honor.

22            THE COURT:  And, Mr. Carmouche, with the PSR having

23  been amended, I take it that you have an argument to present

24  with respect to the amended PSR that includes this two-level

25  increase when we get to the closing argument portion of this?

1          MR. CARMOUCHE:  Yes, Your Honor.

2          THE COURT:  All right.  The next objection is the

3    Government's contention that Michael Lord should receive a

4    two-level increase under Section 3B1.3 for abuse of a position

5    of trust or use of a special skill.  In this particular

6    instance, that objection is still active and will have to do

7    with interpretation of what a special skill is.

8          So that's where I see us right now before we turn the

9    matter over to you, Mr. Carmouche.

10         And as a note, due to scheduling -- and I apologize for

11   this -- we're going to adjourn -- or recess for lunch at noon,

12   but we're not going to be able to pick back up until 2:30 p.m.,

13   and we will finish whatever portion of the hearing remains at

14   that point.

15         And if anybody needs to shove stuff around on schedules,

16   Ms. Jernigan, you can use my name, however you wish to use it,

17   that I have jurisdiction over the person Cytheria Jernigan.

18         Mr. Carmouche, the same applies to you in any other court

19   in the land.

20         MR. CARMOUCHE:  I'm okay with coming back at 2:30.

21         THE COURT:  Oh, good.  I have both of you.  Thank

22   you.

23         All right.  Mr. Carmouche, you may proceed.

24         MR. CARMOUCHE:  Well, Your Honor, at this point, all

25   we would -- all we had intended to put on is the defendant's

1   allocution.

2           THE COURT:  All right.

3           MR. CARMOUCHE:  And maybe a summation by me.

4           THE COURT:  Let me -- before we proceed to

5   allocution, Ms. Jernigan, since you have the objections that

6   are pending, may I ask you to briefly summarize in argument

7   form where we are on this.

8       And I want you to particularly address what the Court

9   perceives as a difference under Section 2D1.1(b)(12), which is

10  the maintenance of the premise for the manufacture or

11  distribution of a controlled substance, versus the section

12  having to do with mass marketing by means of an interactive

13  computer service under Section 2D1.1(b)(7).  That particular

14  subpart does not say "manufacture or distributing."  It says

15  "distributed."  And I need you to address that.

16      I'm convinced that they were certainly set up for mass

17  marketing, but I have questions about evidence on whether

18  anything was mass marketed and whether any controlled substance

19  was actually distributed through the registered sites on the

20  dark Web websites Agora, so forth and so on.  I'm not going to

21  name them off, but under the tradename or registered domain

22  name "WorldofXanax."  And I need to hear some evidence on that.

23  Or not evidence, your argument on that.  Because I'm kind of

24  concerned, frankly, that the wording simply says "distributed"

25  and I did not hear evidence that a single pill was sent by

 1   means of advertising on those various registered dark Web

 2   sites.

 3            MS. JERNIGAN:  Your Honor, my argument with respect

 4   to the application of 2D1.1(b)(7) is that in looking at the

 5   commentary for that particular enhancement, it indicates that

 6   it's appropriate for mass marketing by means of an interactive

 7   computer service, meaning the solicitation by means of

 8   interactive computer service.

 9            And because of the encryption component of the way in

10   which these controlled substances are sold on the dark Web, we

11   have the portion of the encrypted communications that we could

12   preserve and record that indicate a clear intent on the part of

13   this defendant to advertise.  He took affirmative steps of

14   registering, creating unique encryption, passwords, all those

15   things to be in a position to advertise.

16            THE COURT:  And that may go more to special skill --

17            MS. JERNIGAN:  And I think they are related --

18            THE COURT:  -- than it does to, quote, "distributed."

19   And I did not hear evidence that the registered sites under

20   WorldofXanax as registered on the various darknet sites --

21   whether it's Agora or any of the other stuff.  I did not hear

22   that there was ever an ad placed indicating the availability.

23            MS. JERNIGAN:  Well, part of --

24            THE COURT:  Now, to the extent that -- I hear what

25   your reasonable inference argument is, that because it was

1    named "WorldofXanax," it obviously constituted an advertisement

2    in and of itself as to availability.

3         But I didn't hear that there was any drafting of language

4    or a paragraph or a coded wording that would appear on any of

5    those websites.  I never heard any evidence that the manner of

6    ordering -- how that would take place.  And I did not hear the

7    drafting of a specific solicitation posted on -- under the

8    domain name "WorldofXanax" and registered to the various sites.

9         And as I heard it, they finally decided that they could

10   have too many registrations and that Nucleus and Agora would be

11   the two primaries, at least, based on what I heard and what I

12   conclude.

13        Do you see -- that's my interpretation of what I heard.

14        And I did not hear any evidence -- and you can disabuse

15   me of that notion.  I heard no evidence at all that a single

16   pill, much less 5,000 or 10,000, was sent out through the

17   Postal Service or any other method as part of their mass

18   marketing effort -- which got to the point of registration, but

19   it stopped.

20        And that's the problem I have with the Government's

21   argument, and I'm -- if there had been a solicitation posted

22   on -- under the WorldofXanax -- and I realize there are layers

23   of security and encryption and so forth and so on, which is

24   part of the dark Web itself.

25        And the reason I've got familiarity with it is through

1   "Dreamboard," which is the child pornography peer-to-peer

2   sharing website that resulted in 72 indictments.  And I think

3   we processed about 60 to 62 of those defendants from around the

4   world and the U.S.

5        That goes more to a special skill argument than it does

6   to pills actually having been distributed.  So if you could

7   address -- and I'm just basing it on the evidence, on what I

8   heard from your witness up here.  And Mr. Laghari indicated

9   that he simply did not ever place an ad.  And to his knowledge,

10  Mr. Lord never placed an ad on the registered -- or under the

11  registered name "WorldofXanax" or other name on those sites.

12       MS. JERNIGAN:  Your Honor, I think the Court has

13  accurately summarized the testimony up to this point and that

14  the objections that we submitted regarding the use of the

15  computer service and use of special skill are really related

16  because it speaks to a level of expertise and intellect that

17  Michael Lord has that I don't think is commonly available in

18  the general public and --

19       THE COURT:  To put it in the terms of an expert

20  witness, experts testify as to matters which are beyond the ken

21  of the average juror.  In this case, the so-called average

22  person on the street, you're arguing that it's akin to beyond

23  the ken of the average juror, that the special skills that

24  existed for manipulating, using, and installing the layers of

25  security and encryption and message erasures requires a level

1  of skill in the use of computers beyond the average computer

2  user?

3          MS. JERNIGAN:  And that that was all done in

4  preparation and in furtherance of this drug conspiracy.  At

5  bottom, law enforcement got to these individuals early on in

6  their activities, and that's to their credit.  And I think

7  where the enhancement relates to the solicitation, you can't

8  get much closer than I think where the facts are in this case.

9          And I think there are some limits to what we can prove

10  given all of the encryption that is encumbered -- incumbent

11  with this particular drug conspiracy, and so the evidence that

12  we have demonstrating their stated intent combined with at

13  least the registration, as manifested in his words and that we

14  have a record of, shows what we had evidence of during the

15  period of Mr. Laghari's cooperation.  He does not know what

16  Mr. Lord did after he stopped cooperating.  This was about a

17  one-week period when he was first arrested and still in

18  Springhill where these --

19          THE COURT:  So, basically, from a sufficiency of

20  evidence preponderance of the evidence viewpoint, you are left

21  with the fact of the registrations, the fact of the layers of

22  security and encryption, but whether or not law enforcement

23  could get behind the encryption, could get behind and through

24  the layers of security, you are left with your witness's

25  testimony only that, to his knowledge, no pill was ever sent by

1    virtue of any solicitation on that website and there was never

2    an ad posted under WorldofXanax?

3              MS. JERNIGAN:  That's correct, Your Honor.

4              THE COURT:  That would be -- if you had been able to

5    penetrate the layers of encryption, which is not cheap -- it's

6    doable, but it's not cheap -- and peeled layers of security off

7    in order to get to those sites, that would be either, A,

8    corroborating evidence to your witness's testimony that there

9    was no ad placed, or could be contradictory testimony showing

10   an ad and pills having been distributed under WorldofXanax's

11   name.  That's how I see it.

12        The problem is if those sites were never uncovered or

13   unmasked, if you will, then the only evidence that you have is

14   that of Mr. Laghari.

15             MS. JERNIGAN:  That's true, Your Honor.  I think the

16   evidence of Mr. Laghari's testimony combined with the exhibits

17   that have been admitted also support the 3B1.3 enhancement that

18   we think should apply.  But the evidence is where we are for

19   2D1.1(b)(7), and that is the best evidence we have at this

20   point.

21             THE COURT:  All right.  Thank you.

22        Ms. DeMoss, you need to depart.

23             THE PROBATION OFFICER:  Thank you.

24             THE COURT:  And you can let them know that you're

25   involved in a hearing in Judge Hicks's court.  The reception

```
 1   that you may get if you tell the judges in 26th JDC could be
 2   positive, could be negative, but you probably need to tell them
 3   that.
 4              THE PROBATION OFFICER:  Thank you, sir.
 5              THE COURT:  Mr. Carmouche, how long do you think your
 6   argument will take?
 7              MR. CARMOUCHE:  It should not be -- just mine?
 8              THE COURT:  Yes.  Just your portion, because we're
 9   going to --
10              MR. CARMOUCHE:  20 minutes, 30 minutes.
11              THE COURT:  Okay.  We're going to take a break now
12   and let you come back with your argument in response to
13   Ms. Jernigan's argument.  And if you would also address those
14   points that the Court raised about the two-point enhancement
15   for distributed, quote-unquote, as noted by the Court under
16   Section 2D1.1(b)(7).
17        I'm convinced that the mass marketing setup was in place.
18   I really am not convinced that a pill was distributed or even
19   an ad or solicitation for sale of Xanax pills was ever placed
20   on those encrypted websites.  So --
21              MR. CARMOUCHE:  I don't want to mislead the Court.  I
22   thought you meant my closing summation.
23              THE COURT:  Well, I'm interested in your argument in
24   response to Ms. Jernigan, first, and then your closing will
25   actually come after either or both defendants -- it's up to
```

 1   them -- allocute.

 2            MR. CARMOUCHE:  Yeah.

 3            THE COURT:  And that's summation about the case.

 4   It's fine.  But I want these specific objections --

 5            MR. CARMOUCHE:  Addressed, yes.

 6            THE COURT:  -- addressed.  So that will give you time

 7   to prepare a response to Ms. Jernigan's arguments that will be

 8   ready to go at 2:30 p.m.  And until then, court is in recess.

 9        (Lunch recess had 12:06 - 3:06 p.m.)

10            THE COURT:  Good afternoon.  Court will come to

11   order.  You may be seated.

12        All right.  Mr. Carmouche, you have the floor on any

13   arguments that you would like to make in response to the

14   Government's objections and their presentation of evidence in

15   this matter.

16            MR. CARMOUCHE:  Yes, Your Honor.  With respect to the

17   reduction of the two points because --

18            THE COURT:  You may want to move that microphone a

19   little closer to you or come up and use this podium, whatever

20   you're more comfortable doing.

21            MR. CARMOUCHE:  With the two points, we, of course,

22   are objecting to that with respect -- and I'm not sure I have

23   them in order, but the mass -- what was it?  -- the mass

24   marketing of drugs that the points were taken away for

25   2D1.1(b)(7).

1          In the Guidelines Manual, it states that a two-level

2     increase for 2D1.1(b)(6), now (7), was applied to an illegal

3     internet pharmacy that sold controlled substances through mass

4     marketing by means of interactive computers.

5          So what we heard in the testimony, Your Honor, from -- on

6     this count -- this is Count 15 -- was that all that they had

7     accomplished at the time of the arrest, as I understood it, is

8     the fact that they had registered a name for the proposed

9     company.  So we just think that -- based on that, we don't

10    think that fits the definition or the guideline points that

11    they should -- we don't think they should be added based on

12    that, that section.

13         Do you want me to go into each one?

14              THE COURT:  Let's do that.  And let me go ahead and

15    make a ruling on this particular point.

16         As to the applicability of Section 2D1.1(b)(7), that

17    particular guideline section of the 2015 Guidelines provides

18    for a two-point enhancement in the offense level if the

19    defendant or a person for whose conduct the defendant is

20    accountable under Guideline Section 1B1 .3, "Relevant Conduct,"

21    distributed -- and I'm underscoring the word "distributed" -- a

22    controlled substance through mass marketing by means of an

23    interactive computer service.

24         The Court is aware that there are other subsections where

25    "manufacture" and/or "distributed" is used, or "solicitation"

1    or "solicited."

2        In this particular instance, Section (b)(7) uses the term

3    "distributed," and to the extent that the Court is required to

4    engage in some rule interpretation, the Court looks to the

5    plain meaning of the word "distributed" as the Court

6    understands it.  It is a singular requirement.  It is not in

7    conjunction with anything else except for the mass marketing

8    requirement by means of an interactive computer service.

9        In this instance, the Court realizes that, for instance,

10   Subsection (b)(4) requires only that the, quote, "object of the

11   offense," end quote, be distribution of a controlled substance.

12   There it's in connection with a prison/correctional facility or

13   detention facility for the enhancement to apply.  Thus,

14   Section (b)(4) requires less than Section (b)7 for the

15   imposition of the two-point enhancement.

16       The Court finds that the plain language of the Guideline

17   section 2D1.1(b)(7) requires actual distribution of a

18   controlled substance through mass marketing by means of an

19   interactive computer service.

20       The Government's evidence, specifically the testimony of

21   Mr. Laghari, establishes that accounts were set up at various

22   websites on the dark Web for the illicit sale of Xanax, but the

23   evidence also shows that no advertisements were ever made on

24   these sites and that no drugs were ever actually sold using the

25   accounts and registration set up on the dark Web.

1    Thus, the Government's objection to the presentence

2    report where the Government asserts a two-point enhancement

3    under Section 2D1.1(b)(7) is hereby overruled.

4    You may go to your next argument.

5    MR. CARMOUCHE:  The next was the application of the

6    enhancement under 2D1.1(b)(12), and that is that they knowingly

7    maintained a premises or rooms or whatever for -- as a storage

8    for drugs or for selling.

9    And, once again, the definition and -- under the comments

10   of that article states that "among the factors the court should

11   consider in determining whether the defendant maintained the

12   premises are:  A, whether the defendant held a possessory

13   interest in the premises; and, B, the extent to which the

14   defendant controlled access to or activities at the premises."

15   They also look at how frequently the premises was used by the

16   defendant for manufacturing or distributing.

17   I think the testimony, again, of Al Laghari was that

18   Michael Lord had only been there one time.  I think it's clear,

19   also, that he had no ownership interest and he had no control

20   over who could go there and who was not allowed and who was

21   allowed in.

22   So we think, again, that it doesn't fit that definition

23   and ask that that be overruled, Your Honor.

24   THE COURT:  All right.  Ms. Jernigan, would you like

25   to address that?

1          MS. JERNIGAN:  Your Honor, based on the evidence

2     before the Court and the testimony of Mr. Laghari, the place in

3     which the pill press, the mixer, the binding agents, and other

4     substances were recovered, that clearly is a premises

5     maintained for drug manufacturing.  It was maintained there out

6     of the eyes of the witness's parents, but at a place at which

7     both of the parties had access to it.

8          And there was also discussion of their efforts to move it

9     from one parent's property to a second parent's property that

10    would give them increased access to it.  But they had already

11    used that pill press and mixer maintained in Arkansas to do a

12    dummy set of pills as well as those that had the active

13    ingredient, according to Mr. Laghari's testimony.

14         And according to the commentary to the Guidelines,

15    although there are factors that look at possessory interest,

16    that is not an exhaustive and exclusive list of factors that

17    the Court can consider.

18         If the primary purpose of having that equipment there in

19    that room was for the manufacturing of Xanax, then clearly

20    these two were making a lot of effort -- ordering equipment

21    from overseas, storing it across state lines in Arkansas,

22    ordering the products to put in the pill press and the mixer --

23    all of that is because of their intention to have a Xanax

24    operation.

25         And so we think there's more than a sufficient factual

1    basis given the preponderance standard to apply that

2    enhancement to this offense.

3              THE COURT:  All right.  Briefly, any reply,

4    Mr. Carmouche?

5              MR. CARMOUCHE:  Yes, Your Honor.

6         That particular statute deals with maintaining drug

7    premises.  And another definition that they give is where the

8    defendant distributed massive quantities of methamphetamine

9    from the premises on which the defendant and his wife lived.

10   They give, you know, another part where how frequently Mr. Lord

11   would have been there, and he was there only once according to

12   the sworn testimony of Laghari.

13        So there weren't any sales.  There wasn't -- there was

14   some drug thing -- the drug pill press and that, but that -- it

15   seemed to come out in the testimony that that was there because

16   of Laghari, not Michael Lord.  He had no interest, no

17   possessory interest, in that property.

18             THE COURT:  At this particular point, let me note

19   that in response to the Government's initial written objection

20   on this point, the PSR was amended to include the two-level

21   increase for maintaining a premise for the manufacture or

22   distribution of a controlled substance.

23        In this particular matter, there wasn't any question

24   about catching these defendants at a relatively early stage in

25   carrying out the avowed purpose of not only manufacturing, but

1    advertising the availability of illegal controlled dangerous

2    substances under the tradename "Xanax," under the generic name

3    "alprazolam."

4         And although there was no specific chemical composition

5    for the Xanax, that is, the ratio between the binder and the

6    active ingredient, it nonetheless was a substance manufactured,

7    but not yet distributed, under the terms of the conspiracy,

8    some 10,000 pills actually made by Laghari.

9         However, it is clear from the testimony that both of them

10   were involved in operating the pill press to determine how to

11   best use the binder shown in a 20-kilogram plastic bag --

12   pharmaceutical grade -- on the floor of the facility in

13   Arkansas and the unidentified, much smaller plastic bag on top

14   of one of the machines used -- either the mixer or the press; I

15   don't recall which one -- that could have been active

16   ingredients, could have been binder, but under the

17   circumstances, under the burden of proof, the Court makes the

18   reasonable conclusion and inference that the smaller bag of

19   white powder on top of the machinery was, in all likelihood,

20   based on a preponderance of the evidence, the active ingredient

21   in alprazolam; and that both Michael Lord and Laghari practiced

22   making pills together, but they were dummy pills, using the

23   binder ingredient only, to see how best to make them.  And once

24   that was done to the satisfaction of both of them, the actual

25   pills, 10,000 or so, made by Laghari whose -- happened to be

1   made on the very day that he was incarcerated, is all part of

2   that conspiracy.

3        I will agree that there's no indication that there was

4   distribution of any of the manufactured stuff, but it's clear

5   beyond a reasonable doubt that the two of them conspired to

6   both manufacture alprazolam and market it on an illicit basis

7   through encrypted and/or secure websites on the dark Web for

8   bitcoins and that the bitcoins, at the appropriate time, would

9   be converted into so-called hard U.S. currency.

10       In this particular instance, the pill press, when it was

11  used by Mr. Laghari, was placed in a locked and rarely used

12  storage room at Mr. Laghari's father's place of business, but

13  that there was, in fact, evidence to show that the plan

14  included moving the press and mixer to property owned by

15  Mr. Lord's father in Shreveport.  That plan was never executed.

16  But there's no question that both of them were exercising a

17  form of dominion or control over the premises.

18       And Michael Lord having participated in creating dummy

19  pills this Court believes satisfies not only Section 2D1.1, but

20  also complies and comports with the commentary to Application

21  Note 17 which includes storage of a controlled substance for

22  the purpose of distribution.  And those are the Court's

23  conclusions on that.

24       Thus, the objection by the Government resulting in a

25  two-level increase already built into the calculations of the

1  presentence report is sustained, and the objection to that

2  two-level increase by the defendant Michael Lord is hereby

3  overruled.

4        All right.  You may move to your next argument,

5  Mr. Carmouche.

6        MR. CARMOUCHE:  I think we will move to the

7  allocution.  The --

8        THE COURT:  Oh.  We have one other objection, and

9  that is the so-called Section 3B1.3 two-point enhancement for

10  abuse of position of trust or use of a special skill.

11       Ms. Jernigan, did you already put your argument on the

12  record for that one?

13       MS. JERNIGAN:  Yes, Your Honor, I believe I did.

14       THE COURT:  All right.  And, Mr. Carmouche, as the

15  record currently stands, that Government objection is not

16  included as a two-point enhancement, but I don't believe

17  Probation had the full extent of the testimony of

18  Mr. Laghari -- who appeared this morning as a witness on the

19  use of the darknet, encryption, and multiple layers of security

20  set up by Mr. Michael Lord -- in preparing the presentence

21  report or responding to the Government's objection.  Do you

22  wish to address that special skills argument at this time?

23       MR. CARMOUCHE:  Your Honor, yeah, we would.

24       We don't believe that there is any special skills that's

25  required.  It's my understanding that a person knows how to use

1    a computer can go to Google and ask them how to set -- ask

2    Google how to set up a darknet website or whatever, and it will

3    all pop up.

4        Al Laghari had three and a half years of college.

5    Michael Lord dropped out of school in the tenth grade, I

6    believe, and he has a GED.  He has no special skills in getting

7    these sorts of things done.

8        So that would be our argument, Your Honor.  We don't

9    think it's -- we don't think another enhancement ought to be

10   added on top of the already pretty severe penalties involved

11   with distribution of Xanax.

12       THE COURT:  All right.  Any comment, Ms. Jernigan,

13   before the Court proceeds to its ruling?

14       MS. JERNIGAN:  No, Your Honor.

15       THE COURT:  The last objection raised by the

16   Government deals with Section 3B1.3 of the Guidelines providing

17   for a two-point enhancement in the offense level, quote, "if

18   the defendant abused a position of public or private trust or

19   used a special skill in a manner that significantly facilitated

20   the commission or concealment of the offense," end quote.

21       Application Note 4 to the Guidelines section states that

22   "special skill" refers to a skill not possessed by members of

23   the general public and usually requiring substantial education,

24   training, or licensing.  Examples in Application Note 4 include

25   persons with special skills such as pilots, lawyers, doctors,

1   accountants, chemists, and demolition experts.

2       The Court finds that this case is analogous to *United*

3   *States vs. Malagoza*, 2 F.3d at 1107, Eleventh Circuit case

4   1993, where the Eleventh Circuit considered whether a

5   self-taught long range radio operator who had used his skills

6   as a radio operator in furtherance of a drug conspiracy [sic].

7   There the Court held that, quote, "although not every instance

8   of radio operation requires skills not possessed by members of

9   the general public, it is possible to develop expertise in that

10  field that rises to the level of a special skill."

11      Similarly, in this case, the Court finds that though not

12  every evidence of operation of computers and the use of the

13  internet itself requires skills not possessed by members of the

14  general public, it is possible to develop special expertise in

15  that field that rises to the level of a special skill.

16      The Court finds that this is particularly true of skills

17  developed in using the so-called darknet and encrypted or

18  secure chat programs in layers of the type that Michael Lord

19  used in this matter concerning registration of the name

20  utilized or to be utilized in the illicit sale of manufactured

21  Xanax.

22      Though Michael Lord may not have had formal training in

23  these areas, the evidence conclusively shows that he

24  nonetheless exercised considerable self-taught computer skills

25  beyond those that the members of the general public have in

1   participating in this drug conspiracy, especially with respect

2   to use of the darknet, the availability of so-called secure

3   websites, the availability of websites that use messages that

4   are literally erased and disappear without ever being tracked

5   by history.

6        Therefore, the Court finds that the specific self-taught

7   computer skills like those possessed by Mr. Michael Lord do, in

8   fact, qualify as special skills under Section 3B1.3.  And the

9   Court also finds that, based on a preponderance of the

10  evidence, Michael Lord used these special skills in a manner

11  that significantly facilitated the commission or concealment of

12  the offense at issue in this particular matter.  The

13  Government's objection is therefore sustained.

14       The Court orders that the PSR be amended to reflect the

15  two-point enhancement for the use of these special skills.

16       Under this set of circumstances, the recalculation of the

17  guidelines applicable to Mr. Michael Lord are as follows:  The

18  total level of the offense moves from a Level 28 to a Level 30

19  under the guidelines, and that translates into a guideline

20  range of 97 to 121 months at issue in this case based on the

21  Court's rulings made periodically throughout this hearing.

22       Mr. Carmouche, you may object to that finding at this

23  time if you want to do so.

24            MR. CARMOUCHE:  Yes, Your Honor, to that and the

25  ruling that you made just prior to this one.

1          THE COURT:  All right.  Those objections are noted
2    for the record.
3          All right.  Are you ready to proceed to allocution?
4          MR. CARMOUCHE:  Yes, Your Honor.  We're calling
5    Randall Lord.
6          THE COURT:  All right.  Mr. Lord, come on up.  If you
7    would, come to the center podium, where we can be sure that we
8    hear you.
9          Mr. Carmouche, would you like to accompany him?
10          MR. CARMOUCHE:  I will.
11          THE COURT:  Mr. Lord, hang on just a moment till
12    Mr. Carmouche comes on up.
13          All right, sir.  Good afternoon.  You may begin when
14    you're ready.
15          DEFENDANT RANDALL LORD:  Thank you, sir.
16          I'd like to speak on behalf of both me and my son for
17    Counts 1 through 14.  But, of course, I will not be addressing
18    Count 15 in my allocution.
19          Our business began by my son asking me if I would like to
20    be a partner with him in a bitcoin business.  And, of course,
21    at the time, like many of you, I said, "What's bitcoin?"  And
22    he had to spend some time explaining to me what it was, that it
23    was like a digital currency in that it doesn't physically
24    exist, that it is traded and stored on computers.
25          And so I read up on it a little bit, and it sounded like

1    it was something that could be a good business and that -- I

2    was interested in helping him develop a business and get

3    started in that so he could have some form of employment.

4    Because prior to that time, he didn't have anything.

5         But I'd also like to point out that neither one of us had

6    any formal training or education in law or finance, and so we

7    really didn't understand that this -- there were laws and

8    financial rules and regulations that involve bitcoin.

9         My understanding at that time was that bitcoin was not

10   really a currency, but it was, rather, a property.  It had some

11   of the criteria of a currency, but not others; and, therefore,

12   it couldn't really be called a currency.  Even though people

13   call it a currency, it's not really that.

14        When we first started, I didn't realize there were any

15   regulations or licensing issues at all, because I thought we

16   were just selling our own personal property.

17        In, I believe it was June of 2014, Coinbase, one of the

18   exchanges that we were working with, notified us that we needed

19   to be or that we were supposed to have a registration with

20   FinCEN and possibly a license with the state.  So I began

21   researching that and found out there was such a license for

22   what they were calling a "money service business."  But after

23   reading over the statute, I determined that what we were doing

24   did not fit that criteria; that because bitcoin was not a

25   currency under their statute, that we didn't have to have a

1   license.  So I didn't proceed with that any further.

2       I read over the regulation or the -- I guess it was the

3   "guidances," I believe is what it was called, from FinCEN about

4   virtual currencies, and spent some time discussing this issue

5   with my son about -- there were -- it appeared to me that they

6   were trying to expand the meaning of a currency trader to

7   include a virtual currency, and I thought that was rather

8   expansive for them to take a definition of what "currency" is

9   and expand it out to mean something that it originally did not

10  mean.

11      But, nevertheless, I went onto FinCEN's website and

12  registered, or at least I thought I did.  In fact, I sent some

13  messages to both Coinbase and to my son that I had registered

14  at that time.  That was, I believe, late June or early July.

15  In fact, after looking over -- I believe it was Exhibit 3,

16  there's some correspondence between me and my son where I'm

17  telling him that I've got it taken care of.

18      It wasn't until November of that same year that Coinbase

19  contacted me again and said, "We can't find your registration.

20  What's going on?"

21      And I said, "Well, I am registered.  What do you mean?"

22      They said, "Well, you have to have a number with it."

23      I said, "Well, they're -- I don't recall receiving a

24  number."

25      So I had to start the registration process all over

1   again, and then I completed it and got the registration number

2   that time -- at that time.

3        Anyway, apparently I had not clicked on a "submit" button

4   or something on the very last page.  But I didn't find out that

5   until November.

6        At various times throughout our business, we did contact

7   law enforcement about some shady characters that we had come

8   across.  At one time we sent a lot of our communications to the

9   Caddo Parish Sheriff's Office about a person that we thought

10  was probably a scammer, and we asked them to investigate it,

11  see if they could find out anything.

12       And, also, at one time Michael met with an FBI agent in

13  New York to discuss a scammer that he had come in contact with

14  through his bitcoin business.

15       And even towards the end of our business, we were

16  contacted by someone who was wanting to buy -- I believe it was

17  about $100,000 worth of bitcoin.  So we got with our lawyer --

18  because we had a lawyer at that time -- and told him about it.

19  He, in turn, called the DEA and notified them that someone was

20  trying to buy an enormous amount of bitcoins from us.

21       At the change of plea hearing that we had with you, on

22  multiple occasions you used the phrase "unlicensed MSB" or

23  "unlicensed money service business" with us and asked us if we

24  were pleading guilty to that.  And at that time my

25  understanding was that I may have been wrong about the state

1   licensing requirement, and thought, well, they're prosecuting

2   me for it, my attorney says I should have had it, and I said,

3   "Well, I must have misunderstood what that statute said; so I

4   guess I am guilty."  So my son and I both pled guilty to that

5   at that time.

6          I did not understand at that time that "unlicensed money

7   service business" had a very specific legal definition.  In

8   fact, I've just discovered that just a few days before arriving

9   here at this sentencing hearing, that it was much more specific

10  than what I had understood at that time.

11         Had I known everything that I knew at that time, I might

12  have pled not guilty and sent this whole thing to trial.

13  Because there were a number of questions that I had about legal

14  issues from -- not just on Count 1, but throughout all of those

15  other 14 counts.  Like, for example, what is a bitcoin?  What

16  is currency?  What is a currency exchanger?  What is a money

17  service business?  All of those things probably have very

18  specific meanings, and I'm not sure those have all been

19  addressed, certainly not with respect to me and my son.

20         Well, based on this, we never really conspired to operate

21  an unlicensed money service business.  In fact, just the

22  opposite is true, according to the evidence.  We actually were

23  trying to comply with the regulations, we just simply didn't

24  quite understand what they were.  And -- but here we are today,

25  and we will, of course, submit to any ruling that you make.

1        THE COURT:  All right, sir.

2        DEFENDANT RANDALL LORD:  I'm sorry.  I have one more

3   thing, one more issue I forgot to mention.

4        THE COURT:  All right.

5        DEFENDANT RANDALL LORD:  And that was there were

6   times when the banks would shut us down -- and credit card

7   companies -- which the IRS agent had testified about.  Whenever

8   those things happened to us in the beginning, we contacted the

9   banks and the credit card companies to find out why they were

10  doing that, and they wouldn't tell us.  They would -- in fact,

11  one of the answers they gave us was -- in fact, they sent it to

12  us in writing -- that they had the right to shut down any

13  account for any reason or no reason at all.

14       And I said, "Well, so are you saying there's no reason

15  that you're shutting it down?"

16       And they just simply would not answer us.

17       So it was mostly through trial and error that we figured

18  out, well, it must be because of the amounts of cash that are

19  going through our accounts that we're being shut down.  It's

20  not because -- in our minds, we were not doing some illegal

21  activity, it was just they were uncomfortable with that.

22       And regarding the credit card companies, yes, I did not

23  truthfully tell them the nature of my business, but I never

24  imagined that telling them that could be construed as wire

25  fraud.  Because the credit card companies were not my

1   customers, they were simply a processor for my customers, and

2   my customers knew exactly what they were doing.  So I wanted to

3   make sure that you understood that from our perspective.

4            THE COURT:  All right.

5            MR. CARMOUCHE:  Thank you, Your Honor.

6            THE COURT:  Does Michael Lord wish to allocute?  I

7   need that on the record, because he has an absolute right to.

8            MR. CARMOUCHE:  Yes, sir.

9        Your Honor, I think Michael Lord does not desire to

10  discuss that last count.  However, it was his understanding of

11  the charges that -- well, he has always maintained he doesn't

12  know what AB-PINACA is, and some of these other drugs that were

13  involved, but -- but I had prepared sort of a summation of our

14  defense in this case, Your Honor.

15           THE COURT:  Let me back you up one half-step.

16           MR. CARMOUCHE:  Okay.

17           THE COURT:  Mr. Michael Lord, our law provides that

18  you have an absolute right to address the Court and tell me

19  what you think I need to know before I impose a sentence on

20  you.

21           DEFENDANT MICHAEL LORD:  Okay.

22           THE COURT:  And I simply need to know, on the record,

23  whether you wish to exercise that right or not.

24           DEFENDANT MICHAEL LORD:  Right.

25           THE COURT:  And discuss that with Mr. Carmouche.  The

1    law has changed a little bit.  That's why I need you personally

2    to respond to my question.

3         Mr. Carmouche, you can take whatever time you need to

4    discuss that in detail with him if you like.

5         (Defense Counsel confers with his client.)

6         DEFENDANT MICHAEL LORD:  Okay.  It's my understanding

7    that Al Laghari had been purchasing and distributing drugs

8    before, during, and after he met me and interacted with me.

9    The PINACA that was added to my sentencing report, there was

10   never any evidence presented that I had any knowledge of or any

11   involvement in that whatsoever, so I'm really confused why

12   that's there.

13        MR. CARMOUCHE:  That's all he wanted to discuss with

14   the Court.

15        THE COURT:  All right.  Mr. Lord, does that conclude

16   your so-called allocution?  That's a technical term for it.

17        DEFENDANT MICHAEL LORD:  I suppose so.

18        THE COURT:  If you need to tell me more, you're

19   welcome to do that.  If you wish to stop now, that's also your

20   choice.

21        (Defendant Michael Lord confers with his

22        counsel.)

23        MR. CARMOUCHE:  I think he -- I believe I understand

24   that he's said all he needs to say.

25        THE COURT:  All right.  Mr. Lord, thank you very

1    much.  You can resume your seat.

2         Mr. Carmouche, concluding remarks?

3         MR. CARMOUCHE:  Yes, Your Honor.

4    This case I guess has been going on for about two and a

5    half years, maybe, somewhere in that time.  When it first

6    started, I think all of us were asking, you know, "What's a

7    bitcoin?"  And I don't know if -- a lot of people don't take

8    the *Shreveport Times* anymore, but last Sunday's front page had

9    bold headlines saying what are bitcoins at the top of the fold,

10   Sunday paper.  So, obviously, there's still a lot of people

11   that don't know what bitcoins are, how you use them, how you

12   can get them, how you can buy them.

13        And when Randall and Michael Lord -- first, of course,

14   Michael Lord had figured out what bitcoins were, and I think

15   it's clear from the investigation he understood that there was

16   a way, apparently, to buy and sell bitcoins and make a small

17   profit or some profit from those transactions.

18        And as Mr. Randall Lord just said, they did -- and

19   Michael did -- started buying bitcoins and then making --

20   selling them.  Apparently, the price of bitcoin fluctuates.

21   It'll go up and down.  And the people that understand it are

22   able to buy low and sell high and make some money out of it.

23   Sometimes they do, sometimes they don't.

24        But while they were doing that, as Randall Lord just

25   testified, the banks were concerned, I guess because of bank

1    secrecy acts and those things, that -- they didn't like the

2    fact that cash was coming in and out of their accounts.

3        So the bank problems started.  The Lords were told by the

4    banks, "We're shutting your accounts down."  They'd go to

5    another bank and buy and sell bitcoins and that would get shut

6    down.  They'd go somewhere else and that would get shut down.

7    That's why they had so many different bank accounts.  It

8    wasn't -- we would submit it wasn't an attempt to hide their

9    transactions or to do -- to violate the law and try to get away

10   with it.

11       At that time, and probably still today, there was

12   basically a lack of guidance for what an individual can do in

13   this area.  How can they buy and sell and still comply with the

14   law?  So they were -- the Lords were left to their own

15   interpretations.  They read the law.  Mr. Lord is an

16   intelligent person; and he looked at it, and he still couldn't

17   figure out for sure why he would be identified as an MSB or as

18   a money transmitter.  There's just no simple definition to

19   that.

20       And the fact that there's so much confusion in the laws

21   is clearly shown by the indictment in this case.  They were

22   indicted for selling -- buying and selling, basically, bitcoin

23   without a license -- without a license, we understood, from the

24   State of Louisiana.  When we started looking for the license,

25   we couldn't get a definition.  We couldn't find out for sure is

1   there a license in Louisiana.

2        My first impression was there's got to be a license.  The

3   Government wouldn't be indicting you for selling bitcoins or

4   dealing in bitcoins without a license.  I found that hard to

5   believe, that the grand jury would hear testimony and then

6   indict somebody for a law that's not on the books.  And we --

7   that's been shown since then.  So we were totally confused

8   about what's going on.

9        My clients asked, "Should we plead or not?"  We talked

10  about it.  Said, "I don't know.  If they present all 24 or all

11  14 counts of the indictment to a jury and we can't understand

12  it, they can't understand it, the jury's going to convict."

13       That's why when we first came in to offer to plead or to

14  accept the plea, we first asked can we reserve our right to

15  appeal, can we plead *nolo*, reserve our right to appeal, and

16  let's go to the appellate court and find out is this a crime or

17  not.

18       We were told, "No, you can't do that."  I guess in the

19  Western District.  But in other districts, you can.  We

20  couldn't here.  That's what we were told.  That's the way I

21  understood it.

22       And it's in the -- you know, the transcript of the guilty

23  plea.  Went through.  And we then found out, after the plea,

24  that the Government was conceding that Louisiana doesn't

25  require a license, they have no license.  That's when we

1  started talking about, "Well, we need to try to withdraw our

2  plea of guilty."

3           THE COURT:  I've already held that that's just

4  another mode of violation had there been the licensing

5  mechanism in Louisiana.  It doesn't affect the guidelines as

6  calculated or the ranges.  It's the failure to register with

7  FinCEN and the amount of money into and out of bitcoins that

8  raises eyebrows with banks and credit card companies, and never

9  telling a credit card company the whole truth, quote-unquote,

10  as indicated by Mr. Randall Lord, that seems to be part of the

11  issue here.  I've already ruled that the guilty pleas could not

12  be withdrawn.

13           MR. CARMOUCHE:  Yes.  And, of course, that would be

14  part of, I guess, our appeal.

15           THE COURT:  I'm not interested in hearing rehashing

16  on that.  We'll be here till 6:00 today.

17           MR. CARMOUCHE:  Well, just one more brief issue.  In

18  the transcript of the guilty plea, I think it was Agent Heusel

19  that testified, and this is just one paragraph, Your Honor:

20  "Back on March 8 of 2013, FinCEN, the Financial Crimes

21  Enforcement, issued guidance that requires administrators or

22  exchangers of virtual currency to be registered as a money

23  service business."

24       "And there is also a requirement to be licensed by the

25  state in which they operate?"

1      Agent Heusel said, "Yes.  The State of Louisiana requires

2  any money service business, check cashers to be licensed."

3      That, to us, said that we must abide by that statute.  So

4  we -- and once we did that, based on that issue, and we're now

5  told that probably we will lose the three points, both of them,

6  for the acceptance of responsibility, to me, that seems totally

7  punitive.  I mean, you exercise your right to do something that

8  you're allowed to do under the Constitution; and because you do

9  it -- that's like saying if I have a right to trial and I want

10  to go to trial, then -- and it'd be a mighty much of a chilling

11  effect -- and if you go to trial, we're going to give you life,

12  you know, a more severe penalty; if you don't, if you plead,

13  then you'll get a lesser penalty.

14      But in this case, to lose the points for that, we just

15  don't feel like that's --

16      THE COURT:  I'm also convinced that after hearing the

17  allocution of your client, Randall Lord, that he still doesn't

18  believe he did anything wrong.

19      MR. CARMOUCHE:  At least he doesn't understand what

20  he did wrong.

21      THE COURT:  Well, when you handle $2.5 million in

22  currency transactions into and out of something you, quote,

23  "don't understand," end quote -- this isn't a $10,000 case.

24  It's big money.

25      In this particular case, to say "I didn't understand"

1    when a person of his educational background would reasonably

2    have consulted a financial consultant of some kind or

3    character -- a lawyer, which apparently he had access to, but

4    did not -- and then doesn't tell credit card companies the full

5    truth about the kind of business that he's running, and as bank

6    after bank closed that because of cash transactions, his own

7    conclusion tells me specifically that he's doing a pretty fair

8    job of evading the law and finding a way to keep operating.

9          Now, that's my conclusion.  In this particular instance,

10   the attempt to withdraw the guilty plea in this set of

11   circumstances as to the absence of licensure by the state,

12   granted.  Government conceded.

13         As to failing to register with FinCEN:  Number 1, it's an

14   abject failure; Number 2, it's an "oh, I'm negligent, I must

15   not have hit the 'submit' button," and then, finally,

16   registration.  That could be interpreted by a jury or a trier

17   of fact as criminal activity.  They can believe "I didn't

18   know," but ignorance of the law is no excuse.  "I read but I

19   didn't understand" does not imply that you should jump into a

20   $2.5 million business without being sure of what it is you're

21   doing.

22         And the fact that he misinterpreted the requirement about

23   a money servicing business or money transmitting business does

24   not absolve him of compliance with the law.  Instead, what it

25   demonstrates clearly in the allocation to the Court, which is

 1   consistent throughout everything, including the initial guilty

 2   plea, that he still doesn't believe he did anything wrong.

 3        That's what I find to be stretching of the truth.

 4   Sometimes the Court believes it's in the same position as that

 5   credit card company with you don't get the full information

 6   about the nature of the business.

 7        If there were only $10,000 at issue, that's one thing.

 8   But this is on a summary sheet, an admitted exhibit:

 9   $2.5 million worth of cash in and out, with two of those

10   actually being buys by agents for the specific purpose that is

11   shown in the exhibit, one $14,000, the other -- was it $10,000?

12   I may be wrong on that.

13        Ms. Jernigan, can you help me on that?

14             MS. JERNIGAN:  $19,000.

15             THE COURT:  $19,000.

16        So I understand your argument, but the evidence with

17   respect to the guilty plea, if they're trying to say, "Oh, I

18   now reconsider, I didn't do anything wrong," which is how I --

19   this Court interprets that, hearing the allocution "I did

20   nothing wrong," then "I was negligent," then "I finally got my

21   registration number," and then hearing the testimony of

22   Mr. Laghari that the reason for discussing after establishing a

23   level of trust between Laghari and Michael Lord was to

24   manufacture Xanax, sell them on the dark Web or the darknet in

25   encrypted and/or layers of secured types of sites, accept

1   payment on the darknet through bitcoin, accumulate a sufficient

2   number of bitcoins and cash out into U.S. currency at the

3   appropriate time . . .

4        Now, what is missing but which leaves lots of questions

5   is Randall Lord, the dad, participating in these in-and-out

6   bitcoin dollar transactions without having any knowledge -- and

7   that's apparently what the evidence shows -- of his son's

8   drug-related business, whether it's the ability to obtain

9   cocaine over the internet and have it shipped in or the other

10  kinds of drugs involved in this.

11       And a conspiracy, as you know, is a type of issue that

12  involves -- it's the type of crime where the agent of -- a

13  member becomes the agent of every other member.  And using the

14  analogy of the spider at the middle of the web, if another

15  spider or smaller in size is up on the web in the top right

16  quadrant, that spider doesn't have to know everything going on

17  about the spider that's operating in the left lower quadrant or

18  what the spider in the middle is doing.

19       In this, it's very close but does not qualify as a

20  coordinated drug business with bitcoin.  But there is an

21  intersection between the bitcoin business being set up and used

22  in timely fashion to understand its operation before the drug

23  operation begins.  I don't think that's coincidental from the

24  evidence that this Court has heard.

25            MR. CARMOUCHE:  So are you telling us now that

1  Randall Lord's going to be punished for the --

2          THE COURT:  Absolutely not.  Because there's no

3  evidence that Mr. Randall Lord was involved in the drug side of

4  the bitcoin business.  I don't think there's any question about

5  that.  And they are separate crimes.  There's a father-son

6  relationship, but, you know, that's as far as it goes.

7          And in this particular instance, Michael Lord has got the

8  bitcoin problem as well as the drug conspiracy issue.  Randall

9  Lord has only the bitcoin problem.  And I'm making a very

10  bright line of demarcation there, making it perfectly clear for

11  the record one does not bleed over to the other.  I don't even

12  have to make a determination of whether Michael Lord was using

13  his dad for trial runs on trying to figure out how to operate a

14  successful bitcoin business.

15          But it's clear the ultimate purpose by Michael Lord and

16  Laghari was to operate a manufacturing business for illegal

17  drugs -- Xanax -- and getting paid in anonymous

18  cryptocurrency -- bitcoins -- and accumulating it on a rapid

19  basis, converting to U.S. currency, and getting out of the

20  business.  That is uncontroverted evidence.

21          MR. CARMOUCHE:  And I may be wrong, but the testimony

22  I heard, Your Honor, is that Laghari was purchasing bitcoin to

23  buy drugs long before he suckered Michael Lord into the scheme

24  of --

25          THE COURT:  Oh, neither have clean hands, granted.

1    Mr. Laghari faced charges over in Webster Parish, in the 26th

2    JDC, and was sentenced.  He was here on subpoena from the U.S.

3    Government to serve as a witness today.

4              MR. CARMOUCHE:  Yes, sir.

5              THE COURT:  And, you know, the cooperation aspect of

6    it, I understand all that.  I wish we had pillars of the

7    community in every manner, way, shape, or form dealing with

8    drugs, but we typically don't.

9         And I understand the standardized impeachment of

10   Mr. Laghari, because he has the potential of either, A,

11   violating the terms of his cooperation agreement that could

12   inure to his detriment on the parole and so forth and so on;

13   and, B, possibly perjury for lying in this court.

14        So I understand the limitations on his testimony, but I

15   also understand the nature of drug conspiracies.  Because that

16   started early on in my almost 14 years here on the bench.  And

17   I understand the complicitness, the words that are spoken, the

18   words that are unspoken, and the involvement in the internet in

19   the conducting of these kinds of transactions.

20        I am 100 percent convinced that Mr. Randall Lord is not

21   involved in the drug manufacturing business or registration of

22   any business name or domain name on any part of the dark Web or

23   darknet or whatever you want to call it.  Clear line of

24   demarcation there.

25        And that's where -- you know, the fact that both are

 1    involved in bitcoin issues, you know, has bleedover bitcoin to
 2    bitcoin, but there was never a pill distributed, there was
 3    never a bitcoin paid or collected, and there was never a pill
 4    manufactured or advertised for sale on any of the sites that
 5    are registered.  I get that.  I understand it.
 6              MR. CARMOUCHE:  So making an argument for a downward
 7    departure would fall on deaf ears?
 8              THE COURT:  Oh, it's not falling on deaf ears.  I'm
 9    just telling you how the evidence lines up in what I have heard
10    today and what I have reviewed in the presentence reports.
11    Plural in this case because they're different because they
12    involve different levels of activity and crimes.
13         Arguing for downward departure is what I anticipate and
14    expect, and I've got an open mind on this, but I wanted to
15    engage in a colloquy so that you would understand the Court's
16    thinking so you would be able effectively to address those
17    points that I have raised which express my concerns about the
18    evidence that's been presented in connection with today's and
19    yesterday's hearing and in connection with the presentence
20    reports.  And I'm open to downward departures and arguments,
21    and I'm just telling you what the evidence kind of revealed.
22    Okay?
23         And downward departures are always available, no matter
24    what the Court's findings are, in any given case with respect
25    to enhancements or acceptance of responsibility or anything

1    else.  I've done them.  Okay?

2         So I don't want you to leave that out, because it doesn't

3    fall on deaf ears.  But I'm giving you points that you may wish

4    to consider to address in your request for a downward

5    departure.

6              MR. CARMOUCHE:  Well, may I get just one thing, Your

7    Honor?

8              THE COURT:  Yes.

9              MR. CARMOUCHE:  Your Honor, in looking at what a

10   possible sentence might be, I don't know if the Court has been

11   able to find bitcoin convictions and sentences.  We have had a

12   difficult -- I had -- the only case that I found was one where

13   *U.S. vs. Shavers*.  And I don't have the cite because I read it

14   on Google.

15        In that case, the man had defrauded people, apparently

16   using bitcoins, out of a million point two six, somewhere in

17   there.  There were victims.  People lost money.  And he was

18   sentenced in a district court, U.S. District Court in New York,

19   to 18 months.

20        And that would seem to be the -- with respect to the end

21   result of this, nobody lost money except the Lords.  When they

22   were using the credit card accounts and if there was a

23   chargeback, it was charged back to them.

24        In fact, one of the problems that they're having today is

25   that they had like, I think, $190,000 in one of those

1    accounts -- or an account.  They don't have multiple accounts

2    with that kind of money.  They had $190,000, and it's been

3    frozen by a credit card processor since this case started.

4    Over two years, I believe, it's been frozen.  They can't get to

5    it.

6         The rest of their property has liens on it.  All of that

7    property was bought -- that they have now was bought long

8    before any bitcoin transactions ever took place.

9         You know, if there were two and a half or three and a

10   half million dollar transactions that were going through -- and

11   I think the evidence showed that there were that many coming

12   through the bank accounts -- that doesn't mean that that kind

13   of money was being made.  I think if we look at the bank

14   accounts and their assets now, there's nothing, basically.

15        So when we look at what would be a proper penalty if the

16   judge was looking at it, I think the guideline points are way

17   above.  I think they vastly overstate the seriousness of this

18   charge.  Because they were deceiving some people and not

19   hurting anybody, that, to me, is not near as bad as somebody

20   who actually hurts somebody, steals money from them, defrauds

21   them out of money, and does those kinds of things that cause

22   victims problems.  We don't have any in this case.  And I know

23   that all the cases don't have to have a victim, but we don't

24   have victims in this case.

25        And I would submit to the Court and ask, Judge, that you

 1    go below, on both of the defendants, that what the guidelines

 2    may call for.  The maximum sentence, as I understood, in the

 3    bitcoin case was five years.  We hope that any sentence would

 4    be way below that.  And if we went back to the original

 5    charge -- the original charge itself is just zero to six

 6    months.  These are both first time offenders, had no record of

 7    any kind.  Michael Lord was lured in by a much more

 8    sophisticated guy that told him, "Look, we can make some money;

 9    let's do this."

10         With that, Your Honor, I'll sit down and ask for your

11    consideration of what I've asked.  Thank you.

12              THE COURT:  All right.  Thank you for the case as

13    well.  You're right, bitcoins are a relatively undeveloped area

14    of law.

15         Ms. Jernigan, concluding remarks?

16              MS. JERNIGAN:  Your Honor, the Government opposes the

17    request for a downward departure with respect to both

18    defendants for all the reasons stated in the sentencing

19    memorandum that we submitted and I hope communicated through

20    the objections presented to the presentence investigation

21    reports in this case.

22         Mr. Carmouche represented that there are no victims in

23    this crime.  I think that's inaccurate.  I think that's wrong.

24    There's a societal harm to defendants who choose to operate in

25    a way that circumvents the law.

1    They decided to go into a business of selling bitcoins

2  and exchanging those, which in and of itself is not illegal,

3  but there are rules and regulations that come along with that,

4  as Mr. Lord indicated awareness and knowledge of through his

5  allocution this afternoon before the Court.

6    Having chosen to subject themselves to this particular

7  area of industry which is highly regulated, they're bound to be

8  governed by those rules.  And part of those rules are designed

9  to prevent criminal proceeds from making their way out into the

10  market and for law enforcement to be able to trace those as a

11  part of their investigative tools.

12    We don't want criminals to be able to just keep the

13  profits from their illegal acts, and so people who are in the

14  business of exchanging and accepting currency have a certain

15  responsibility.  If you're going to meet a customer at

16  McDonald's in Shreveport and accept cash and exchange that for

17  bitcoin, you've got to ask for identification.  You've got to

18  get basic information about who your customer is.

19    If you find that there are suspicions raised by people

20  who are endeavoring to do business with you, be it Quantum

21  Health, Pelican Mining, Data Security, or whatever they're

22  calling themselves, there are mechanisms for that.  You file a

23  suspicious activity report.  That's something that a money

24  service business has to do.

25    There has never been a single suspicious activity report

1   submitted by either of these defendants, despite the

2   representations that Mr. Lord said to this Court this afternoon

3   about nefarious characters, including the individual wanting to

4   buy $100,000 worth of bitcoin.

5        So you've got to ask for identification.  You've got to

6   have them fill out paperwork so that we can have some record of

7   who it is that's bringing you cash or who is buying

8   sequentially numbered money orders all obtained at the same

9   time below the reportable threshold amount, because that might

10  be something that is of interest to law enforcement.  But they

11  didn't report any of that activity, as we saw demonstrated in

12  their bank records, and that happened on a repeated and

13  iterative basis.

14       What the indictment speaks to and what the facts were

15  established through the testimony of Agent Heusel and

16  Agent Upchurch during the guilty pleas in this case is that the

17  defendants at every opportunity lied about what it is that they

18  were doing, both with the depository institutions where they

19  had bank accounts as well as the credit card companies, and

20  they were lying because they wanted to do it their own way.

21  They didn't want to just be aboveboard and say, "We are bitcoin

22  exchangers, my son and I.  We're operating this business."

23       They called themselves health practitioners or various

24  misrepresentations about what it was that they were doing, and

25  they did that knowingly, as acknowledged by Mr. Lord this

1    afternoon.  And that speaks to a certain intent about the kinds

2    of customers they want to have and that they anticipate

3    getting, and what they intend to do with that money.

4         Ultimately, Michael Lord decided to get in bed with an

5    admitted drug dealer, Al Hasnat Laghari, who spoke quite openly

6    about giving drugs to students and others down in the Baton

7    Rouge area.  There was no secret about the kind of man that

8    Al Hasnat Laghari is, and that's whom Michael Lord decided to

9    use his sole source of earnings, mining and selling bitcoin and

10   exchanging bitcoin, and to go in the Xanax operation.  And on

11   the side, he had no problem ordering cocaine for him, or MDMA

12   or whatever else he might need for his entertainment and

13   pleasure.

14        Mr. Carmouche suggests that an 18-month sentence is

15   appropriate and cites to the *Shavers* case.  I would direct the

16   Court to the *Ross Ulbricht* case.  And I'm probably

17   mispronouncing that.  U-l-b-r-i-c-h-t.  He was sentenced to

18   life for his involvement in Silk Road and that market and the

19   use of bitcoins in connection with the illegal trafficking

20   activities that were involved in his case.

21        They are first time offenders who, to this day, don't

22   seem to understand the import of the anti-money laundering

23   laws.

24        The Court has a difficult task in trying to determine

25   what is an appropriate, reasonable, and just sentence for these

1    defendants, but I would submit that 18 months is not it.  I

2    think that the length of the activity, how long it went on, how

3    much was involved in it, the repeated lies, the failure to show

4    any sort of acknowledgment -- ideally, remorse -- makes

5    deterrence less likely, at least as of this day as to these

6    defendants, and so we would ask the Court to impose a guideline

7    sentence consistent with the findings in the presentence

8    investigation reports and sentence both defendants accordingly.

9         It's an unfortunate and tragic situation that both father

10   and son, endeavoring to go into bitcoin, have found themselves

11   before this Court facing sentencing and terms of imprisonment,

12   but it's something that they knowingly did repeatedly.

13        To the extent that there is hesitation expressed

14   regarding the nature of the charges against them, the

15   indictment itself as well as the testimony elicited from the

16   agents at the time of the guilty pleas clearly established that

17   there was evidence that the Government had that provided two

18   different bases of violating the conspiracy charged in Count 1:

19   lack of having federal registration after being a money service

20   business involved in virtual currency, and the state licensing.

21        Those facts changed based on new information that the

22   defendants got post-indictment that the Government did not have

23   at the time of indictment and was contrary to the information

24   that the Government had prior to indictment on the state

25   licensing prong; but, nevertheless, it has always been clearly

1    communicated to these defendants that lack of federal

2    registration was one of the theories of prosecution and the

3    bases for Count 1.  And I think that that has been consistently

4    communicated both in the charging documents and in

5    communications with opposing counsel.

6            And so with that, Your Honor, I'll complete my

7    submission.

8            THE COURT:  All right.  Thank you.

9        Mr. Carmouche, any brief response?  I'm going to give you

10   an opportunity to close this if you have anything else to add.

11           MR. CARMOUCHE:  Nothing else, Your Honor.

12           THE COURT:  All right.  The Court's going to take

13   about a ten-minute break, after which time we will come back

14   in, reconvene court, and proceed to the actual sentencing

15   involved in this particular matter.

16       (Recess had 4:17 - 4:38 p.m.)

17           THE COURT:  Thank you.  Court will come to order.

18   Please be seated.

19        Before getting to the specific issue of sentencing,

20   Ms. Jernigan, Mr. Carmouche, we have a forfeiture issue

21   involved in this; and when we proceed to sentencing, my initial

22   proposal is to rule on the section having to do with everything

23   but forfeiture.  Forfeiture appears to me to require a separate

24   hearing, or has -- what's the status of the forfeiture portion

25   of the indictment?

1       MR. CARMOUCHE:  I think it's in the -- maybe in the

2   Plea Agreement.  I mean, it was mentioned either --

3       THE COURT:  Well, I know it's mentioned, but I have

4   not -- do we have an order of civil forfeiture signed at this

5   point?

6       MS. JERNIGAN:  No, Your Honor.  The Government filed

7   a motion for a money judgment of forfeiture in an amount based

8   on the total value of the funds into the various bank accounts

9   of the MSB, and I don't believe there's an opposition to it.  I

10  thought we were going to take care of it as a part of the

11  sentencing, but I'll defer to Mr. Carmouche.  Because he's the

12  money --

13      THE COURT:  And I can't --

14      MS. JERNIGAN:  -- segment, which is not a

15  particular --

16      THE COURT:  I don't have a cart full of stuff, but

17  I've got more than a handful.  And I cannot readily find what

18  the status of that forfeiture issue is, and I wanted to know

19  whether that can be handled today in due course or whether

20  that's going to require a separate hearing as part of the

21  overall sentencing.

22      MR. CARMOUCHE:  From our standpoint, Your Honor, we

23  have notice, but there's not really anything else involved to

24  what might be; so we -- we certainly won't agree to a

25  forfeiture money judgment, but -- especially if the defendants

 1   are sentenced to jail.  I don't know where it would -- how it
 2   would be paid.
 3            THE COURT:  It's not a matter of restitution.  It's a
 4   matter of forfeiture.  Those are two completely different
 5   animals.
 6        And a money judgment forfeiture is different than the
 7   standard kind of forfeiture that we typically see.  It's for
 8   that reason that when we get to the hearing and the result of
 9   the hearing and the ruling on the objections and the
10   presentence report -- which does not address the forfeiture
11   issue in so many words like this as to where exactly it is --
12   if there is a prior agreement that just requires a
13   court-ordered enforcement of the prior agreement, that's one
14   thing.  If there is no agreement and it is capable of being
15   objected to, then there may have to be a hearing involved.
16        And I can't tell from what I can find in my file -- and
17   I'll admit, I don't have a cart full of stuff, Ms. Jernigan, to
18   know where we stand on this.  And before proceeding to this
19   phase of sentencing, I needed to know a little bit more about
20   that.
21            MS. JERNIGAN:  At the time of the entry of the guilty
22   pleas, both defendants agreed to forfeiture as contained in
23   their Plea Agreements.  There was no specific dollar amount,
24   and what followed was the motion where we delineated our
25   analysis of the numbers.  And so I think the defendants have

 1    agreed to forfeiture.  Mr. Carmouche may dispute the number if

 2    he thinks it should be --

 3         THE COURT:  And, see, that's what I'm really getting

 4    to, is that there's a disputation of the number involved that's

 5    going to require evidence and/or argument, which as I read

 6    sentencing, I think it all has to be tied up in a neat little

 7    bow at one time.  And if that's true, then I will rule on this

 8    part of the sentencing today, hold the record open and not

 9    complete the sentencing until the forfeiture matter is

10    addressed.

11         Now, if we were in a jury trial, we'd have a separate

12    jury trial on forfeiture, potentially.  But we're at this

13    stage, and I am, frankly, unclear about where to go from here

14    on forfeiture.

15         MS. JERNIGAN:  Well, Your Honor, I would point the

16    Court to Government Exhibit H, which has already been admitted

17    in evidence, which lays out the $2.5 million.

18         THE COURT:  That's the summary sheet that we have

19    talked about?

20         MS. JERNIGAN:  Yes, Your Honor.

21         And so I think as relates to any subsequent hearing, we

22    have the evidence before the Court that supports the number

23    contained in the motion.  And so I don't know if Mr. Carmouche

24    anticipates presenting additional --

25         THE COURT:  Mr. Carmouche, under this set of

1   circumstances, given the Court's concerns, are you moving for a

2   hearing on precisely what is meant by the forfeiture and the

3   agreement as to the amount?

4          MR. CARMOUCHE:  I guess I would have to, Your Honor,

5   since we haven't had any discussions with the Government

6   about --

7          THE COURT:  I, frankly, am going to feel more

8   comfortable with that approach given this set of circumstances.

9          I realize fully that restitution is not part of the

10  sentencing, but the forfeiture that's alleged in the indictment

11  that does have preliminary paperwork, I don't know has an

12  agreed-upon value.

13         And the issue about Government Exhibit H introduced in

14  connection with this hearing, it may indeed be the source and

15  final document for that calculation, or it may not be.  And for

16  today's purposes, I've admitted it and have relied on it for

17  use in calculating guidelines.  Whether it is suitable for use

18  in the forfeiture context, I am less certain.

19         And what I will do is move to impose the sentence, but

20  not adjourn and not make it final until we get to the

21  forfeiture aspect of this.  And I think I'm going to prefer

22  some evidence, argument, and at least some preliminary briefing

23  before the hearing to kind of outline those kinds of issues.

24         This is an unusual enough set of circumstances that I

25  haven't seen a corollary to in my years on the bench, and I

1    want to be sure that this is done in correct order and with

2    proper documentation.

3          And there may or may not be an agreement as to an amount,

4    but since there was the objection raised to the 3.5-some-odd

5    million and Government Exhibit H reduces it to 2.656 million

6    leaves room for some concern by the Court over the evidence

7    necessary to arrive at the correct amount of the forfeiture.

8    Therefore, I'm going to probably want to hold a hearing on that

9    issue.

10          MR. CARMOUCHE:  Your Honor, are we talking about --

11   like if there's a money judgment, 2.5, is there the ability to

12   have the Government come in and substitute assets if -- what

13   I'm saying is --

14          THE COURT:  Sort of like a writ of seizure and sale

15   of assets as opposed to a money judgment?

16          MR. CARMOUCHE:  No.  Under the forfeiture rules, many

17   times there are "we can't prove this was bought with bitcoins,

18   but this was owned by them; so we're going to substitute this

19   asset for the forfeiture."

20          THE COURT:  And at this point, I will tell you I

21   don't know.  And that's one of the things I think that might

22   bear fruit if there were discussions held between counsel.  And

23   I will set a hearing date in the not-too-far distant future.

24          Ms. Jernigan, I know y'all are running short on personnel

25   and your calendar is pretty chock-full.  Let me tell you about

1    Lafayette and Monroe on my dockets.  So finding a spot and

2    place to be able to hold a hearing -- which will probably take

3    a couple of hours, I would think, but would be substantially

4    shortened by briefing schedules, just a memorandum to the Court

5    by each side laying this out as to how to approach it and what

6    the Court can expect at the hearing as foreseeable issues in

7    connection with the forfeiture -- would be of great help.

8            Mr. Carmouche, I'll grant your oral motion for a hearing

9    as to the forfeiture.

10           The briefing, what I'd like to do is have you submit a

11   brief -- how long do you need to be able to pull that together,

12   Ms. Jernigan?  I'm going to let you pick your own portion --

13   poison, not portion.  I don't want to give you too much to chew

14   on, but . . .

15           Remember, Jarzabek prosecuted people, too, as well as

16   being chief of the criminal section; so here you are.

17                 MS. JERNIGAN:  Yes, Your Honor.

18                 THE COURT:  You need fourteen days?

19                 MS. JERNIGAN:  Yes.  Fourteen would be good.

20                 THE COURT:  All right.  Fourteen days for the

21   Government's brief.

22           Mr. Carmouche, can you respond within seven days of that?

23                 MR. CARMOUCHE:  Probably.  Yeah, I guess so.  And it

24   may be that we can meet with -- if I could meet with

25   Ms. Jernigan, maybe we could work it out.

 1          THE COURT:  It's possible, too.  But in the meantime,

 2    we're going to work toward the hearing on this.  And that would

 3    put us during the week of June 5, Denise?

 4          Could we set the hearing for the 5th and be able to meet

 5    that schedule that I've just given you on briefing?  I know

 6    that's tight, and I can --

 7          MS. JERNIGAN:  That's fine with the Government, Your

 8    Honor.

 9          THE COURT:  -- actually move it to Friday, on the

10    10th.  But I'm trying to give reasonable opportunity to get the

11    work done that I need beforehand.

12          MS. JERNIGAN:  That's fine, Your Honor.

13          MR. CARMOUCHE:  That's the 5th of June?

14          THE COURT:  Yes.  It's a Monday.  And that's within

15    the 21 days, but I'm hopeful we can shave some of that time off

16    by meeting and getting it done.  So I propose 10:00 a.m. on the

17    5th of June.

18          I could slide it to the morning of the 8th if that works

19    better.

20          MS. JERNIGAN:  (Shakes head.)

21          THE COURT:  No better?

22          MS. JERNIGAN:  No, Your Honor.  The 5th would be

23    better.

24          THE COURT:  Okay.  We'll set it for 10:00 a.m. on the

25    5th.  And if you need to move your briefing and stuff up and

1    work over a weekend in order to get that done, okay.  But it

2    shouldn't be that involved, I don't think.

3         And, yes, I'm fully aware that the 14-day and 7-day

4    response period puts it beyond the 5th, but I'm anticipating

5    there will be some movement between counsel.  And I think the

6    briefing may be easier than 14 full days and completed within

7    that time.  And if necessary, we'll have a status conference in

8    order to adjust the date if it becomes necessary.

9         All right.  Given that set of circumstances, are we then

10   ready to proceed to the sentencing phase of today's hearing?

11              MS. JERNIGAN:  Yes, Your Honor, the Government is.

12              THE COURT:  Mr. Carmouche?

13              MR. CARMOUCHE:  Yes, Your Honor.

14              THE COURT:  I have previously alluded to the fact of

15   the Court's ruling on the motion to withdraw the guilty plea,

16   and I will formally adopt as part of this record the Court's

17   ruling in response to the co-defendants' motion to withdraw the

18   guilty plea entered by both of them.  That's as a preliminary.

19        The Court has entered its oral reasons for ruling in

20   connection with both defendants and the PSR and the appropriate

21   recalculations in this particular matter.

22        The net effect of the Court's ruling as to Randall B.

23   Lord is a recalculated offense level of 24, which translates

24   into a range of 51 to 63 months.  The Court notes that prior to

25   the recalculation, that the total offense level for Randall

1     Lord was 21, with a guideline range of 37 to 46 months.

2          In this particular instance, the Court believes now that

3     the guidelines are properly calculated, and the Court stands by

4     its rulings on removing the point calculations for acceptance

5     of responsibility for Randall B. Lord.

6          The Court adopts the factual findings of the probation

7     office as contained in the presentence report and its addendum.

8          Pursuant to the Sentencing Reform Act of 1984, it is the

9     judgment of this Court that the defendant Randall B. Lord is

10    hereby committed to the custody of the Bureau of Prisons for a

11    term of 46 months as to Count 1.

12         This sentence was selected after consideration of the

13    factors contained in Title 18, U.S. Code, Section 3553(a)

14    pertaining to the defendant's absence of criminal history, his

15    personal characteristics, as well as his involvement in the

16    instant offense as detailed in the Court's oral reasons given

17    in support of the recalculation of the total offense level in

18    this particular matter.

19         The Court notes that the 46-month sentence imposed in

20    this particular instance is an appropriate number of months

21    given all of the facts and circumstances in this case.

22         The Court notes that under the previous calculation, that

23    46 months was at the top end of guidelines and the recalculated

24    amount of 51 to 63 months nonetheless applies under the

25    recalculation.  However, in consideration of the fact that this

1   is a relatively new area of law involving interpretation of

2   money service business regulations as they involve bitcoins,

3   the Court is convinced that under Section 3553(a), that the

4   46-month is the most reasonable sentence possible under the

5   circumstances of this particular case.

6           The Court is mindful that there have been unique, novel,

7   to the point of *res nova* issues raised by the prosecution and

8   defense in the context of this case, and the Court imposes that

9   sentence as a result of consideration of the entirety of the

10  case.

11          Upon release from confinement, the defendant Randall B.

12  Lord is placed on supervised release for a term of one year as

13  to Count 1.

14          Based on the defendant's current financial condition and

15  lack of significant assets, a fine is not ordered.

16          The defendant is ordered to pay $100 to the Crime Victim

17  Fund, payable immediately to the U.S. Clerk of Court.

18          The defendant shall cooperate in the collection of DNA,

19  as directed by the U.S. Probation Office.

20          In this particular matter, we have remaining counts

21  against Randall Lord in the indictment?

22              MS. JERNIGAN:  Your Honor, the Government moves to

23  dismiss the remaining counts.

24              THE COURT:  Pursuant to the Government's motion and

25  in accordance with the Plea Agreement entered of record in this

1    proceeding, all remaining counts in which this defendant is
2    named are hereby dismissed.
3         In this particular instance, the defendant is notified of
4    his right to appeal.  In the event that a notice of appeal is
5    filed under Title 18, U.S. Code, Section 3742 for a review of
6    sentence, the clerk is directed to transmit the presentence
7    report under seal to the Court of Appeals.
8         Should you wish to appeal, Mr. Carmouche, it will be up
9    to you to counsel with your clients about filing an appeal and
10   to timely file the notice of appeal.
11        At this particular point, since you are retained counsel,
12   I don't have information indicating whether there is a
13   capability of continuing you as retained counsel for purposes
14   of the appeal, but I will appoint the Federal Public Defender's
15   Office out of an abundance of caution and require you to
16   coordinate with them in making -- completing the paperwork
17   necessary to evaluate whether they are entitled to be
18   represented by the Federal Public Defender's Office on any such
19   appeal.
20        In the event the decision is made not to appeal,
21   Mr. Carmouche, you will, on your firm letterhead, state the
22   fact of that counseling with your client, Mr. Randall Lord.
23   And if the decision is made not to appeal, it shall recite that
24   fact and be signed and agreed to by Mr. Randall Lord.
25        This matter with respect to Mr. Lord is held open for the

1    final entry of judgment pending resolution of the forfeiture
2    issue that is the subject of a hearing on June 5.  Therefore,
3    it's not quite yet appealable since the whole set of issues
4    with respect to sentencing, which does include forfeiture, I
5    think, in this case, is not yet ready to go.  So I'm holding
6    this hearing open for the forfeiture hearing and the Court's
7    ruling on that before a final judgment will be signed.
8         At this particular point, Mr. Randall Lord is now a
9    convicted federal felon.  The statutory presumption is for him
10   to be taken into custody.  Does the Government move for taking
11   him into custody at this time?
12        MS. JERNIGAN:  No, Your Honor.
13        THE COURT:  All right.  Mr. Randall Lord, you are
14   currently free on bond.  You are allowed to remain free on
15   bond.  I will caution you that you must stay in compliance with
16   those terms and conditions.  Should you violate them, you are
17   subject to being arrested, taken into custody and remain in
18   custody through the time of your designation to a federal
19   Bureau of Prisons facility.
20        I'm going to order that you self-report to the designated
21   Federal Bureau of Prisons facility not later than 2:00 p.m. on
22   Tuesday, July the 11th.  It used to be always on a Monday, but
23   they don't want us to do that anymore; so you get an extra day
24   by virtue of the fact of federal processing.
25        All right.  Is there any reason why this sentence as

 1   stated in this portion of the sentencing hearing should not be

 2   imposed, Ms. Jernigan?

 3          MS. JERNIGAN:  None from the Government, Your Honor.

 4          THE COURT:  Mr. Carmouche, subject to your previous

 5   objections, any other reason to be noted at this time?

 6          MR. CARMOUCHE:  No other reasons, Your Honor, subject

 7   to our appellate rights.

 8          THE COURT:  Noted.

 9      All right.  Let's move to Mr. Michael Lord.

10      The Court notes in this particular instance that the

11   issues with respect to Michael Lord as to the bitcoin business

12   track that of his father, Randall Lord.  And, once again, the

13   Court, for the purposes of Michael Lord's sentencing, will also

14   adopt the ruling of the Court on the motion to withdraw guilty

15   pleas.

16      The Court does adopt the factual findings of the

17   probation office as contained in the presentence report, its

18   addendum, and as altered today by virtue of the Court's rulings

19   on the objections by the defendant and the Government.

20      Pursuant to the Sentencing Reform Act of 1984, the

21   defendant Michael A. Lord is hereby committed to a term of 46

22   months' imprisonment as to Count 1 and 60 months as to

23   Count 15.

24      The Court notes that the Count 1 total shows a

25   recalculated offense level of 30 and a range of 97 to 121

months.  The Court notes that the statutory maximum of 60
months is imposed to Count 15 and orders that the 46-month and
the 60-month amount of imprisonment be run consecutive to each
other.

The Court notes that each count carries a 5-year
statutory maximum.  And in this case, the Court refers to
Section 5G1.2(d), which states that in this set of
circumstances the sentences shall be served consecutively,
which the Court hereby imposes, for a total of 106 months'
imprisonment.

This sentence was selected after consideration of the
factors contained in Title 18 of the U.S. Code, Section 3553(a)
pertaining to the defendant's lack of criminal history, his
personal characteristics, as well as his involvement in the two
instant offenses.

Following imprisonment, this defendant, Michael A. Lord,
shall serve a term of three years' supervised release as to
each count.  However, those will run concurrently.

While on supervised release, this defendant shall not
commit another federal, state, or local crime; shall not
possess a firearm or dangerous weapon; and shall comply with
all standard conditions of supervision adopted by this Court.

I may have failed to include that on Randall Lord's
sentence, and if I did, I'm imposing that as well, since we're
still working with a partial sentencing judgment in this

1    matter.

2         No fine is ordered at this point given the forfeiture

3    that will be involved.

4         This defendant is ordered to cooperate with the probation

5    officer in the collection of a DNA sample.  He is ordered to

6    pay $100 as to each count to the Crime Victim Fund, for a total

7    of $200, payable immediately to the U.S. District Clerk.

8         The requirement of $100 per count, I may have left out of

9    Randall Lord's.  That is imposed at this time by operation of

10   law.

11        Remaining counts to be dismissed at this time?

12        MS. JERNIGAN:  The Government so moves.

13        THE COURT:  Pursuant to the Plea Agreement and the

14   Government's motion at this time, all remaining counts against

15   defendant Michael A. Lord are hereby dismissed.

16        I need to notify you of your right to appeal; and in the

17   event, Mr. Lord, that a notice of appeal is filed under

18   Title 18, U.S. Code, Section 3742 for a review of your

19   sentence, the clerk is directed to transmit your presentence

20   report under seal to the Court of Appeals.

21        Mr. Carmouche, you are appointed to consult with your

22   client and to timely file the notice of appeal.  In the event

23   that your consultation with your client indicates that an

24   appeal should not be taken, you will be required to file the

25   same sort of letter that I detailed in Mr. Randall Lord's case

1    that will require your client's signature indicating that he

2    has decided not to appeal.

3         I will also appoint the Federal Public Defender's Office

4    purely as a precautionary measure.  Mr. Carmouche, it is up to

5    you to coordinate with them and to assist in the completion of

6    paperwork necessary to determine whether Mr. Michael A. Lord

7    qualifies for representation by the Federal Public Defender's

8    Office in this matter.

9         The defendant shall self-report to the designated Federal

10   Bureau of Prisons facility not later than 2:00 p.m. on Tuesday,

11   July 11, 2017.

12        Ms. Jernigan, once again, we have a conviction as a

13   federal felon.  Does the Government move for immediate custody

14   of Mr. Michael A. Lord?

15             MS. JERNIGAN:  No, Your Honor.

16             THE COURT:  Mr. Michael Lord, you are out on bond.

17   Please stay in compliance with the terms and conditions of that

18   bond.  As I explained to your father just a few moments ago,

19   you are subject to being taken into immediate custody, where

20   you will remain until transferred to the Bureau of Prisons

21   designated facility.

22        The Court notes that at this time there is no evidence of

23   any flight risk by either of these defendants, that they have

24   been in compliance with their bond; therefore, the Court agrees

25   with the Government's motion to allow them to remain free on

1    bond.

2         The forfeiture matter to be taken up with respect to both

3    defendants is hereby held open pending a hearing or other

4    resolution of the forfeiture issue, with the hearing set for

5    10:00 a.m. on June 5 of this year.

6         Is there any further business to come before the Court

7    this afternoon?

8         And I will state the appellate delays do not begin to run

9    today, but only after the forfeiture matter has been dealt with

10   and a final judgment combining the imprisonment plus the

11   forfeiture and in accordance with law.

12        MS. JERNIGAN:  Nothing further from the Government,

13   Your Honor.

14        THE COURT:  Mr. Carmouche?

15        MR. CARMOUCHE:  No.

16        THE COURT:  Thank you.  This has been a very

17   interesting matter, very tedious but very important.  Thank you

18   for the work done by all counsel in this.  It has been of great

19   assistance to the Court.

20        With nothing further to come before the Court this

21   afternoon, we are adjourned.  All evidence shall be filed in

22   the record and available for transmittal to the Court of

23   Appeal.

24        (Proceedings concluded at 5:09 p.m.)

25

1                        I N D E X

2
PROCEEDINGS                                    Page
3
        Witnesses called by the Government (Cont'd):
4
            Al Hasnat Laghari:
5                 Direct Examination...................94
                  Examination by the Court............138
6                 Cross-Examination...................144
                  Redirect Examination................158
7
            Allocution...................................183
8       Oral Motion for Forfeiture Hearing...........213
        Judgement as to  Defendant Randall B. Lord....218
9       Judgment as to Defendant Michael A. Lord......222

10

11  EXHIBITS                      *Identified*   *Admitted*

12      Government Exhibit No. A...............   101        101
        Government Exhibit No. B...............   102        102
13      Government Exhibit No. C...............   102        102
        Government Exhibit No. D...............   109        109
14      Government Exhibit No. E...............   124        134
        Government Exhibit No. F...............   128        134
15      Government Exhibit No. G...............   129        134
        Government Exhibit No. J...............   131        132
16      Government Exhibit No. M...............   109        109
        Government Exhibit No. O...............   133        160
17

18

19                        Certificate

20  I hereby certify this 20th day of September, 2017, that the
    foregoing is, to the best of my ability and understanding, a
21  true and correct transcript from the record of proceedings in
    the above-entitled matter.
22

23                        /s/ Marie M. Runyon
                          Official Court Reporter
24

25